UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| WANDA BRANDON, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 4:22-CV-00635 SRC |
| v. | ) | |
| | ) | |
| BOARD OF EDUCATION OF THE CITY | ) | |
| OF ST. LOUIS, ET AL. | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' S MEMORANDUM IN SUPPORT OF THEIR
MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

COME NOW Defendants Board of Education of the City of St. Louis ("SLPS" or "Board"),

Kelvin R. Adams, and Charles K. Burton (collectively "Defendants"), by and through their

undersigned counsel, and in support of their Motion to Dismiss ("Motion") state:

**BACKGROUND**

On August 25, 2021, in response to the COVID-19 global pandemic that has claimed the lives

of more than a million Americans, SLPS announced its "COVID-19 Employee Vaccination Policy"

("Vaccine Policy" or "Policy"). The Vaccine Policy required **all** SLPS staff, employees, volunteers,

and vendors (collectively, "Staff") who provided regular service to students to be vaccinated by

October 15, 2021, regardless of their religion or other class or characteristic. (Doc. 1-1) Notably, it did

not single out any particular Staff members or groups of Staff members. The Vaccine Policy

specifically permitted Staff members to apply for an exemption from the vaccine requirement if 1)

they have a disability that requires such and accommodation; 2) their sincerely held religious beliefs,

observances, or practices conflict with receiving any FDA-approved COVID-19 vaccines; or 3) they

have a medical condition that may be exacerbated or contraindicated by the COVID-19 vaccine.

Plaintiffs filed the instant lawsuit on June 14, 2022, alleging the Vaccine Policy which applies

to **all** staff—regardless of religion—is unlawful. *See* Complaint. Plaintiff's claims arise out of the

District's denial, for a period of time, of their requests for religious exemptions from the COVID-19

vaccination policy.  Specifically, Plaintiffs allege the Vaccine Policy violated: 1) their First Amendment

right to the free exercise of religion (Count I); 2) their Fourteenth Amendment rights to privacy,

personal autonomy, and personal identity (Count II); 3) the Missouri Human Rights Act ("MHRA")

(Count III); and 4) Title VII of the Civil Rights Act of 1964 ("Title VII") (Count IV)[1]. *Id.* Although

Plaintiffs purport to assert the aforementioned causes of action, a review of Plaintiffs' Complaint

reveals that it fails to state a claim under any count; and, therefore, the Complaint should be dismissed

in its entirety.

## STANDARD OF REVIEW

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), the claim "must

contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A claim is facially plausible—rather than sheerly possible

—when the plaintiff pleads factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged."  *Brown v. Green Tree Servicing LLC*, 820 F.3d 371,

372 (8th Cir. 2016).  This obligation requires a party to plead "more than labels and conclusions, and

a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*,

550 U.S. 544, 555 (2007).  To survive a motion to dismiss, a plaintiff's factual allegations "must be

enough to raise a right to relief above the speculative level." *Id.* at 555. Although the Court must accept

the plaintiff's factual allegations as true, the Court does not accept as true legal conclusions that have

been couched as factual allegations. *Brown*, 820 F.3d at 372-73.

I.     **COUNTS I AND II FAIL TO STATE A CLAIM BECAUSE THE VACCINE POLICY IS RATIONALLY CONNECTED TO THE DISTRICTS' LEGITIMATE INTEREST IN PROTECTING THE HEALTH, SAFETY, AND EDUCATIONAL RIGHTS OF ITS STUDENTS.**

---

[1] The Complaint mislabels Plaintiffs' fourth cause of action "Count IX," but for purposes of this Motion, it will be referred to as Count IV.

A.     **DEFERENTIAL REVIEW APPLIES BECAUSE THE VACCINE POLICY IS FACIALLY NEUTRAL AND PLAINTIFFS DO NOT HAVE A FUNDAMENTAL RIGHT TO WORK FOR THE EMPLOYER OF THEIR CHOOSING.**

1.     **A Deferential Standard of Review Applies to State Action During a Public Health Crisis, and to State Action Concerning Education.**

