**BEFORE THE BOARD OF EDUCATION
FOR ST. LOUIS PUBLIC SCHOOLS
STATE OF MISSOURI**

| | |
|---|---|
| **In the Matter of:** | ) |
| | ) |
| **Tammy O'Connor,** | ) |

## EMPLOYEE TAMMY O'CONNOR'S POST HEARING BRIEF

The district is allegedly seeking to terminate Ms. O'Connor because it claims she has violated board policies requiring her to receive a COVID-19 vaccination and that she has somehow engaged in conduct that disrupts the education process. The Board must reject the arguments of the district because Ms. O'Connor did not engage in the conduct alleged by the district, because the district has failed to act in good faith in the implementation of its policies, because there is no compelling interest that supersedes Ms. O'Connor's right to free exercise of religion and because the district has unlawfully violated the rights of Ms. O'Connor by refusing to grant an exemption for Ms. O'Connor's sincerely held religious belief.

### I. The district has engaged in unlawful discrimination

SLPS engaged in unlawful discrimination by refusing to grant her an exemption for Tammy O'Connor's sincerely held religious belief as required by the Title VII and the Missouri Human Rights Act.

An employer's obligation to reasonably accommodate the religious beliefs of its employees is derived from a 1972 amendment to Title VII, which added the following definition of religion:

1

Exhibit 6

The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business. 42 U.S.C. § 2000e(j), *Wangsness v. Watertown School Dist. No. 14-4, Etc.*, 541 F. Supp. 332, 335 (Dist.Ct.S.D. 1982). "[t]he intent and effect of this definition was to make it an unlawful employment practice under [§ 2000e-2(a)(1)] for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees." Id. citing *Transworld Airlines, Inc. v. Hardison*, 432 U.S. 63, 74, 97 S.Ct. 2264, 2271-2272, 53 L.Ed.2d 113 (1977).

### A. Tammy O'Connor has a prima facie case for discrimination

In order to establish a prima facie case of religious discrimination under §§ 2000e-2(a)(1) & (j), a plaintiff must plead and prove that (1) he has a bona fide belief that compliance with an employment requirement is contrary to his religious faith; (2) he informed his employer about the conflict; and (3) he was discharged because of his refusal to comply with the employment requirement. *Brown v. General Motors Corp.,* 601 F.2d 956, 960 (8th Cir. 1979).

There is no question Ms. O'Connor has established a prima facie case for discrimination. The district is bringing charges against Ms. O'Connor because it alleges she violated its policy by refusing to get a COVID-19 vaccination. Ms. O'Connor sought an accommodation from the district vaccination policy which was offered by the district under its policy 4642. TR 44:16-18, 45:2-4, 66:6-20, Ex. 12. Her request for accommodation clearly set forth her sincerely held religious belief and explained how she sincerely believes that receiving the vaccine required by policy 4642 conflicts with her religious beliefs:

2

> ____After searching my soul and praying, it is my sincere religious belief that life begins at conception and ends with natural death. Based on my sincerely held religious belief, I cannot receive the COVID-19 vaccine because all of the currently available COVID-19 vaccines used cell lines originating from aborted babies in their manufacturing or testing.

> ____It is my sincerely held religious belief that abortion is murder and violation of the Ten Commandments – "You shall not kill." (Exodus 20:13), and, for that reason, it would be violating my sincerely held religious belief to cooperate with or be complicit in abortion in any way.

> ____Fetal stem cell lines have been used in the development of the Johnson & Johnson COVID-19 vaccine, and fetal stem cell lines have been used in the testing of the Moderna and Pfizer COVID-19 vaccines. (James Lawler, MD, You asked, we answered: Do COVID-19 vaccines contain aborted fetal cells?, Nebraska Medicine, August 4, 2021, https://www.nebraskamed.com/COVID/you-asked-we-answered-do-the-covid-19-vaccines-contain-aborted-fetal-cells.)

> ____According to *Psalm 139:13* "For thou didst form my inward parts, thou didst knit me together in my mother's womb." and *Jeremiah 1:5* "Before I formed you in the womb I knew you, and before you were born I consecrated you; I appoint you a prophet to the nations." Both verses reinforce my belief in life beginning at conception.