For more than one hundred (100) years, federal courts have applied the deferential review used by the Supreme Court in *Jacobson v. Commonwealth of Massachusetts* when determining the constitutionality of state action during public health crises. 197 U.S. 11 (1905); *see, e.g., In re: Rutledge*, 956 F.3d 1018, 1027 (8th Cir. 2020) (abuse of discretion for district court to fail to "meaningfully apply the [*Jacobson*] framework for reviewing constitutional challenges to state actions taken in response to a public health crisis."); *Klassen v. Trustees of Indiana University*, 7 F.4th 592, 593 (7th Cir. 2021) (applying rational-basis standard to uphold public employer's COVID-19 vaccination policy); *Clark v. Jackson*, 2022 WL 1751420 *3–4 (E.D. Tenn. 2022) (granting motion to dismiss employee's constitutional claims regarding COVID-19 vaccination policy); *Rodriguez-Vélez v. Pierluisi-Urrutia*, 2021 WL 5072017 *7 (D. Puerto Rico 2021) (applying *Jacobson* framework to dismiss constitutional case against COVID-19 vaccination policy); *see also Heights Apartments, LLC v. Walz*, 30 F.4th 720, 727 (8th Cir. 2022) (*Jacobsen* deference applicable during public health crisis). Contrary to more than a hundred years of precedent and the growing body of judicial opinions regarding COVID-19 vaccination policies, Plaintiffs inexplicably assert the strict scrutiny standard of review to Counts I and II, and without any legal authority, suggest the Court must do the same. Complaint at ¶¶125-129, 138. (Doc. 1 at 20-22.) Plaintiffs are incorrect and their error is fatal to their purported causes of action in Counts I and II.

During a public health crisis, a state action is "susceptible to constitutional challenge only if it, 'purporting to have been enacted to protect the public health, public morals, or the public safety, has *no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law.*'" *In re: Rutledge*, 956 F.3d at 1027–1028 (quoting *Jacobson*, 197 U.S. at 31) (emphasis added). Further, the Supreme Court has long respected and deferred

to the states' authority to make laws and regulations concerning education: "The very complexity of the problems of . . . managing a…public school system suggests that 'there will be more than one constitutionally permissible method of solving them,' and that, **within the limits of rationality**, 'the legislature's efforts to tackle the problems' should be entitled to respect." *San Antonio Independent School Dist. v. Rodriguez* , 411 U.S. 1, 42 (1973) (emphasis added) (quoting *Jefferson v. Hackney*, 406 U.S. 535, 546–547 (1972)); *see also Open Our Oregon v. Brown*, 2020 WL 2371915.

COVID-19 unquestionably presented a public health crisis. With its highly contagious properties and potentially fatal or disabling consequences, governments, businesses, employers, and families have been forced to make decisions as to how to best protect those whose health and well-being they are charged with safeguarding. *See Biden v. Missouri*, 142 S.Ct. 647, 652 (2022) ("COVID-19 is a highly contagious, dangerous, and . . .deadly disease.") The District, to which the state of Missouri has delegated authority to implement rules governing its operations and the education of its students under § 171.011 R.S.Mo., made the informed decision that requiring its Staff be vaccinated—**subject to certain exemptions**—was the most effective way to safeguard the educational rights of its students and guard against the virus running rampant in the schools and infecting students and Staff.

Pursuant to longstanding precedent concerning both public health crises and states' rights concerning education, the Vaccine Policy is subject to a deferential standard of review.

2. **Strict Scrutiny Does Not Apply Because the Vaccine Policy Is Facially Neutral and Generally Applicable, and Plaintiffs Do Not Have a Fundamental Right to Work for the District, or to Privacy and Bodily Autonomy When the Lives of Others are at Stake.**

Even if there were no public health crisis and the Vaccine Policy did not involve education—circumstances that are both present and both of which trigger deferential review—strict scrutiny still would not apply. Strict scrutiny applies only when a state action 1) operates to the disadvantage of a suspect class, or 2) it impinges on a fundamental right explicitly or implicitly protected by the

Constitution. *Rodriguez*, 411 U.S. at 15; *see also Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 312 (1976). Neither of those elements is present in the Vaccine Policy.

a)      <u>The Vaccine Policy Is Neutral and Generally Applicable.</u>

The Supreme Court has long followed the standard set forth by Justice Scalia in *Employment Div., Dept. of Human Resources of Ord. v. Smith* to determine the standard of review applicable to a facially neutral law that burdens religious practice. 494 U.S. 872 (1990); *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993); *Fulton v. City of Philadelphia, Pennsylvania*, 141 S.Ct. 1868, 1876 (2021). ". . . [L]aws [that] incidentally burden[] religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton*, 141 S.Ct. at 1876 (citing *Smith*, 494 U.S. at 878–882).