Ex. 12 – O'Connor's Request for Religious Exemption

     Tammy O'Connor testified she sought a religious exemption because she was a devout Catholic who believes that taking the vaccines would make her complicit in murder in contrast to her beliefs because the vaccines were tested, manufactured and developed using fetal cells from aborted babies. TR 66:21-69:13.   The sincerity of her religious belief was not contested by the district and the district did not take into account whether or not Ms. O'Connor's religious belief was sincere.  TR 45:14-18

3

Having established a prima facie case, the burden shifted to the defendant school district to show that it made a good faith effort to accommodate the religious beliefs of the employee, and if those efforts were unsuccessful, to demonstrate that it was unable to reasonably accommodate her beliefs without undue hardship. *Wangsness v. Watertown School Dist. No. 14-4, Etc.*, 541 F. Supp. 332, 335 (Dist.Ct.S.D. 1982).

B. <u>**SLPS Cannot Prove Undue Hardship**</u>

Any hardship asserted, furthermore, must be "real" rather than "speculative," "merely conceivable," or "hypothetical," *Brown v. Polk County, Iowa*, 61 F. 3d 650, 655 - Court of Appeals, 8th Circuit 1995. An employer "stands on weak ground when advancing hypothetical hardships in a factual vacuum." *Id.* "Undue hardship cannot be proved by assumptions nor by opinions based on hypothetical facts." *Id.* Undue hardship is "not defined within the language of Title VII. Thus, the precise reach of the employer's obligation to its employee is unclear under the statute and must be determined on a case-by-case basis." *Id.* "[U]ndue hardship" must mean present undue hardship, as distinguished from anticipated or multiplied hardship." *Id.* Any hardship asserted, furthermore, must be "real" rather than "speculative," *Id.* Unless the statutory mandate [which requires reasonable accommodation] is to be rendered meaningless, it must be held to provide that until facts or circumstances arise from which it may be concluded that there can no longer be an accommodation without undue hardship, the employee's religious practices are required to be tolerated. *Id.*

*Wangsness v. Watertown School Dist. No. 14-4, Etc.*, 541 F. Supp. 332, 335 (Dist.Ct.S.D. 1982) is instructive. In *Wangsness*, the Plaintiff, a junior high industrial arts teacher, sought leave for 9 days to attend a religious function. The board of education informed the plaintiff that he would be terminated if he attended the religious function. The Plaintiff attended the function

4

and the district subsequently terminated him. The district argued that accommodating Wangsness "would set up a precedent for which there is no justification, and that if they allowed this absence, it would result in requests for many other types of absences and seriously affect the discipline of the school system, to say nothing of the effect upon the students of being required to have substitute teachers . . ." The district argued that it was not discriminating against Wangness and that it "[i]t is simply not intending to grant absences for any religious or personal reasons, and the same applies where the absence is for the purpose of attending a convention or other meeting, regardless of whether it is religious or non-religious in character."

The court found the testimony indicated that the school district's efforts to accommodate Wangsness consisted primarily of a meeting at which the school's administrators reviewed a list of available substitute teachers, and finding no qualified manual arts teacher on the list, the administrators decided to recommend to the board of education that Wangsness' request for leave be denied. *Id.* at 336. The Court viewed defendant's efforts to accommodate Wangsness as "minimal, at best," and that "[m]ore importantly, however, the board of education made it quite clear to Wangsness that it did not intend to accommodate his religious beliefs." It noted:

"The [evidence] reveals that in denying Wangsness' request for leave, the board was more concerned with setting a bad precedent for other types of leave requests than it was with accommodating the religious beliefs of Wangsness. The [evidence] makes no mention of a fruitless attempt to find a qualified substitute which defendant school district now alleges. Nor does it mention any other attempts to accommodate plaintiff's religious beliefs. In fact, the [evidence] states that the Board is "not intending to grant absences for any religious ... reasons." The position asserted by the board is in direct

5

conflict with the obligation under 42 U.S.C. § 2000e et seq. to accommodate an employee's religious beliefs."

The court concluded that the evidence does not sufficiently prove that defendant school district attempted in good faith to accommodate plaintiff's religious beliefs. *Id.* at 337. The court also conclude that the district's use of the school's guidance counselor to teach classes during Wangsness' absence was not an undue hardship. *Id.* at 338. A seven day absence of Wangsness was not so detrimental that it had a substantial effect on the education program of the school district." *Id.* The court noted that the district's argument that substitute teachers could be detrimental to the educational process as "as the kind of hypothetical hardship which the *Brown* court rejected. *Id,* citing *Brown v. General Motors Corp.*, 601 F.2d at 960.