The Vaccine Policy explicitly states it "applies to all employees and staff . . .," and it does, indeed, apply to all Staff. (Doc. 1-1 at 1). That being said, the District "provides reasonable accommodations, absent undue hardship," to employees who have disabilities, religious beliefs, or medical conditions that conflict with receiving a vaccine. (*Id.* at 1-2). In some cases, a reasonable accommodation may be an exemption from the requirement to be vaccinated (hence, the Policy's reference to "exemptions"); however, such an exemption may not be reasonable or may cause an undue burden in certain circumstances. Nothing in the Policy provided that all exemption requests would be granted, or even that exemption requests based on potentially fatal or disabling contraindications of the vaccine on an individual's existing medical condition would be subject to the same level of deference as those based on an individual's religious beliefs.

Nothing in the law requires that religious exemption requests from a vaccine requirement be treated on the same level as medical exemption requests. To the contrary—the law is clear that it is perfectly legitimate and lawful for the state (and/or employers) to grant medical exemption requests while denying requests for exemptions based on religious beliefs. In fact, a policy that provides for

medical exemptions to a vaccine requirement, but does not allow for religious exemptions, passes Constitutional muster so long as the law is generally applicable. *We the Patriots, USA v. Hochul*, 17 F.4th 266 (2021) (upholding COVID-19 vaccination requirement without religious exemption).

In *We The Patriots, USA, Inc. v. Hochul*, the Second Circuit was faced with essentially the same legal challenges Plaintiffs raise in their Complaint. In rejecting the need for strict scrutiny review, the *Hochul* Court held that a New York law that required certain healthcare workers to be vaccinated and allowed for medical exemptions—but not religious exemptions—was neutral and generally applicable. *Id.* at 284–290. In so holding, the Court stressed that the law at issue applies to all employees "who could safely receive the vaccine," regardless of "whether an employee is eager to be vaccinated or strongly opposed, and it applies whether an employee's opposition or reluctance is due to philosophical or political objections to vaccine requirements, concerns about the vaccine's efficacy or potential side effects, or religious beliefs" *Id.* at 282. Further, they reasoned that the state's justification for medical exemptions was related to the purpose of the law, which was to protect the health of its personnel and to ensure healthcare facilities had appropriate staffing. *Id.* 285. "Vaccinating a[n] . . . employee who is known or expected to be injured by the vaccine would harm her health and make it less likely she could work." *Id.* at 285. In other words, the law was neutral and generally applicable for purposes of deferential review despite that it allowed for medical exemptions and not religious exemptions.

The same reasoning applies to the instant case. The District's vaccination policy is neutral and generally appliable because it applied to all District staff, even though medical exemption requests and religious exemption requests were not granted at the same time or rate. The District's goals of ensuring its students receive an education and protecting their health (as well as the health of its Staff) would not be accomplished by requiring that employees with certain medical conditions, who could be harmed by the vaccine, nonetheless receive the vaccine. Indeed, such a requirement would be contrary

to the District's goals in that it would be a detriment to the Staff member's health and likely would require them to miss work, which results in the inability to provide students with an education.

All Staff members are allowed to request an accommodation under the terms of the Vaccine Policy; however, nothing in the Policy guarantees them their preferred accommodation of allowing them to come to school unvaccinated. The Policy is neutral and generally applicable; thus, it does not trigger strict scrutiny.

b)      <u>Plaintiffs are Not Members of a Suspect Class.</u>

For purposes of applying strict scrutiny, a suspect class is "one 'saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *Murgia*, 427 U.S. at 312. Plaintiffs have not alleged they share a history of purposeful unequal treatment, or are relegated to a position of political powerlessness so as to warrant "the extraordinary protection from the majoritarian political process" (and would be hard pressed to do so). Plaintiffs do not (and cannot) allege they are of one religion that has been treated unfairly—they simply claim that their varying religious beliefs should exempt them from the generally applicability of the Policy. Again, the Vaccine Policy does not target employees who subscribe to any particular religion or express any particular religious tenets, and does not disproportionately affect them. Rather, as explained above, it does not require more of them than it does any other Staff member who objects to receiving the vaccine for personal, policitical, ideological or other reasons. Indeed—the policy provides Plaintiffs with *more* rights than other Staff members because it has religious exemptions (which eventually were granted) and not for an exemption based on any other philosophical or political reason.

Plaintiffs do not and cannot allege that the Policy targeted them or disproportionately affected them because of their religious beliefs; therefore, they are not a suspect class for purposes of strict scrutiny.