*Edwards v. School Bd. of City of Norton, Va*., 483 F. Supp. 620 (Dist. Ct, W.D. VA, 1980) is also on point. In *Edwards*, the employee, a teacher's aid, required leave for five to ten days each year to observe her religious doctrine. The plaintiff's duties were to provide individual math and reading instruction to the students, especially the "educable mentally retarded and slow learners." The school district witnesses testified that the failure of the plaintiff to provide students day-to-day instruction resulted in great harm to the student's educational progress, that there were no substitutes available, and that other school personnel might complain because of the special treatment plaintiff would receive. Id at 626. The court found in favor of the Plaintiff, noting:

6

"defendant failed to sustain its burden of proving undue hardship. While sympathetic to defendant's fears of undue hardship suffered by the students, such a finding cannot be made on mere opinion and speculation."

*Id* at 627.

SLPS argues it denied Ms. O'Connor's request for a religious exemption because "[i]t was determined by the district that in balancing the constitutional obligation to provide a free public education to students against her request for religious exemption that the balance fell on the constitutional rights of children. So, therefore, her religious exemption was denied." TR: 32:13-32:18, ex 9.

The district argued that "[i]f a teacher has not been vaccinated and if they have a close contact with a person who is COVID positive, whether they have symptoms or not, that person has to quarantine for 10 to 14 days and that's required by the City." TR:14-18   This argument by the St. Louis Public Schools is precisely the hypothetical hardship argument that was struck down by the *Brown*, *Wangsness* and *Edwards* courts. The district's theories that she may get sick in the future requiring her to miss time are purely speculation and cannot be used to justify her termination.   The record shows that COVID has not prevent Ms. O'Connor from teaching and she has never had to quarantine.   Tammy O'Connor taught students in person, with students in her classroom, since January 2021 and did not miss any time since then due to illness.  TR 75:25-76:8.   She has never had to quarantine or take time off because of COVID.  TR 75:22-24. She was able to teach students last year and this year.  TR 75:19-21.  She would be able to continue teaching if she was allowed the accommodation of twice per week testing.  TR 75:25-77:3.

7

SLPS is speculating that she may need to quarantine in the future, however, this is simply a brief absence, which the *Wangsness* and *Edwards* courts determined was not a sufficient reason to deny a religious exemption.

The accommodation denial letter given to Ms. O'Connor indicated that she was denied because only students 12 years old or older are authorized by the Food and Drug Administration to receive the COVID-19 vaccine. TR 40:25-41:4, Ex. 7. Burton admitted that this was no longer true and that students under 12 could receive the vaccine. TR 40:25-41:9. The excuse is also inapplicable to Ms. O'Connor because she does not teach any student under the age of 12. TR 41:14-21. The youngest student taught by Ms. O'Connor is 14. TR 65:18-23. This indicates the reasons the district stated for its denial of her exemption request were false because the statement regarding the unavailability was inapplicable to Ms. O'Connor. This indicated the district did not take into account the particular circumstances of Ms. O'Connor which it is required to do under the law.

Burton testified that testified that the district granted fifteen medical exemptions, with eight additional still pending. TR 38:3-8. He testified that there were "a couple hundred" requests for religious exemptions and zero of which were granted. TR 43:23-44:6, 49:5-8. The accommodation given to persons who sought medical exemptions was they were allowed to test twice per week, on Monday and Thursday. TR 38:9-12, 40:5-8. This would be the same accommodation given to persons had they been approved for a religious exemption. TR 38:9-16. The district determined that it could give exemptions persons seeking an exemption. TR 40:5-8. The district determined that it was able to make the accommodation of twice per week testing for employees. TR 40:15-17. It cannot therefore say it will undergo undue hardship if it grant's Ms. O'Connor the accommodation of twice per week testing.

8

The district granted medical exemptions, which offered the same twice per week testing accommodation as offered to those seeking religious exemptions. The district may not grant exemptions to one class and then deny the same exemptions to those seeking religious accommodations, this is per se discrimination.

Charles Burton testified that he "believed" the district's vaccination policy resulted in more teachers being retained than would otherwise been quarantined, but he did not know for a fact. TR 59:22-60:11. He did not know how many teachers or students were quarantined any week since August 2021 when the school year began. TR 60:12-61:18. He did not know whether the number of teachers and students quarantined increased or decreased after the quarantine deadline of October 15, 2021. TR 60:12-61:18. This is further evidence of speculation on the part of the SLPS.