3.      <u>Plaintiffs Do Not Have a Fundamental Right to Work for the District.</u>

While Plaintiffs couch their allegations in terms of being denied their fundamental rights to Free Exercise, privacy, personal autonomy, and personal identity, nothing in the Policy prevents them from exercising their religious beliefs or making personal choices about their bodies. The District is not forcing a vaccination on them, and they are not subject to criminal sanctions if they refuse to be vaccinated. Rather, the Policy simply sets forth a condition of employment. The right to governmental employment is not fundamental; therefore, "a standard less than strict scrutiny" applies to state action "restricting the availability of employment opportunities." *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 313 (1976) (applying rational basis review to uphold Massachusetts law mandating retirement of police at age fifty (50));   "The Due Process Clause secures the liberty to pursue a calling or occupation, and not the right to a specific job." *Maniscalco v. New York City Dept. of Educ.*, 563 F.Supp.3d 33, 38 (E.D.N.Y. 2021) (upholding COVID-19 vaccine requirement applicable to public school district employees). "[A]ny property right to employment . . . does not rise to the level of a fundamental right protected by substantive due process." *Id.* at 39; *see also Marin v. Town of Brattleboro*, 2008 WL 4416283, at *2 (D.Vt. 2008).

Nothing in the Vaccine Policy prevents Plaintiffs from practicing their occupation or obtaining employment from other school districts or employers who do not have a vaccine requirement. Indeed, Plaintiffs readily acknowledge that other public school districts in Missouri allow employees to "opt out" of receiving COVID-19 vaccinations (Doc. 1 ¶ 68). The fact that their refusal to be vaccinated could disqualify them from employment with the District or subject them to unpaid administrative leave with this particular employer, the District, does not implicate a fundamental right entitled to substantive due process protection. As such, the potential for disqualification of employment with the District does not implicate strict scrutiny.

4.    Plaintiffs Do Not Have a Fundamental Right to Privacy, Personal Autonomy
      or Personal Identity When Another Person's Life is at Stake.

Even if this were a matter of privacy, personal autonomy, and/or personal identity (as opposed to a claimed right to employment with the District), Plaintiffs do not have a fundamental right to refuse to be vaccinated when doing so could put the District's students or their colleagues' at risk.

In *Dobbs v. Jackson Women's Health Organization*, the Supreme Court examined what constitutes a fundamental right in terms of making decisions concerning your body. 142 S.Ct. 2228 (2022). The Court held that if a right is not explicitly provided for in the Constitution, it deserved protection under the Fourteenth Amendment only if it is "deeply rooted in this Nation's history and tradition," and implicit in the concept of liberty." *Id.* at 2242 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997). In doing so, the Court overruled and rejected previous holdings that the right to have an abortion was protected by the right to privacy and the right "to make 'intimate and personal choices' that are 'central to personal dignity and autonomy.'" *Id.* at 2256 (citing *Roe v. Wade*, 410 U.S. 113, 154 (1973) and quoting *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 851 (1992)). In short, as the Federal Constitution does not explicitly discuss vaccinations, Plaintiffs' conclusory allegations in Count II regarding "their fundamental constitutional right to privacy, personal autonomy, and personal identity" and "their fundamental right to bodily integrity" are insufficient to state a claim unless Plaintiffs can show that the freedom to make choices regarding vaccination are deeply rooted in the nation's history. Plaintiffs have not made these allegations in their Complaint.

Further, the right to refuse vaccination is not "deeply rooted in this Nation's history and tradition." *See Id.* at 2242. In fact, the opposite is true—vaccine requirements themselves are deeply rooted in our history and have been held Constitutional for more than a century. *See Jacobson*, 25 S.Ct. 11; *Biden v. Missouri*, 142 S.Ct. 647, 653 (2022); *Hochul*, 17 F.4th at 293 ("Both this Court and the Supreme Court have consistently recognized that the Constitution embodies no fundamental right that in and of itself would render vaccine requirements imposed in the public interest, in the face of a

public health emergency, unconstitutional") Earlier this year, the Supreme Court explicitly recognized the deep history of vaccination requirements for healthcare workers when it upheld a federal mandate requiring staff working at healthcare facilities participating in Medicaid and Medicare to be vaccinated against COVID-19. *Biden*, 142 S.Ct. at 653. In upholding the mandate, the Court stressed that vaccine mandates are a "common feature" in the provision of healthcare in our country, and healthcare workers "ordinarily are required to be vaccinated against diseases such as hepatitis B, influenza, and measles, mumps, and rubella." *Id.* Just as there is a history and tradition of requiring vaccinations for healthcare worker, so is the case with teachers, educational staff, and even students. *See, e.g.*, *State ex rel. O'Bannon v. Cole*, 119 S.W. 424, 426 (Mo. 1909) (upholding public school regulation excluding unvaccinated students during smallpox epidemic); R.S.Mo. § 167.181 (compulsory immunizations against eight diseases for public, private, and parochial students in Missouri).