Burton also testifies that there has been a shortage of teachers for several years. TR 42:2-5. The district's vaccination policy resulted in 48 teachers being suspended without pay or leaving the district. TR 42:6-43:6. There were also 12 substitute teachers who were suspended because of the district's vaccination policy. TR 43:7-13. Charles Burton did not know who was teaching Tammy O'Connor's class after she has been suspended, he did not know if the person teaching her class was as experienced as her or whether they were certified to be a teacher. TR 53:2-15. This indicates that the decision to suspend the teachers was more costly than the speculative potential quarantine that Ms. O'Connor may or may not have been subjected to had she been allowed to continue teaching, which at most, would be a de minimis cost.

Because SLPS is speculating that Ms. O'Connor will miss work due to COVID, because no undue hardship will occur even if Ms. O'Connor misses work, and because SLPS has not

9

demonstrated that it cannot provide an accommodation without undue hardship, is suspension and attempted termination of Ms. O'Connor is therefore unlawful discrimination.

### II. The obligation of the district to provide free education does not trump the right of Ms. O'Connor to her religious beliefs.

Charles Burton testified that "[i]t was determined by the district that in balancing the constitutional obligation to provide a free public education to students against her request for religious exemption that the balance fell on the constitutional rights of children. So, therefore, her religious exemption was denied." TR 32:13 to 32:18   The Religious Vaccination Exemption Response letter issued to Ms. O'Connor by the district stated "As a public entity, the St. Louis Public School District (SLPS) must balance the constitutional obligation to provide a free public education to "all persons in this state within ages not in excess of twenty-one years...," against the individual state and federal constitutional right to the free exercise of religion. Art. IX, Sec 1(a), Mo. Const." and "the balance of competing constitutional interests weigh in favor of the rights of students." Ex. 7.

The argument that the students have a right to an education that trumps the right of Ms. O'Connor to freedom of religion is misguided.   The right to free exercise of religion is an inalienable right granted in the bill of rights of the U.S. Constitution and the Missouri State Constitution which supersedes the obligation to provide free education.

The Bill of Rights of the U.S. Constitution states:

"*Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof*; or abridging the freedom of speech, or of the press; or the right of

10

the people peaceably to assemble, and to petition the Government for a redress of grievances."

U.S. Const., Amend. I.

It is important that there is not a federally protected right to an education under the U.S. Constitution. *San Antonio Independent School District v. Rodriguez*, 411 U.S.1 (1973). "Education, of course, is not among the rights afforded explicit protection under our Federal Constitution. Nor do we find any basis for saying it is implicitly so protected." *Id*. at 35.

The district cannot claim that the students have rights to an education that supersede the Federally protected right to the free exercise of religion. The Supremacy Clause of the U.S. Constitution (Article VI, Clause 2), establishes the rights established by the U.S. Constitution and the protections of Title VII take priority over state law. A state statute is void to the extent that it actually conflicts with a valid Federal statute. *Edgar v. MITE Corp*., 457 U.S. 624 (1982).

The right to free exercise of religion under the Missouri Constitution trumps language in the Missouri Constitution addressing education because the free exercise of religion is designated a "natural and indefeasible right" whereas education is a legal benefit maintained by the state. The Bill of Rights of the Missouri Constitution states:

> "That all men and women have a *natural and indefeasible right* to worship Almighty God according to the dictates of their own consciences; that *no human authority can control or interfere with the rights of conscience* .. . nor shall a citizen's right to pray or express his or her religious beliefs be infringed… and, to emphasize the right to free exercise of religious expression, that all free public schools receiving state

appropriations shall display, in a conspicuous and legible manner, the text of the Bill of Rights of the Constitution of the United States"

MO Const., Art. I, § 5. (*Emphasis added*.)

The inalienable right to the freedom of religion contrasts with the language in the Missouri Constitution addressing religion:

A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the general assembly shall establish and maintain free public school for the gratuitous instruction of all persons in this state within ages not in excess of twenty-one years as prescribed by law.

MO Const., Art. IX, § 1(a).

The Missouri Constitution specifies that freedom of religion is an "natural and indefeasible right". It did not specify educational access as a natural right – it in not included in the Missouri Bill of Rights. This indicates the right to freedom of religion is trumps the maintenance of free public education. The argument of the district that their obligation to provide free education trumps the natural and indefeasible right of Ms. O'Connor fails. Any balancing between the constitutionally protected natural and indefeasible right of Ms. O'Connor to the free exercise of her religion and the obligation of the district to provide free education must fall to the side of Ms. O'Connor's natural and indefeasible right right to freedom of religion.