Strict scrutiny does not apply because Plaintiffs do not have a fundamental right to privacy, personal autonomy, or personal identity when others' lives are at stake, which unquestionably is the case during a deadly pandemic.

**B.    THE VACCINE POLICY HAS A REAL AND SUBSTANTIAL RELATION TO THE DISTRICT'S INTEREST IN PROTECTING THE HEALTH, SAFETY, AND EDUCATION OF ITS STUDENTS, AND THE HEALTH AND SAFETY OF ITS STAFF.**

"[W]hen faced with a public health crisis, a state may implement measures that infringe on constitutional rights . . . " and "liberty secured by the Constitution . . . does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint." *In re: Rutledge*, 956 F.3d at 1027 (quoting *Jacobson*, 197 U.S. at 26). "The right to practice religion freely does not include the liberty to expose the community or [a] child to communicable disease or the latter to ill health or death." *Prince v. Commonwealth of Massachusetts*, 321 U.S. 158, 166–167 (1944).

Under the authority granted to it by the state legislature, the District used its familiarity with local problems and expertise in educational policy—to which the Courts defer—to determine the best

course of action when faced with a deadly pandemic. *See Rodriguez*, 411 U.S. at 41–42; R.S.Mo. §§162.621, 171.011. After analyzing available data concerning local infection rates and vaccine availability, consulting with health experts, and balancing all of the factors at play, the District determined that the Vaccine Policy was necessary to keep its Staff and students safe, and. *See* Doc. 1-1 at 1 ("This policy is based on guidance provided by the Center for Disease Control and Prevention (CDC), the Occupational Safety and Health Administration (OSHA), and the City of St. Louis Public Health Department"); Doc. 1-2 ("According to information and advice from our healthcare partners, mandating a COVID-19 vaccine is the best way to protect our students, staff, and families….Quarantined staff members last year represented the greatest obstacle to in-person learning.") The District's policy decisions were rationally related and narrowly tailored to the important state interest of providing the free and public education guaranteed under the Missouri Constitution to the community's students. *See* Mo. Const. Art. IX §1(a).

Under the deferential framework established in *Jacobson* and recognized for more than a hundred years later by the Eighth Circuit in *Rutledge*, Plaintiffs cannot state a claim that the Vaccine Policy violates their Constitutional rights. The Vaccine Policy most certainly has a real and substantial relation to the District's goal of protecting the health of its Staff and students. At the time the Policy was implemented, in August 2021, COVID-19 vaccines were not even available to children under the age of twelve (12), and the Delta variant was proving to be especially transmissible. (*See* Doc. 1-4). As such, many of the District's students were particularly vulnerable to the virus and Delta had the potential of disabling a significant portion of the Staff. Ensuring vaccination of Staff members who were able to safely be vaccinated was determined to be the most effective way keep the virus at bay inside the school and protect the health and safety of those in the District's care. (Doc. 1-2.)

Furthermore, the Policy most certainly is rationally related to its goal of providing students with an education. If COVID-19 were to render a significant portion of the Staff unable to work,

students would be deprived of an education. At the time the Policy was implemented, the CDC recommended that unvaccinated individuals quarantine for up to fourteen (14) days in cases of infection or being identified as a close contact (Doc. 1-3, Burton Dep., 21:4-23:20) (14-day quarantines resulting in hundreds of students and staff out of school per week).[2] The CDC did not recommend quarantines for asymptomatic but vaccinated individuals who identified as close contacts. (Doc. 1-1 at 2.) The District's ability to operate and fulfill its state-mandated mission to educate students would be substantially impaired if a significant portion of its Staff were unable to teach or otherwise work for up to two (2) weeks each time they were exposed to the virus.