**III. The district has failed to operate in good faith.**

12

School districts are required to act in good faith in their discipline of teachers. *Iven v. Hazelwood School Dist.*, 710 SW 2d 462, 465 (Mo. App. E.D. 1986)(teacher ordered reinstated where district failed to . Good faith effort on the part of district requires that they inform the teacher of defects and also requires they inform the teacher how the teacher may cure those defects. *Id.* The SLPS district failed to inform its teachers, including Ms. O'Connor how they could meet the districts obscure requirements.

The letter the district issued to O'Connor denying her request for religious exemption indicated that "there is insufficient information for the District to grant your request for sincerely held religious exemption". Ex. 7. The letter also indicated she could submit additional information, but failed to indicate what information she could submit which would qualify her for the accommodations they indicated they could provide. *Id.* The district is not acting in good faith in its determination whether to grant religious exemptions. This is apparent when the district sets forth a religious accommodation it represents is available to the teachers which would allow the teachers to teach and the students to learn, the twice per week testing it offers in the FAQ sent to employees (Ex. 5), but then denies all of the request for religious exemptions it received.

### IV.     Tammy O'Connor did not violate any school policies

The District alleges Ms. O'Connor violated Policy Board Policy 4624 and Board Policy 4840, subsections 1 and 11. TR 20:16-21, Ex. 4.    The District's Policy 4624 indicates that accommodations to employees are available. TR 16:5-9, Ex 2. The district provided its employees with a FAQ titled Message to All Employees. TR 21:16-22:13, Ex. 5.    The August 25, 2021 *Message to All Employees* indicated that it would grant religious exemptions and

acknowledged that availability of the accommodation of twice weekly testing. Tr 38:9-40:14, Ex. 5

> **My religion will not allow me to take vaccines. What should I do?**
>
> If you believe that you are eligible for a religious exemption, please email ERStaff@slps.org to request a copy of the District's exemption form. **Requests for exemptions must be on the District's form.** Please be sure to submit your completed exemption form on or before **September 24, 2021,** in order to be considered for an exemption.
> Employees who are given approved exemptions will be subject to testing on Monday and Thursday each week, at no cost to the employee.

Ex. 5

Ms. O'Connor followed the policies of the district and its direction to apply for the exemption which it indicated was available. But for the district's unlawful denial of her request for an exemption and unlawful suspension, she would still be willing and able to teach her students.

The District alleges Ms. O'Connor violated Policy 4840 – Code of Ethics and Conduct, subsections 1 and 11. TR:16:23-17:3   Subsection 1 requires employees to become familiar with, enforce and follow all Board policies, regulations, administrative procedures and other directions given by district administrators, and all applicable state and federal laws as they relate to the performance of job duties.   Subsection 11 requires employees to refrain from any conduct that disrupts the educational process.

Tammy O'Connor followed the District's policies and procedures to seek an exemption. TR 75:5-11. The only reason O'Connor would not be compliance of any policy would be because the District unlawfully denied her request for a religious exemption. TR 75:5-11. Tammy O'Connor did not engage in any conduct which disrupts the educational process.  TR

14

75:12-18. Tammy O'Connor taught students in person, with students in her classroom, since January 2021 and did not miss any time since then due to illness. TR 75:25-76:8. She has never had to quarantine or take time off because of COVID. TR 75:22-24. She was able to teach students last year and this year. TR 75:19-21. She would be able to continue teaching if the district followed its own policies and its lawful duty by allowing her the accommodation of twice per week testing. TR 75:25-77:3.

## V. Conclusion

The overwhelming evidence shows the district has discriminated against Ms. O'Connor by refusing to grant an exemption for her sincerely held religious belief. It is not disputed that she has a sincerely held religious belief that prohibits her from receiving the vaccine. The district has not established that it will suffer undue hardship if her request is granted. Any balancing between the constitutionally protected natural and indefeasible right of Ms. O'Connor to the free exercise of her religion and the obligation of the district to provide free education must fall to the side of Ms. O'Connor's natural and indefeasible right to freedom of religion. There is no evidence Ms. O'Connor violated any policy but for the districts unlawful refusal to grant her religious exemption and its refusal to enforce its own policies and deal with Ms. O'Connor in good faith. The Board must reject the arguments of the SLPS and reinstate Tammy O'Connor.

Respectfully submitted,

**KASPER LAW FIRM, LLC**

By: */s/ Kevin Kasper*
Kevin J. Kasper, #52171
Ryan P. Schellert, #56710
3930 Old Hwy 94 South
Suite 108

15

St. Charles, MO 63304
Ph: 636-922-7100
Fax: 866-303-2874
KevinKasper@KasperLawFirm.net
RyanSchellert@KasperLawFirm.net
*Attorney for Tammy O'Connor*