For all of the stated reasons, Counts I and II of Plaintiffs' Complaint fail to state a claim that the Vaccine Policy violated their Constitutional rights. These purported claims fail as a matter of law based upon the lengthy history of jurisprudence concerning vaccine requirements, the Free Exercise Clause, and the established confines of substantive due process rights Counts I and II should be dismissed with prejudice.

## II.    COUNTS III AND IV FAIL TO STATE A CLAIM BECAUSE ALLOWING PLANTIFFS TO WORK UNVACCINATED PRIOR TO JANUARY 2022 WOULD HAVE RESULTED IN AN UNDUE HARDSHIP TO THE DISTRICT.

"To establish a prima facie case of religious discrimination under Title VII, a plaintiff must show she 1) has a bona fide religious belief that conflicts with an employment requirement; 2) informed the employer of such conflict, and 3) suffered an adverse employment action." *Burrow-Threlkeld v. U.S. Vision*, 2019 WL 7343443, * 4 (2019) (citing *Ollis v. HearthStone Homes, Inc.*, 495 F.3d

---

[2] When deciding a 12(b)(6) motion to dismiss, a court may consider the Complaint, along with "other materials that are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice." *Clark*, 2022 WL 1751420, *2 (*citing Hancock v. Miller*, 852 F. App'x 914, 919 (6th Cir. 2021). In *Clark*, the district court considered federal guidelines and attachments to the complaint when it upheld a COVID-19 policy without converting the motion to dismiss to a motion for summary judgment. Here, it is appropriate to consider the attachments to the Complaint, including the Burton deposition, and public records regarding the COVID-19 pandemic that informed the District's policy decisions.

570, 575 (8th Cir. 2007).[3] "Once a plaintiff establishes a prima facie case, the burden shifts to the

employer to show that the accommodation [of the plaintiff's religious belief] would result in an undue

hardship to the employer." *Seaworth v. Pearson*, 203 F.3d 1056, 1057 (8th Cir. 2000).

In granting a religious accommodation, an employer is not obligated to grant an employee's

preferred accommodation . . . ." *Sturgill v. United Parcel Service, Inc.*, 512 F.3d 1024, 1031 (8th Cir. 2008)

(citing *Ansonia Board of Education v. Philbrook*, 479 U.S. 60 (1986)). If an accommodation would result

in an undue hardship to the employer, the employer is not obligated to accommodate an employee's

religion. *Id.* Assuming, *arguendo*, that Plaintiffs have pled a prima facie case of religious discrimination

(which Defendants deny), their claims of religious discrimination nonetheless fail because granting

their requests would risk the District students' and staff members' health and safety, and would have

subjected the District to staffing shortages and student absences that would result in substantial

impairment of the students' educational rights provided for in the Missouri Constitution.

Again, the Vaccine Policy requires **all** District employees be vaccinated, but allows employees

to submit **requests** for exemptions for medical or religious reasons. 9(Doc. 1-1) The Policy is not

directed toward employees with religious beliefs, nor does it discriminate against employees with

religious beliefs. Plaintiffs' allegations that the fact that the District granted medical exemptions but

not religious exemptions is wholly insufficient to state a claim of religious discrimination under the

MHRA or Title VII.

The fact that the District granted medical and disability accommodations before it granted

religious accommodations is consistent with the law, as the Americans with Disabilities Act ("ADA")

requires a much more stringent showing of undue hardship than Title VII's protections for religious

---

[3] In deciding cases under the MHRA, Missouri courts are guided by both Missouri law and federal employment discrimination case law that is consistent with Missouri Law. *Li Lin v. Ellis*, 594 S.W.3d 238, 242 (Mo. 2020). Amendments to the MHRA in 2017 brought Missouri employment discrimination standards more in line with federal law; as such, federal employment discrimination case law should serve as a guide to this Court in deciding both Plaintiffs' MHRA claim and their Title VII claim.

beliefs. For an employer to establish that a religious accommodation would create an undue hardship under Title VII, it simply must show the accommodation would result in "more than a *de minimis* cost" to the employer. *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977). However, an employer must prove an accommodation would require "***significant*** difficulty or expense" to be considered an undue hardship under the ADA. 42 U.S.C.A. §12111(A) (emphasis added)*; see also EEOC Compliance Manual on Religious Discrimination*, §12-IV (Title VII showing of "more than *de minimis*" cost or burden is lower than the standard for undue hardship under the ADA). To claim that the District discriminated against Plaintiffs because the District complied with the obligations its legal obligations to accommodate those with is simply absurd. Further, the affect an accommodation would have on the health of others and the safety of the workplace is a significant factor in determining whether it would pose an undue hardship. *See, e.g., Draper v. United States Pipe and Foundry Company*, 527 F.2d 515, 521 (6th Cir. 1975) (Title VII does not require that safety be subordinated to the religious beliefs of an employee."); *Beadle v. City of Tampa*, 42 F.3d 633, 637 (11th Cir. 1995) (When the employer's business involves the protection of lives, "courts should go slow in restructuring its employment practices.") (quoting *U.S. v. City of Albuquerque*, 545 F.2d 110, 114 (10th Cir. 1976)); *Together Employees v. Mass General Brigham Inc.*, 573 F.Supp. 3d 412, 435 (D.Mass. 2021) (considerations for undue hardship include indirect costs such as to health and safety); *EEOC: What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*, §L (2021) ("EEOC COVID-19 Guidance")).

"A religious accommodation that creates a genuine safety or security risk can undoubtedly constitute an undue hardship . . . ." *EEOC v. GEO Grp., Inc.*, 616 F.3d 265, 273 (3d Cir. 2010)*. See also EEOC v. Kelly Services, Inc.* 598 F.3d 1022, *Does 1–6 v. Mills*, 16 F.4th 20, 36 (1st Cir. 2021) (hospitals need not provide [a COVID-19 vaccine] exemption . . . because doing so would cause them to suffer undue hardship); EEOC Religious Discrimination Guidance at §12-IV(B)(2) ("[C]ourts have found undue hardship where the accommodation diminishes efficiency in other jobs, infringes on other

employees' job rights or benefits, impairs workplace safety, or causes coworkers to carry the accommodated employee's share of potentially hazardous or burdensome work.") (citations omitted).

Case law, anti-discrimination statutes, and administrative guidance support the District's lawful denial of Plaintiffs' religious exemption requests in the Fall of 2021, when children under the age of 12 could not be vaccinated and the CDC still recommended prolonged quarantines for unvaccinated individuals. (Doc. 1-1 at 2.)  Indeed, Plaintiffs do not plead a single allegation to establish that granting them exemptions would not have created an undue hardship for the District, other than a blanket legal conclusion that "[g]ranting the exemption to Plaintiffs would be at most a de minimis cost to the Defendants." (Doc. 1 ¶ 63) Further, immediately after the CDC revised its guidance to recommend shorter quarantine periods and after vaccines were approved for children aged 5-11, the District granted Plaintiffs' requests and allowed them to return to work unvaccinated. (*Id.* ¶ 101) While Plaintiffs attempt to couch this decision as the District "chang[ing] its mind," the decision (again) was made pursuant sound reasoning and in accordance with anti-discrimination laws. by January 2022, based on changed circumstances, the District determined that granting Plaintiff's requests for religious exemptions would no longer present an undue burden because of the availability for vaccinations for children under 12 rendered these students less vulnerable, and the risk of the District not having sufficient staff to provide students with an education was dramatically reduced because lengthy quarantines were no longer required. (Doc. 1-7)

In sum, Plaintiffs' MHRA (Count III) and Title VII (Count IV) religious discrimination claims fail on their face and cannot be remedied with amended pleadings. As such, Defendants ask this Court to dismiss Counts III and IV of Plaintiffs' Complaint with prejudice.

Respectfully submitted,

**MICKES O'TOOLE, LLC**

By:   */s/ Melanie A. Renken*
      Vincent D. Reese, # 49576
      vreese@mickesotoole.com
      Melanie A. Renken, #59973
      mrenken@mickesotoole.com
      Jasmine Y. McCormick, #66386
      jmccormick@mickesotoole.com
      12444 Powerscourt Drive, Suite 400
      St. Louis, Missouri 63131
      Telephone:  (314) 878-5600
      Facsimile:  (314) 878-5607

      *Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 8th day of August, 2022, a true and correct copy of the foregoing was filed with the Court's electronic filing system and thereby served via electronic mail to all counsel of record:

KASPER LAW FIRM, LLC
Kevin J. Kasper
Ryan P. Schellert
3930 Old Hwy 94 South - Suite 108
St. Charles, MO 63304
Ph: 636-922-7100
Fax: 866-303-2874
KevinKasper@KasperLawFirm.net
RyanSchellert@KasperLawFirm.net

*Attorneys for Plaintiff*

      */s/ Melanie A. Renken*