UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| WANDA BRANDON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 4:22-cv-00635-SRC |
| | ) | |
| BOARD OF EDUCATION OF THE CITY | ) | |
| OF ST. LOUIS, et al., | ) | |
| | ) | |
| Defendants. | | |

**Memorandum and Order**

COVID-related restrictions continue to abate, but for some, the socioeconomic and legal fallout remains.  Restrictions impermissibly infringing on constitutional rights, like the right to freely exercise one's religion, spread across the country like a virus, as evidenced by the number of court decisions finding them unconstitutional.  But for this virus, a cure exists:  the federal courts stand open to ensure "steady, upright, and impartial administration of the laws" when plaintiffs seek to vindicate constitutional and statutory rights that may have suffered invasion, *see* The Federalist No. 78 (Alexander Hamilton).  Forty-three educators and school staff members seek that vindication here.  Against the school board, the superintendent, and the chief of human resources, these Plaintiffs raise multiple federal and state-law claims challenging the implementation of a vaccination policy.  Defendants move to dismiss all claims.

**I.      Background**

The Court accepts the following well-pleaded facts of the amended complaint as true for purposes of deciding the motion to dismiss.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

1

Plaintiffs are 43 current and former employees of the St. Louis Public School District—some of whom are certified teachers and some of whom are not—who each object to receiving COVID-19 vaccines for religious reasons.  Doc. 24 at ¶¶ 1, 12–54.  Plaintiffs name as Defendants:  the Board of Education of the City of St. Louis; Kelvin Adams, who was at all relevant times the Superintendent of the St. Louis Public School District; and Charles Burton, who was at all relevant times the Chief Human Resources Officer for the St. Louis Public School District.  *Id.* at ¶¶ 55–57.  Defendants (collectively "the District") "are responsible for creating, adopting, approving, ratifying, and enforcing the policies . . . of [the] Board."  *Id.* at ¶ 58.

Defendant Board of Education of the City of St. Louis, a body corporate under the laws of Missouri that operates the St. Louis Public School District, has the authority to make rules for the regulation and management of the public schools.  *Id.* at ¶ 61 (quoting Mo. Rev. Stat. § 162.621).  In response to the COVID-19 pandemic, the Board of Education exercised its statutory authority by adopting a policy in August of 2021 requiring all employees and staff either to receive a COVID-19 vaccination or to obtain an exemption by October 15, 2021.  *Id.* at ¶ 59.  That policy reads, in part,

> By October 15, 2021, all individuals covered by this policy must either (a) establish that they are fully vaccinated, including timely receipt of all booster vaccine doses recommended by the CDC; or (b) obtain an approved exemption as an accommodation as set forth below. Covered individuals who do not fulfill one of these two requirements by October 15, 2021 shall be placed on unpaid leave and/or subject to discipline, up to and including termination. Individuals covered under this policy that [sic] obtain an approved exemption shall be subject to COVID-19 testing on Monday and Thursday each week.

*Id.* at ¶ 59 (emphasis omitted); Doc. 24-1 at p. 1.

The Policy also explained the exemption-application process for individuals seeking accommodations based on a disability, a medical condition, or religious beliefs.  As to religious-based exemptions, the Policy explained:

> The District provides reasonable accommodations, absent undue hardship, to employees with sincerely held religious beliefs, observances, or practices that conflict with getting vaccinated. If you believe you need an accommodation regarding this policy because of a sincerely held religious belief, you are responsible for requesting a reasonable accommodation from the Human Resources Department. You must use and submit the form(s) provided by the District in order to be eligible for an exemption.

Doc. 24 at ¶ 64; Doc. 24-1 at p. 2.  The Policy contemplates that individuals who obtained an exemption would continue to work as normal, "subject to COVID-19 testing" twice a week. Doc. 24 at ¶ 65; Doc. 24-1 at p. 1.  The District granted the majority—i.e., between 40 and 50— of all exemption requests based on disabilities and medical conditions.  *Id.* at ¶ 79–80.  Those who received these exemptions continued working subject to the testing requirement, except that the District allegedly did not require testing until weeks after it granted the exemptions.  *Id.* at ¶ 81–82, 138.

In contrast, the District denied all requests for religious exemptions.  *Id.* at ¶¶ 71–72. Because of their sincerely held religious beliefs, Plaintiffs object to receiving COVID-19 vaccines that "used fetal cell line[s]" derived from the tissue of aborted fetuses in their research-and-development or production stages.  *Id.* at ¶¶ 114–15.  As it happened, all available vaccines at the time allegedly used such cell lines, so Plaintiffs sought exemptions.  *Id.* at ¶ 115.  The District received between 150 and 200 religious-exemption requests—and categorically denied all of them, apparently without the benefit of individualized review.  *Id.* at ¶¶ 71–72, 78, 87.

Burton, the Chief Human Resources Officer, and Karla Dozier, Director of Employee Relations, allegedly decided to deny all requests for religious exemptions, *id.* at ¶ 78, even though Adams, the Superintendent, had previously asserted at a Board meeting that the human resources department would review all religious-exemption requests "on an individual basis," *id.* at ¶ 86.  After submitting requests, Plaintiffs received substantially identical "Religious Vaccine Exemption Response" letters in September of 2021.  The letters stated, in relevant part:

> As a public entity, the St. Louis Public School District . . . must balance the constitutional obligation to provide a free public education to "all persons in this state within ages not in excess of twenty-one years . . .," against the individual state and federal constitutional right to the free exercise of religion.  Art. IX, Sec 1(a), Mo. Const. . . . [T]here is insufficient information for the District to grant your request for a sincerely held religious exemption.  In addition, the balance of competing constitutional interests weigh in favor of the rights of students ineligible to receive the vaccine.  At this time, this decision is not subject to review; however, the District may consider additional information <u>not previously presented</u> with the original exemption request.

*Id.* at ¶ 99; Doc. 24-4 (second ellipsis and underline in original).  The District eventually suspended without pay and/or terminated between 100 and 127 of those who applied for a religious exemption because they continued to refuse to receive vaccines after the District denied their requests.  *Id.* at ¶ 127.  Defendant Adams allegedly issued statements of charges against the teacher-Plaintiffs beginning on October 15, 2021, "indicating he was suspending them without pay and was seeking their termination with the board."  Doc. 24 at ¶ 129.  In October of 2021, the District terminated the Plaintiffs who were not certified teachers as well.  *Id.* at ¶ 134.  The District denied the religious-exemption requests of Plaintiffs Wendy Huddleston and Jamell Wren but later granted them medical accommodations.  *Id.* at ¶ 135.

In January of 2022, the District changed course and granted "most" of the religious-exemption requests.  *Id.* at ¶ 145.  The District sent to each teacher-Plaintiff whom the District suspended without pay a letter titled "Exemption Approval, Return to Work, and New Statement of Charges" indicating that the District was "now able to grant your request for sincerely held religious exemption."  *Id.* at ¶ 146.  The District sent to each non-certified Plaintiff, whom the District terminated, a letter titled "Exemption Approval and Reappointment."  *Id.* at 148.  The District re-hired all non-certified Plaintiffs except Angel Scott and Tomeka Slaughter.  *Id.* at ¶ 150.  The District did not pay teacher-Plaintiffs during their suspension, nor did it back-pay the

rehired, non-certified Plaintiffs from the date of their termination to the date of their reappointment. *Id.* at ¶¶ 147, 149.

## II.     Standard

Under Rule 12(b)(6), a party may move to dismiss a claim for "failure to state a claim upon which relief can be granted." The notice pleading standard of Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a plaintiff to give "a short and plain statement . . . showing that the pleader is entitled to relief." To meet this standard and to survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citation omitted). This requirement of facial plausibility means the factual content of the plaintiff's allegations must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 512 (8th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). The Court must make all reasonable inferences in favor of the nonmoving party. *Lustgraaf v. Behrens*, 619 F.3d 867, 872–73 (8th Cir. 2010).

When ruling on a motion to dismiss, a court must liberally construe a complaint in favor of the plaintiff. *Huggins v. FedEx Ground Package Sys., Inc.*, 592 F.3d 853, 862 (8th Cir. 2010). However, if a claim fails to allege one of the elements necessary to recovery on a legal theory, the Court must dismiss that claim for failure to state a claim upon which relief can be granted. *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 355 (8th Cir. 2011). Threadbare recitals of a cause of action, supported by mere conclusory statements, do not suffice. *Iqbal*, 556 U.S. at 678; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rule 8 does not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678–79. "A pleading

that merely pleads labels and conclusions or a formulaic recitation of the elements of a cause of action, or naked assertions devoid of factual enhancement will not suffice." *Hamilton v. Palm*, 621 F.3d 816, 817 (8th Cir. 2010) (internal quotations omitted).  Although courts must accept all factual allegations as true, they are not bound to accept as true a legal conclusion couched as a factual allegation.  *Twombly*, 550 U.S. at 555 (internal quotations and citation omitted); *Iqbal*, 556 U.S. at 677–78.

Only a complaint that states a plausible claim for relief survives a motion to dismiss. *Iqbal*, 556 U.S. at 679.  Therefore, the Court must determine if the well-pleaded factual allegations "plausibly give rise to an entitlement to relief."  *Id*.  This "context-specific" task requires the court to "draw on its judicial experience and common sense."  *Id*. at 679, 682.

## III.   Discussion

Against all Defendants, Plaintiffs bring claims under the First Amendment (count 1), the Due Process Clause of the Fourteenth Amendment (count 2), the Equal Protection Clause (count 3), the Missouri Religious Freedom Restoration Act (count 6), and a Missouri statute prohibiting employers from discharging and discriminating against employers for refusing to participate in abortion (count 7).  Doc. 24.  Against Defendant Board of Education of the City of St. Louis, Plaintiffs bring a claim under the Missouri Human Rights Act (count 4) and Title VII of the Civil Rights Act of 1964 (count 5).  *Id*.  Defendants move to dismiss all counts for failure to state a claim.  Doc. 27.  The Court partially grants and partially denies the motion.

### A.     First-Amendment Claim

The District's alleged Policy put Plaintiffs to a choice:  compromise their convictions or lose their livelihoods.  The Free Exercise Clause of the First Amendment, which applies to the States under the Fourteenth Amendment, provides that "Congress shall make no law . . .

prohibiting the free exercise" of religion.  U.S. Const. amend. I.  The Clause "does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through 'the performance of (or abstention from) physical acts.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022) (quoting *Emp. Div., Dept. of Hum. Res. of Ore. v. Smith*, 494 U.S. 872, 877 (1990)).  Bringing an action under 42 U.S.C. § 1983, Plaintiffs plead that the District's implementation of this Policy violated their First-Amendment rights because it impermissibly burdened their sincerely held religious beliefs— which compelled them to abstain from receiving certain COVID-19 vaccines.  Accordingly, the Court must decide whether Plaintiffs have pleaded facts, accepted as true, supporting the inference that the District, under the appropriate standard of review, impermissibly burdened their religious beliefs through the Policy.  *See Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1294 (11th Cir. 2007) ("To plead a valid free exercise claim, [a plaintiff] must allege that the government has impermissibly burdened one of his 'sincerely held religious beliefs.'" (quoting *Frazee v. Ill. Dept. of Emp. Sec'y*, 489 U.S. 829, 834 (1989))).

### 1.    The Court must apply strict scrutiny to the Policy.

The parties disagree on what standard of review the Court must apply.  The District argues that the "deferential" standard of *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905), "applies to state action during a public health crisis."  Doc. 28 at p. 9.  In *Jacobson*, the Supreme Court rejected a challenge to a city-wide, smallpox-vaccination mandate.  197 U.S. at 11–13, 39.  The District points to *In Re Rutledge*, a COVID-19 case in which the Eighth Circuit held that the district court abused its discretion in failing to meaningfully apply *Jacobson* to a challenged April 2020 ban on elective surgical procedures.  956 F.3d 1018, 1028 (8th Cir. 2020).  In that case, the Eighth Circuit described *Jacobson* as standing for the proposition that,

7

"when faced with a public health crisis, a state may implement measures that infringe on constitutional rights, subject to certain limitations."  *Id.* at 1027 (citing *Jacobson*, 197 U.S. at 26–31).

      For their part, Plaintiffs argue that the Supreme Court's traditional three tiers of scrutiny—and specifically strict scrutiny—apply to the Policy, not *Jacobson*, because "the actions of the defendants were not done during a period of a public health crisis necessitating emergency public health initiatives . . . ."  Doc. 32 at p. 5–6.  Plaintiffs rely on a later Eight Circuit case, *Heights Apartments, LLC v. Walz*, 30 F.4th 720 (8th Cir. 2022), in which a residential-property owner challenged the constitutionality of pandemic-related eviction moratoria.  In *Heights Apartments*, the Eighth Circuit held that "*Jacobson* . . . is not wholly inconsistent with the application of the[] tiers [of scrutiny]."  *Id.* at 726 (citing *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 70 (2020) (Gorsuch, J., concurring)).  The court then clarified why it applied *Jacobson* in its earlier *In re Rutledge* decision:

> When this Court decided *In re Rutledge* [in April of 2020], we were in the early days of the pandemic.  Much was unknown at that time—governmental leaders were acting on the best information available and needed to move quickly given the nature of the emergency.  At a time when local authorities were confronted with a public health crisis that was rapidly developing, poorly understood, and in need of immediate and decisive action, *Jacobson* seemed to be the best guide for navigating constitutional challenges to emergency public health initiatives.  The public health crisis has since evolved, and time is available for more reasoned and less immediate decision-making by public health officials.  In addition, the Supreme Court has since given guidance that is instructive regarding our standard of review during public health crises.

*Id.* at 726–27 (first citing *Chrysafis v. Marks*, 141 S. Ct. 2482 (2021); and then citing *Tandon v. Newsom*, 141 S. Ct. 1294, 1296–97 (2021)).  In *Chrysafis*, the Supreme Court enjoined part of New York's COVID-19 Emergency Eviction and Foreclosure Prevention Act due to alleged due-process violations without mentioning *Jacobson*.  141 S. Ct. at 2482–83.  And in *Tandon*, the

Court applied strict scrutiny, rather than *Jacobson*, to California's restrictions on religious gatherings. 141 S. Ct. at 1296–97. In *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020), which the *Heights Apartments* court also relied on, the Supreme Court applied strict scrutiny to a pandemic-related executive order that imposed restrictions on attendance at religious services. *Heights Apartments*, 30 F.4th at 726.

In light of those Supreme Court decisions—which came after *In re Rutledge*—the Eighth Circuit concluded in *Heights Apartments* that "[s]ome of the damages [Heights Apartments] allegedly suffered likely occurred during the public health crisis when *Jacobson* deference would be applicable. Some likely occurred after the immediate public health crisis dissipated, and traditional levels of scrutiny are applicable." *Heights Apartments*, 30 F.4th at 727 (citing *Roman Cath. Diocese*, 141 S. Ct. at 65, 70). "It is a factual determination left to the district court on remand to resolve when during the pandemic the constitutional lens shifted from *Jacobson* deference to the . . . tiers of scrutiny." *Id.*

*Heights Apartments*, then, instructs district courts to apply *Jacobson* to laws passed and enforced while an emerging public-health emergency is "developing rapidly, poorly understood, and in need of immediate and decisive action," 30 F.4th at 726–27, but the tiers of scrutiny when "time [was] available for more reasoned and less immediate decision-making by public health officials" and "the immediate public health crisis [had] dissipated," *id.* at 727. Again, which standard applies depends upon a "factual determination," *id.*, and the Court must at this point accept Plaintiffs' well-pleaded factual allegations as true, *see Iqbal*, 556 U.S. at 678. Because Plaintiffs have pleaded the existence of a late-2021 policy apparently lacking the urgency that characterized the regulations and executive orders issued early in the pandemic,

*Heights Apartments* compels the Court—at least for now—to apply the ordinary tiers of scrutiny to the District's Policy as alleged.

Many of Plaintiffs' factual allegations lead the Court to draw the reasonable inference that the District implemented the Policy when "time [was] available for more reasoned and less immediate decision-making" and "after the immediate public health crisis [had] dissipated." *Heights Apartments*, 30 F.4th at 727. First, the Policy came relatively "late" in the pandemic. The District allegedly enacted the Policy in late August of 2021—well over one year after the Governor of Arkansas issued the executive orders at issue in *In re Rutledge*, Doc. 24 at ¶ 59, and well after the Supreme Court had begun applying strict scrutiny to challenged, pandemic-related laws. *See, e.g.*, *Roman Cath. Dioc.*, 141 S. Ct. at 65 (decided in November of 2020); *Tandon*, 141 S. Ct. at 1296 (decided in April of 2021). The Policy also came well after the "stay at home" orders at issue in *SH3 Health Consulting, LLC v. Page*, 459 F. Supp. 3d 1212, 1217 (E.D. Mo. 2020), where on a motion for a temporary restraining order this Court applied *Jacobson* and *Rutledge* to those orders. As the Eighth Circuit explained in *Heights Apartments*, both the legal and factual landscape have meaningfully changed since then.

Second, the alleged Policy lacks a sense of urgency. The Policy, adopted on August 24, 2021, allowed individuals who objected to the vaccines on religious grounds an entire month to fill out and submit the exemption-request form for review. Doc. 24-2 at p. 2 ("Please be sure to submit your completed  exemption form on or before September 24, 2021 in order to be considered for an exemption."). And even after an applicant submitted a request, the Policy, on its face and as explained by the District, provided for a system in which the District would review that exemption request. Doc. 24 at ¶¶ 59, 63–67; Doc. 24-1 at ¶ 1–2. Defendant Adams allegedly represented at a board meeting that each request for a religious accommodation would

receive individual attention.  The existence of a system of individualized administrative review suggests that the District planned to devote the time necessary to review each request.  Doc. 24 at ¶ 86; *see also* Doc. 24-2 at p. 2.  While it appears that the District did not end up reviewing religious requests individually, Doc. 24 at ¶¶ 87–88, 98–99, it did take the time to review medical and disability requests on an individual basis:  it granted the majority of disability-based and medical-based exemption requests—i.e., between 40 and 50—that it received, *id.* at ¶¶ 79, 80, 86.  Common sense dictates, and Plaintiffs' allegations show, that such an administrative review process existed for the purpose of making individualized, "more reasoned" decisions. *Heights Apartments*, 30 F.4th at 727; *Iqbal*, 556 U.S. at 682 (The Court must "draw on its judicial experience and common sense.").  Such a process would take more time than a school district could likely spare in the face of a truly emergent and poorly understood public-health crisis.

Third, Plaintiffs allege the existence of reasonable accommodations that would impose "at most a de minimis cost to Defendants":  "masking, remote teleworking, physical distancing, and regular testing."  Doc. 24 at ¶¶ 90, 179.  The existence of such accommodations, and the fact that the Policy apparently allowed the District to factor their existence into its decisions, Doc. 24-1, supports the inference that the state of affairs did not require the sort of immediate, decisive government action that would compel the application of *Jacobson* under *Heights Apartments*.  Rather, the District crafted a Policy that contemplated a process for "more reasoned and less immediate decision-making" in individual cases, *Heights Apartments*, 30 F.4th at 727, and it indeed followed that process at least for certain kinds of requests.

So, for purposes of the motion to dismiss, the tiers of scrutiny apply.  *See Heights Apartments*, 30 F.4th at 727.  Under the Free Exercise Clause of the First Amendment, a law that

11

burdens religious practice need not be justified by a compelling government interest if it is neutral and of general applicability.  *Smith,* 494 U.S. at 881.  If, however, a plaintiff shows that (1) the government has burdened his sincere religious beliefs (2) pursuant to a policy that is not neutral and generally applicable, (3) the government must then "satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest."  *Kennedy*, 142 S. Ct. at 2421–22 (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993)); *see also Lukumi*, 508 U.S. at 546 ("A law [1] burdening religious practice [2] that is not neutral or not of general application [3] must undergo the most rigorous of scrutiny.  To satisfy the commands of the First Amendment, a law restrictive of religious practice must advance 'interests of the highest order' and must be narrowly tailored in pursuit of those interests." (quoting *McDaniel v. Paty*, 435 U.S. 618, 628 (1978))).

### 2.    The District plausibly burdened Plaintiffs' religious beliefs.

The District apparently does not dispute that it burdened Plaintiffs' sincere religious beliefs.  *See* Doc. 28 at pp. 18–21.  It does not question whether Plaintiffs' abstention from vaccination truly resulted from their sincerely held religious beliefs.  Docs. 28, 33; Doc. 24 at ¶ 139.  It does not dispute that it terminated Plaintiffs for activity resulting from their sincerely held religious beliefs.  *See* Docs. 28, 33.  Because the amended complaint and parties' briefing take those facts for granted, the Court concludes that Plaintiffs have plausibly alleged that the District burdened their beliefs through the Policy by putting them to the choice of losing their livelihoods or compromising their religious convictions.  *See Kennedy*, 142 S. Ct. at 2422 (concluding that a school district burdened high-school coach's religious beliefs when it disciplined him for praying quietly, without his players, after games); *Fulton v. City of*

*Philadelphia*, 141 S. Ct. 1868, 1876 (2021) ("As an initial matter, it is plain that the City's actions have burdened CSS's religious exercise by putting it to the choice of curtailing its mission or approving relationships inconsistent with its beliefs.").

### 3.    The Policy is not neutral and generally applicable.

Having found that the District burdened Plaintiffs' beliefs, the question becomes whether it did so "pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy*, 142 S. Ct. at 2421–22 (quoting *Smith*, 494 U.S. at 879–81). As noted, under *Smith* and its progeny, laws incidentally burdening religion are subject to strict scrutiny under the Free Exercise Clause if they are not neutral and generally applicable. *Fulton*, 141 S. Ct. at 1876 (citing *Smith*, 494 U.S. at 878–82). The Board characterizes the Policy as "neutral and generally applicable" under *Smith*—and therefore not subject to strict-scrutiny review—because it applied to all staff. Doc. 28 at pp. 11–13. Plaintiffs counter that, under recent Supreme Court precedent, the Policy as alleged is clearly *not* generally applicable because it contains a mechanism for exemptions at the sole discretion of the District. Doc. 32 at pp. 7–11. Plaintiffs have the better argument.

Plaintiffs rely on *Fulton v. City of Philadelphia*, in which the City of Philadelphia contracted with foster care agencies like Catholic Social Services (CSS) to place foster children with foster families that CSS "certified" based on a home study. 141 S. Ct. at 1874–75. In 2018, the City informed CSS that it would no longer refer children to CSS because, even though no same-sex couple had ever sought certification from CSS, CSS's religious beliefs would prevent it from certifying same-sex couples as foster families. *Id.* The City pointed to a non-discrimination provision in its contract with CSS and a citywide ordinance. *Id.* at 1875. The contractual provision read: "Provider shall not reject a child or family . . . for Services based upon . . . their . . . sexual orientation . . . *unless an exception is granted by the Commissioner or the Commissioner's designee, in his/her sole discretion*." *Id.* at 1878 (emphasis added). Chief

13

Justice Roberts, writing for a unanimous Court, rejected the City's arguments that the provision was generally applicable, holding that "[t]he creation of a formal mechanism for granting exceptions renders a policy not generally applicable, regardless of whether any exceptions have been given, because it 'invite[s]' the government to decide which reasons for not complying with the policy are worthy of solicitude." *Id*. at 1879 (quoting *Smith*, 494 U.S. at 884).

The Policy as alleged here clearly involves "a formal mechanism for granting exceptions." *Id.* The Policy reads:  "[A]ll individuals covered by this policy must either (a) [prove they are fully vaccinated]; or (b) obtain an approved exemption as an accommodation as set forth below." Doc. 24 at ¶ 59; Doc. 24-1 at p. 1.  "[C]overed" individuals include those seeking medical, religious, and disability-related exemptions. *Id.* The Policy then directed those seeking an exemption to file the appropriate paperwork with the Human Resources Department, where each request would supposedly receive individualized review. Doc. 24 at ¶ 86; Doc. 24-1 at p. 2.  The fact that the Policy contemplates categories of exemption-requests and provides for a system of individualized review compels the conclusion that the Policy contains a "formal mechanism for granting exceptions." *Fulton*, 141 S. Ct. at 1879.

Despite the fact that the Policy contains a formal mechanism for exemptions, the District argues that strict scrutiny does not apply because courts have declined to apply strict scrutiny even in cases where the challenged vaccination policy contained *no* process for religious exemptions.  Doc. 28 at p. 12.  And so, the argument goes, the Policy here is *more* favorable to religion because it at least contains a mechanism for exemptions.  But the District fails to realize that, under *Fulton*, the very existence of such a mechanism is precisely what *invites* strict-scrutiny review because that mechanism renders the Policy not generally applicable.  141 S. Ct. at 1879 (quoting *Smith*, 494 U.S. at 884).

14

The District also attempts to distinguish the Policy here from the one at issue in *Fulton* by arguing that "[u]nlike the State action in *Fulton*, Plaintiffs do not allege that the District made individualized [religious] exceptions to the Policy.  Rather, Plaintiffs allege that the District categorically denied all exemption requests, then granted requests at a later date.  Doc. 33 at p. 5 (citing Doc. 24 at ¶¶ 70–72, 87, 145) (emphasis deleted).  Indeed.  But again, what renders the Policy not generally applicable is the implementation of a "formal *mechanism* for granting exemptions"—the existence of which Plaintiffs have alleged and the District concedes— "regardless of whether any exceptions have been given."  *Fulton*, 141 S. Ct. at 1879 (emphasis added).  As noted above, the language of the Policy, as alleged, clearly contemplates a system of discretionary, individualized "disability accommodation[s]," "religious exemption[s]," and "exemption[s] for other medical reasons."  Doc. 24 at ¶¶ 59, 63–65; Doc. 24-1.

How the District eventually *used* its discretion in granting or denying requests does not necessarily render this case distinguishable from *Fulton*.  In *Fulton*, the Court noted that the City had never actually used its authority to grant an exception and instead focused on the crucial fact that exemption mechanisms, however used, "'invite[]' the government to decide which reasons for not complying with the policy are worthy of solicitude."  141 S. Ct. at 1878–79 (quoting *Smith*, 494 U.S. at 884).  And in this case, the District indeed decided which reasons were worthy of solicitude:  it reviewed all, and granted most, non-religious requests yet denied, without review, all religious requests.  Doc. 24 at ¶ 71, 84, 86–87.  Because the mechanism here invited the District to decide which reasons for not receiving the vaccine were worthy of solicitude, this case, like *Fulton*, "falls outside of *Smith*," and strict scrutiny applies.  141 S. Ct. at 1877.

**4.    The Court can draw the reasonable inference that the alleged implementation of the Policy was not narrowly tailored in pursuit of a compelling state interest.**

Because the District plausibly burdened Plaintiffs' religious beliefs through a Policy that was not generally applicable, the question becomes whether the District's "course was [1] justified by a compelling state interest *and* [2] was narrowly tailored in pursuit of that interest." *Kennedy*, 142 S. Ct. at 2422 (citing *Lukumi*, 508 U.S. at 546) (emphasis added).  The Policy as plausibly alleged fails both prongs.

First, the Court can draw the reasonable inference the District's course was not justified by a compelling interest.  Analyzing the City's non-discrimination policies under this prong in *Fulton*, the Supreme Court "scrutinize[d] the asserted harm of granting specific exemptions to the particular religious claimants."  141 S. Ct. at 1881 (quoting *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 431 (2016)).  In other words, the question was "not whether the City ha[d] a compelling interest in enforcing its non-discrimination policies generally, but whether it ha[d] such an interest in denying an exception *to CSS*."  *Id.* (emphasis added).  The City asserted three interests to justify its course of action, all of which the Court found "insufficient": (1) "[m]aximizing the number of foster families"; (2) "minimizing liability"; and (3) "the equal treatment of prospective foster parents and foster children."  *Id.* at 1881–82.   As to the first two interests, the Court held that granting CSS an exemption would likely *serve*—rather than undermine—its goal of increasing the number of foster families and that its concern about "liability" was too speculative "to satisfy strict scrutiny."  *Id.* at 1882.  As to the third, the Court acknowledged its "weight[]" but found that it ultimately did not "justify denying CSS an exemption" in part because "[t]he City offers no compelling reason why it has a particular interest in denying an exception to CSS while making them available to others."  *Id.*

16

Here, too, the Court must ask not whether the District has an interest in enforcing the Policy "generally," but whether it had an interest in denying exceptions *to Plaintiffs*. *See id.* at 1881.  The District "may not refuse to extend th[e] [exemption] system to cases of 'religious hardship' without compelling reason."  *Id.* at 1878 (quoting *Smith*, 494 U.S. at 884) (second alteration in original).  The District asserts two interests:  (1) "provid[ing] a free public education to students," Doc. 24-1 at p. 1; and (2) stemming the spread of COVID-19 so as to "safeguard the health and well-being of employees and their families," *id.*

As to the first interest, the Court notes—as the Supreme Court did in *Fulton*—that granting exemptions likely, or at least plausibly, would have *served* this interest.  The District writes that it could not have accommodated exemptions because, at that time, employees had to quarantine for 14 days after coming into close contact with an infected person.  Doc. 28 at p. 20  That, the District argues, would have compromised its mission of providing a free, public education by causing a "critical Staff shortage."  *Id.* at p. 20.  But when the District suspended and/or terminated over 100 employees *en masse* for refusing the vaccine, the District may have imposed on itself a staff shortage of a worse nature than the one it sought to avoid in the first place.  Which is worse:  the speculative prospect that some of those 100-plus employees, at some time in the future, might have to quarantine for two weeks (or whatever quarantine period may have then been in effect), or an abrupt shortage of over 100 employees?  The Court need not answer that question here; it simply notes that it can reasonably infer that the District's first asserted interest plausibly does not suffice.

As to the District's second asserted interest—stemming the spread of COVID-19—the Court acknowledges, at a certain level of generality, its weight.  *See Roman Cath. Diocese*, 141 S. Ct. at 67 ("Stemming the spread of COVID-19 [was] a compelling interest.").  But, like the

17

City in *Fulton*, the District has "offer[ed] no compelling reason why it has a particular interest in denying . . . exception[s] to [*Plaintiffs*] while making them available to others"—i.e., some of those who applied for disability and medical exemptions.  *Fulton*, 141 S. Ct. at 1882; Doc. 24 at ¶ 84.  In other words, what is it about stemming the spread of COVID-19 that allegedly "compell[ed']" the District to deny without review all requests for religious exemptions—simply because they were religious—while reviewing all and granting some of the other kinds of requests?  *Fulton*, 141 S. Ct. at 1878 (quoting *Smith*, 494 U.S. at 884); Doc. 24 at ¶¶ 72, 79–80, 84, 86–88.  So the second interest, too, while important, is plausibly "insufficient to satisfy strict scrutiny."  *Fulton*, 141 S. Ct. at 1882.  Finding that the Policy plausibly fails the first prong of strict-scrutiny analysis alone means that Plaintiffs' First-Amendment claim survives the instant motion.

And even assuming that the District had a compelling interest in denying exemptions to Plaintiffs, the Court can easily infer that the alleged Policy as applied would plausibly fail the second prong of strict-scrutiny analysis because it was not "narrowly tailored":

> narrow tailoring requires the government to show that measures less restrictive of the First Amendment activity could not address its interest in reducing the spread of COVID.  Where the government permits other activities to proceed with precautions, it must show that the religious exercise at issue is more dangerous than those activities even when the same precautions are applied.  Otherwise, precautions that suffice for other activities suffice for religious exercise too.

*Tandon*, 141 S. Ct. at 1296–97 (first citing *Roman Catholic Diocese*, 141 S. Ct. at 69–70; and then citing *South Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 719 (2021) (statement of Gorsuch, J.)).

The District ultimately bears the burden of establishing narrow tailoring, *id.* at 1296, but for present purposes it suffices to note that Plaintiffs have plausibly alleged a Policy that appears not to be narrowly tailored for the simple reason that the Policy—by its own terms—

contemplated a set of minimally restrictive accommodations, including regular testing, for those whom the District granted exemptions.  And the Court can reasonably infer that these accommodations could address its interest "in reducing the spread of COVID," *id.* at 1297, and in ensuring that it would have enough staff to fulfill its duty of educating students.  The fact that the District allowed 40 to 50 applicants to submit to regular testing and to continue working supports this inference.  Doc. 24 at ¶ 79.  Further, Plaintiffs allege the existence of other less restrictive accommodations, beyond testing, that was available to the District:  masking, physical distancing, and the option for remote work in the case of an exposure.  Doc. 24 at ¶¶ 65–66, 113, 179.  Such accommodations for Plaintiffs, of course, would have been far "less restrictive of [Plaintiffs'] First Amendment activity," i.e., refusing vaccination.  *Tandon*, 141 S. Ct. at 1296–97.  Indeed, such accommodations might have eliminated the First-Amendment concerns altogether.  Accordingly, the Policy as alleged plausibly fails strict scrutiny, and the Court denies Defendants' motion as to count 1.

As a final matter, the Court notes here that the District seems to argue as if Plaintiffs have only challenged the Policy on its face, neglecting to address the constitutionality of the Policy as applied.  Docs. 28, 33.  While the facial/as-applied distinction "does not control the pleadings" or affect the present analysis, the distinction will become necessary at the remedial stage because it "goes to the breadth of the remedy employed by the Court."  *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010).  The Court therefore expects the parties to be prepared to address the remedial question at the proper time.

### B.    Privacy Claim

Plaintiffs bring a substantive-due-process claim under § 1983 alleging that the District's Policy deprived them of their right to privacy, autonomy, and personal identity through the

Policy.  Plaintiffs argue that this right originates in the Due Process Clause of the Fourteenth

Amendment, which states in relevant part, "No State shall . . . deprive any person of life, liberty,

or property, without due process of law."  U.S. Const. amend. XIV.

The Due Process Clause "protects two categories of substantive rights.  The first consists

of rights guaranteed by the first eight Amendments. . . . The second category . . . comprises a

select list of fundamental rights that are not mentioned anywhere in the Constitution."  *Dobbs v.*

*Jackson Women's Health Org.*, 142 S. Ct. 2228, 2246 (2022).  To qualify as an unenumerated

right under the Fourteenth Amendment, it must be "'deeply rooted in this Nation's history and

tradition' and 'implicit in the concept of ordered liberty.'"  *Id.* at 2259 (quoting *Washington v.*

*Glucksberg*, 521 U.S. 702, 721 (1997)).  That test is a hard one to pass:  courts must be "reluctant

to expand the concept of substantive due process because guideposts for responsible

decisionmaking in this unchartered area are scarce and open-ended."  *Collins v. City of Harker*

*Heights*, 503 U.S. 115, 125 (1992) (citing *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225–

26 (1985)); *see also Glucksberg*, 521 U.S. at 720 ("We must . . . 'exercise the utmost care

whenever we are asked to break new ground in this field,' lest the liberty protected by the Due

Process Clause be subtly transformed into the policy preferences of the Members of this Court."

(first quoting *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992); and then citing *Moore v. East*

*Cleveland*, 431 U.S. 494, 502 (1997)).

Whether an asserted right qualifies as "fundamental" under the Clause determines the

standard of review.  "Legislation infringing a fundamental right must survive strict scrutiny—the

law must be 'narrowly tailored to serve a compelling state interest.'"  *Gallagher v. City of*

*Clayton*, 699 F.3d 1013, 1017 (8th Cir. 2012) (quoting *Glucksberg*, 521 U.S. at 721).  On the

other hand, the Court must "uphold" state action "that does not . . . restrict a fundamental right

against a[] . . . substantive due process challenge if it is rationally related to a legitimate state interest." *Birchansky v. Clabaugh*, 955 F.3d 751, 757 (8th Cir. 2020) (first citing *F.C.C. v. Beach Comms., Inc.*, 508 U.S. 307, 313 (1993); and then citing *Kansas City Taxi Cab Drivers Ass'n, LLC v. City of Kansas City*, 742 F.3d 807, 809 (8th Cir. 2013). "The law's rational relation to a state interest need only be conceivable . . . ." *Id.* (citing *F.C.C.*, 508 U.S. at 315).

To determine the standard of review, the Court first asks whether the alleged Policy plausibly implicates a fundamental right. If not, the Court must review for rational basis, asking whether Plaintiffs' allegations support the reasonable inference that no conceivable, rational relation between the Policy and the state interests exists. *See Carter v. Arkansas*, 392 F.3d 965, 968 (8th Cir. 2004) ("[A] district court may conduct a rational basis review on a motion to dismiss.").

Plaintiffs' supposed fundamental right to refuse mandatory vaccination would fall into the second category of Fourteenth-Amendment rights—i.e., those "that are not mentioned anywhere in the Constitution." *Dobbs*, 142 S. Ct. at 2246. But the Court would first have to assure itself that the right is "deeply rooted in this Nation's history and tradition." *Dobbs*, 142 S. Ct. at 2260. The parties have presented the Court with woefully meager briefing on this issue; however, the Court's duty to "say what the law is," and apply it faithfully, remains. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). While not the clearest area of constitutional law generally, substantive-due-process precedent compels a straightforward answer here: no such fundamental right or interest exists.

In 1988, the D.C. Circuit noted that "the Supreme Court has not recognized that the decision to reject vaccination implicates a 'fundamental interest,' although bodily invasion and medical treatment are unavoidably involved." *New York State Ophthalmological Soc'y v. Bowen*,

854 F.2d 1379, 1391 (D.C. Cir. 1988) (citing *Jacobson*, 197 U.S. 11).  Plaintiffs rely chiefly (in

fact, exclusively) on a Supreme Court case decided two years later, *Cruzan v. Director, Mo. Dep't

of Health*, 497 U.S. 261 (1990).  Doc. 32 at p. 13.  In that case, the Supreme Court held that the

Due Process Clause does not forbid Missouri from requiring clear and convincing evidence of an

incompetent person's wishes as to the withdrawal of life-sustaining treatment.  *Id.* at 2852–53.

Part of the reasoning leading to that conclusion involved an assumption based on previous

cases—chiefly *Jacobson*—that "a competent person has a constitutionally protected liberty

interest in refusing unwanted medical treatment."  497 U.S. 261, 278 (1990) (citing *Jacobson*,

197 U.S. at 24–30) (emphasis added).  As the Court explained, *Jacobson* recognized the

plaintiff's liberty interest in refusing the vaccine, but under the applicable standard of review, the

State's interest in preventing disease prevailed.  *Id.*  Notably, the *Cruzan* Court did not classify

the liberty interest as "fundamental."

Plaintiffs have not offered the Court any additional legal support, or any historical

arguments, of the sort that a *Glucksberg* analysis would require—nor does it appear they could.

The Court has not found any cases holding that individuals have a fundamental right under the

Due Process Clause to refuse unwanted vaccines.  In fact, the Courts of Appeals that have

addressed this issue have unanimously held otherwise.  First, in *Klaassen v. Trustees of Indiana

University*, the Seventh Circuit rejected a substantive-due-process challenge to a vaccination

mandate at a public university, applying *Glucksberg* and reasoning that "*Jacobson*, which

sustained a criminal conviction for refusing to be vaccinated, shows that plaintiffs lack such a

[fundamental] right [under the Due-Process Clause to refuse vaccines].  To the contrary,

vaccination requirements, like other public-health measures, have been common in this nation."

7 F.4th 592, 593 (7th Cir. 2021) (denying injunctive relief).

Similarly, in *Lukaszczyk v. Cook Cnty.*, the Seventh Circuit reviewed three state and local vaccination policies.  In a thorough opinion by Judge Brennan, the court acknowledged the "important privacy interests" that compelled vaccination implicates, but concluded that "the record developed and presented . . . does not demonstrate that these interests qualify as a fundamental right under substantive due process."  47 F.4th 587, 602 (7th Cir. 2022), *cert. denied sub nom. Troogstad v. Chicago, IL*, No. 22-461, 2023 WL 192006 (U.S. Jan. 17, 2023). "Following [the relevant] authority, we decline to apply strict scrutiny and instead review for rational basis."  *Id.* (denying injunctive relief).

Finally, the Second Circuit in *We The Patriots USA, Inc. v. Hochul* penned a line that this Court easily could have written here:  "In *Cruzan*, a case relied upon by Plaintiffs for the proposition that they have a fundamental constitutional right to refuse medical treatment, the Court expressly recognized its holding in *Jacobson* that 'an individual's liberty interest in declining an unwanted smallpox vaccine' was outweighed there by 'the State's interest in preventing disease.'  Plaintiffs provide no basis for concluding that the vaccination requirement here, considerably narrower than the city-wide mandate in *Jacobson*, violates a fundamental constitutional right."  17 F.4th 266, 293 (2nd Cir. 2021) (internal citation omitted) (denying injunctive relief).

Plaintiffs here point generally to a "fundamental right to bodily integrity to make their own informed medical decisions."  Doc. 24 at ¶ 191.  But specifically, Plaintiffs claim a right to refuse vaccines, *id.* at ¶ 192—a proposition that finds no footing in substantive-due-process caselaw, especially bearing in mind the need to be "reluctant to expand the concept of substantive due process . . . ."  *Collins*, 503 U.S. at 125 (citing *Regents of Univ. of Mich.*, 474 U.S. at 225–26).  While the Policy here indeed implicates important privacy interests, nothing in

Plaintiffs' complaint or briefing—or in the Court's independent research—leads the Court to conclude that refusing vaccination is a "fundamental right" under the Due Process Clause of the Fourteenth Amendment.

Accordingly, the Court applies rational-basis review to the Policy. *Gallagher*, 699 F.3d at 1019. As noted, a law survives rational-basis review "if it is rationally related to a legitimate state interest." *Birchansky*, 955 F.3d at 757 (first citing *F.C.C.*, 508 U.S. at 313; and then citing *Cab Drivers Ass'n*, 742 F.3d at 809); *see Carter*, 392 F.3d at 968 (affirming district court's dismissal of equal-protection and due-process claims upon rational-basis review). For Plaintiffs' claim to survive the instant motion, the Court would have to infer that the Policy plausibly lacks *any* reasonable connection to the District's interests. The Court cannot do that.

As noted, the District asserted interests in "provid[ing] a free public education to students," Doc. 24-1 at p. 1, and stemming the spread of COVID-19 so as to "safeguard the health and well-being of employees and their families," *id.* The Policy did not force Plaintiffs to receive vaccines; it put them to a choice between receiving the vaccine or losing their jobs. Putting Plaintiffs to such a choice—while perhaps a drastic measure—certainly may bear a rational relationship to the District's stated interests. Common sense dictates that COVID-19, as a virus, likely possessed a certain degree of transmissibility and that keeping unvaccinated teachers and staff at their posts may have threatened those interests. While reasonable minds may disagree on the wisdom of the Policy, the Court must merely discharge its duty to ask whether Plaintiffs have plausibly negated all possible rational connections between the Policy and the District's interests. They have not, though this is not to say anything about Plaintiffs' First-Amendment claims. Accordingly, Plaintiffs have failed to state a substantive-due-process claim, and the Court grants the motion to dismiss as to count 2.

24

C.        **Equal-Protection Claim**

Plaintiffs also bring a § 1983 claim under the Equal Protection Clause of the Fourteenth

Amendment:  "No State shall . . . deny to any person within its jurisdiction the equal protection

of the laws."  U.S. Const. amend. XIV, § 1.  The Clause "is essentially a direction that

all persons similarly situated should be treated alike."  *City of Cleburne, Tex. v. Cleburne Living*

*Ctr.*, 473 U.S. 432, 439 (1985) (citing *Pyler v. Doe*, 457 U.S. 202, 216 (1882)).  It protects

"fundamental rights" and members of "suspect classifications."  *Brandt v. Davis*, 191 F.3d 887,

893 (8th Cir. 1999) (quoting *Batra v. Bd. of Regents of the Univ. of Neb.*, 79 F.3d 717, 721 (8th

Cir. 1996).  In an early Equal-Protection case, the Supreme Court held that a law may be "fair on

its face," but "if it is applied and administered by a public authority with an evil eye and an

unequal hand, so as practically to make unjust and illegal discriminations between persons in

similar circumstances, material to their rights, the denial of equal justice is . . . within the

prohibition of the constitution."  *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886).

Equal-Protection plaintiffs generally must prove "the existence of purposeful

discrimination."  *Ashaheed v. Currington*, 7 F.4th 1236, 1250 (10th Cir. 2021) (quoting

*McCleskey v. Kemp*, 481 U.S. 279, 292 (1987)); *Snowden v. Hughes*, 321 U.S. 1, 8 (1944) ("The

unlawful administration by state officers of a state statute fair on its face, resulting in its unequal

application to those who are entitled to be treated alike, is not a denial of equal protection unless

there is shown to be present in it an element of intentional or purposeful discrimination.  This

may appear on the face of the action taken with respect to a particular class of person, or it may

only be shown by extrinsic evidence showing a discriminatory design to favor one individual or

class over another not to be inferred from the action itself."  (citing *Yick Wo*, 118 U.S. at 373–74)

(internal citation omitted)).  If the state action interferes with fundamental rights or involves a

25

suspect classification, the reviewing court applies strict scrutiny.  *Ashaheed*, 7 F.4th at 1250 (first

citing *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 310 (2013); and then citing *Save Palisade*

*FruitLands v. Todd*, 279 F.3d 1204, 1210 (10th Cir. 2002)); *Jesus Christ Is the Answer*

*Ministries, Inc. v. Baltimore Cnty., Maryland*, 915 F.3d 256, 265 (4th Cir. 2019) (citing *Bostic v.*

*Schaefer*, 760 F.3d 352, 375 (4th Cir. 2014)), *as amended* (Feb. 25, 2019).

The first question is whether the District failed to treat alike "all persons similarly

situated."  *City of Cleburne*, 473 U.S. at 439 (citing *Pyler*, 457 U.S. at 216).  In *Yick Wo*, a local

ordinance, with the aim of reducing the risk of fires, gave local officials "a naked and arbitrary

power to give or withhold consent" to individuals wishing to operate a laundry business.  118

U.S. at 366.  The local officials withheld consent from, and so denied equal protection to, all

Chinese applicants—apparently simply because they were Chinese—while granting consent to

non-Chinese applicants.  *Id.* at 373–74.

Likewise, the Policy at issue here, apparently passed with the aim of ensuring a free,

public education to students and stemming the spread of COVID-19, Doc. 24-1 at p. 1, gave the

District discretion to give or withhold exemptions from the Policy's vaccine mandate, Doc. 24 at

¶ 59, 64, 78.  The Policy contemplates a group of similarly situated individuals—those who

object to receiving a COVID-19 vaccine.  The Policy appears to set out for all who so object the

same exemption-application process, whether their objection arises from religious beliefs,

disability, or other medical reasons.  Doc. 24-1 at pp. 1–2.  The Policy allowed all objectors

within these three categories to seek exemptions, but the District categorically withheld, without

having conducted any administrative review, consent from all religious-exemption applicants—

apparently simply because they were religious—while apparently reviewing all and granting

most of the non-religious requests.  *Id.* at ¶¶ 72–78, 84, 87.

Moreover, the District plausibly took its course "with an element of intentional or purposeful discrimination." *Snowden*, 321 U.S. at 8. True, the District denied certain non-religious requests in addition to denying the religious requests. Doc. 24 at ¶¶ 79–80. But that does not, by itself, render implausible any religious discrimination. The District plausibly denied equal protection to Plaintiffs, with an element of discrimination, when it allegedly reviewed, and made individual determinations on, non-religious requests for exemptions while categorically denying all religious exemption requests without even the benefit of individualized review. *Id.* at ¶¶ 72–80. To analogize again to *Yick Wo*, the Supreme Court there took issue with the fact that the ordinance allowed local officials to withhold consent whether or not the officials conducted an administrative review of an applicant's "personal character and qualifications." 118 U.S. at 368. Here, too, the Policy in its operation allegedly allowed the District to decide not only which applicants merited an exemption, but also which kinds of applications even deserved administrative review in the first place. Doc. 24 at ¶¶ 71–80. In effect, the Court can reasonably infer that the District decided that the requests of religious persons, for whatever reason, did not merit the same solicitude or administrative attention that the requests of non-religious persons merited. *Id.* at ¶ 84 ("The district has offered no plausible explanation why it treated medical and disability accommodation requests more favorably than those seeking religious [accommodations]."); *id.* at ¶¶ 78, 87.

Concluding that the District plausibly denied Plaintiffs equal protection of the laws with an element of intentional or purposeful discrimination, the Court turns to the question whether the Policy as alleged plausibly interferes with the fundamental right to free exercise or makes a suspect classification. *See Ashaheed*, 7 F.4th at 1250–51. If so, the Court must apply strict

27

scrutiny to the Policy.  *Id.* at 1250 (first citing *Fisher*, 570 U.S. at 310; and then citing *Save Palisade FruitLands*, 279 F.3d at 1210).

Plaintiffs have plausibly alleged that the Policy interferes with their fundamental free-exercise rights.  "[U]nquestionably, the free exercise of religion is a fundamental constitutional right" for Equal Protection purposes.  *Jesus Christ Is the Answer*, 915 F.3d at 265 (quoting *Johnson v. Robison*, 415 U.S. 361, 375 n.14 (1974)), *as amended* (Feb. 25, 2019); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 33 (1973) (A right is "fundamental" when it is "explicitly or implicitly guaranteed by the Constitution.").  The Court incorporates here its analysis of Plaintiffs' First-Amendment claim, in which the Court found that the Policy as alleged plausibly impermissibly burdened Plaintiffs' free-exercise rights.  *Cf. Jesus Christ Is the Answer*, 915 F.3d at 265 (finding a burdening of plaintiff's free-exercise rights for equal-protection purposes after finding a "substantial burdening" of those rights under RLUIPA).

Plaintiffs have also plausibly alleged that the Policy draws a distinction as to a protected class.  Suspect classifications for Equal Protection purposes include religious classifications.  *Ashaheed*, 7 F.4th at 1251; *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (referring to "inherently suspect distinctions such as race, religion, or alienage" in explaining when courts apply strict scrutiny in equal-protection cases).  And Plaintiffs have adequately alleged, as noted above, that the District chose to treat religious requests differently than other requests by deciding to categorically withhold exemptions without the benefit of administrative review.  Doc. 24 at ¶ 71, 84, 86–87.

Accordingly, both (1) the Policy's plausible interference with Plaintiffs' fundamental free-exercise rights and (2) its plausibly unlawful classification of religious persons in its application-review process independently compel the Court to apply strict scrutiny.  *Ashaheed*, 7

28

F.4th at 1250.  The Court has already found that the Policy as alleged plausibly fails strict-scrutiny review above and need not repeat that analysis here.  The Court need not address the District's argument that Plaintiffs do not have a fundamental right to work for the District, Doc. 28 at pp. 14–15, because Plaintiffs have alleged the District's interference with their free-exercise rights, and their claim can proceed.  Plaintiffs may face an uphill climb in seeking to prove the elements of their equal-protection claim, but for now they have alleged enough to "nudge[] their claims across the line from conceivable to plausible."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The Court, then, denies Defendants' motion as to count 3.

### D.    Title-VII Claim

Plaintiffs bring a claim under Title VII of the Civil Rights Act of 1964 against Defendant Board of Education only.  Title VII states:

> It shall be an unlawful employment practice for an employer –
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).  This provision requires but-for causation.  *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1740 (2020).  To establish a prima facie case of religious discrimination under Title VII, a plaintiff must show that he or she "(1) has a bona fide religious belief that conflicts with an employment requirement, (2) informed the employer of such conflict, and (3) suffered an adverse employment action."  *Ollis v. HearthStone Homes, Inc.*, 495 F.3d 570, 575 (8th Cir. 2007) (citing *Seaworth v. Pearson*, 203 F.3d 1056, 1057 (8th Cir. 2000)).

To survive a Rule 12(b)(6) motion in a Title VII case, the plaintiff need not plead facts establishing a prima facie case because the prima facie case is an evidentiary standard, not a pleading requirement. *Wilson v. Arkansas Dep't of Hum. Servs.*, 850 F.3d 368, 372 (8th Cir. 2017) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002)). Federal Rule of Civil Procedure 8(a)'s "simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Swierkiewicz*, 534 U.S. at 512–13. However, "elements of the prima facie case are [not] irrelevant to a plausibility determination in a discrimination suit. Instead, such elements are part of the background against which a plausibility determination should be made." *Blomker v. Jewell*, 831 F.3d 1051, 1056 (8th Cir. 2016) (internal citations and quotations omitted). The Court uses the elements of the prima facie case of discrimination based on religion as a "prism" to shed light on the plausibility of Plaintiffs' claim. *Id.*

First, Plaintiffs have adequately pleaded that they had "bona fide religious beliefs that conflict[ed]" with the requirement of vaccination. *Ollis*, 495 F.3d at 575. Plaintiffs plead that "[e]ach of the Plaintiffs have sincerely held religious beliefs that prevent them from receiving the COVID-19 vaccines." Doc. 24 at ¶ 69. The fact that Plaintiffs did not cave to the pressure to receive the vaccines even when threatened with termination, *id.* at ¶¶ 124–25, 129, further supports an inference that Plaintiffs' beliefs were "bona fide." *Ollis*, 495 F.3d at 575.

Second, Plaintiffs informed the Board of the conflict between their religious beliefs and the vaccination requirement when they submitted religious-exemption requests to the Board pursuant to the Policy. Doc. 24 at ¶¶ 64–69.

Third, Plaintiffs allege that the Board suspended without pay the teacher-Plaintiffs and terminated the non-certified Plaintiffs, except for Plaintiffs Wendy Huddleston and Jamell Wren,

who received medical exemptions and kept their jobs. *Id.* at ¶¶ 133–35  Termination, as the paradigmatic adverse-employment action under Title VII, satisfies the third element. *See Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 616 (8th Cir. 2007) (quoting *Thompson v. Bi-State Dev. Agency*, 463 F.3d 821, 825 (8th Cir. 2006)).  And suspension for roughly three months without pay, akin as it is to a temporary termination, likewise plausibly satisfies the third element. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 73 (2006) (finding reasonable a jury's conclusion that a 37-day suspension without pay was materially adverse under Title VII).  Accordingly, all Plaintiffs, except Wendy Huddleston and Jamell Wren, have plausibly satisfied the third element.

"Once a plaintiff establishes a prima facie case, the burden shifts to the employer to show that accommodation would result in undue hardship to the employer." *Seaworth v. Pearson*, 203 F.3d 1056, 1057 (8th Cir. 2000) (first citing *Toledo v. Nobel-Sysco, Inc.*, 892 F.2d 1481, 1486 (10th Cir. 1989); then citing *Wilson v. U.S. West Commc'ns*, 58 F.3d 1337, 1340 (8th Cir. 1995); and then citing 42 U.S.C. § 2000e(j)).  Under 42 U.S.C. § 2000e(j), "[t]he term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."  The Supreme Court has defined "undue hardship" as "more than a *de minimis* cost." *Brown v. Polk Cnty., Iowa*, 61 F.3d 650, 655 (8th Cir. 1995) (quoting *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 84 (1977)).  "Any hardship asserted, furthermore, must be 'real' rather than 'speculative.'" *Id.* (quoting *Cook v. Chrysler Corp.,* 981 F.2d 336, 339 (8th Cir. 1992)).

Here, Plaintiffs' allegations support the inference that the Board's course of action sought to avoid *any* cost associated with reviewing and granting Plaintiffs' requests. Doc. 24 at ¶¶ 71–76, 84, 86–88, 90. But the law requires employers to grant accommodations amounting to no more than a *de minimis* cost. Plaintiffs have alleged the existence of accommodations—which the Board had previously used and used again in the cases of medical disability exemptions—that, the Court can reasonably conclude, would have imposed only a *de minimis* cost on the District. *Id.* at ¶¶ 90–94, 179. The Board, of course, may challenge Plaintiffs' factual assertions with facts of their own at a later stage in this litigation, *see Swierkiewicz*, 534 U.S. at 512–13, but for now, suspended and terminated Plaintiffs have asserted enough to state a claim under Title VII. Accordingly, as to all Plaintiffs except Wendy Huddleston and Jamell Wren, the Court denies the motion to dismiss count 5; as to Plaintiffs Wendy Huddleston and Jamell Wren, the Court grants the motion to dismiss count 5.

### E.     Claim under the Missouri Human Rights Act

Plaintiffs also bring an employment-related-religious-discrimination claim under the Missouri Human Rights Act (MHRA) against the Defendant Board of Education only. The Missouri Human Rights act, which largely mirrors Title VII in all relevant respects here, states:

1. It shall be an unlawful employment practice:

(1) For an employer, because of the race, color, religion, national origin, sex, ancestry, age or disability of any individual:

(a) To fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, national origin, sex, ancestry, age or disability;

(b) To limit, segregate, or classify his employees or his employment applicants in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an

32

employee, because of such individual's race, color, religion, national origin, sex, ancestry, age or disability[.]

Mo. Rev. Stat. § 213.055.1(1).  "The MHRA and Title VII are coextensive, but not identical, acts."  *Brady v. Curators of Univ. of Missouri*, 213 S.W.3d 101, 112 (Mo. Ct. App. 2006) (quoting *Hammond v. Mun. Correction Inst.*, 117 S.W.3d 130, 136 (Mo. Ct. App. 2003)) (emphasis deleted).  "Missouri Courts have adopted Title VII case law when interpreting analogous discrimination statutes in the Missouri Human Rights Act."  *Id.* at 113 (citing *Hammond*, 117 S.W.3d at 137).  The MHRA's prohibition against religious-based discrimination mirrors Title VII's, except that the MHRA requires a showing of "motivating factor" causation, Mo. Rev. Stat. § 213.010(2), whereas Title VII requires "but-for" causation, *see Bostock*, 140 S. Ct. at 1740.  The MHRA defines "motivating factor" as follows:  "the employee's protected classification actually played a role in the adverse action or decision and had a determinative influence on the adverse decision or action."  Mo. Rev. Stat. § 213.010(19).

The Court has not found, nor have the parties cited, any Missouri cases on religious discrimination under the MHRA, so the Court incorporates here its Title-VII analysis as to all elements of Plaintiffs' MHRA claim except causation (the only materially different element between the statutes).  *See Brady*, 213 S.W.3d at 113 (citing *Hammond*, 117 S.W.3d at 137).  As for the causation requirement, the difference in the two statutes' standards makes no difference here.  Above, the Court found plausible Plaintiffs' assertions that, but for their religious beliefs, they would not have suffered adverse employment actions.  And the Court can easily infer here that the religion of each Plaintiff "actually played a role in the adverse action[s] . . . and had a determinative influence on the adverse . . . action[s]," Mo. Rev. Stat. § 213.010(19), because Plaintiffs' religious beliefs, not some other force or consideration, compelled them to refrain from receiving COVID-19 vaccinations.  Doc. 24 at ¶ 68.  Accordingly, for reasons stated above,

33

all Plaintiffs except Wendy Huddleston and Jamell Wren have stated an MHRA claim, and the

Court denies the motion to dismiss count 4 as to those Plaintiffs.  The Court grants the motion to

dismiss count 4 as to Wendy Huddleston and Jamell Wren.

> **F.      Claim under the Missouri Religious Freedom Restoration Act**

Plaintiffs bring a claim against all Defendants under the Missouri Religious Freedom

Restoration Act (MRFRA).  The MRFRA states, in part:

1.  A governmental authority may not restrict a person's free exercise of religion,
    unless:

(1)  The restriction is in the form of a rule of general applicability, and does not
     discriminate against religion, or among religions; and

(2)  The governmental authority demonstrates that application of the restriction to
     the person is essential to further a compelling governmental interest, and is
     not unduly restrictive considering the relevant circumstances.

Mo. Rev. Stat. § 1.302.1.  The MRFRA "appl[ies] to all state and local laws, resolutions and

ordinances and the implementation of such laws, resolutions, and ordinances, whether statutory

or otherwise."  Mo. Rev. Stat. § 1.307.1.

Defendants argue: (1) that the Missouri Human Rights Act partially repeals the MRFRA

by implication; (2) that MRFRA provides no private right of action; and (3) that the MRFRA on

its face does not apply to the Policy, which is not a "law[]," "resolution[]," or "ordinance[]."

Doc. 28 at pp. 27–28; Doc. 33 at p. 15.  As a threshold matter, the Court would have to reject all

three arguments to proceed in its analysis of Plaintiffs' claim—and all three arguments present

state-law matters of first impression.  *See Marianist Province of United States v. City of*

*Kirkwood*, 944 F.3d 996, 1004 (8th Cir. 2019) (noting the poverty of caselaw on the MRFRA).

The Court avoids the Charybdis that last two arguments represent and sails instead toward the

less-deadly Scylla represented by the first:  whether the Missouri Human Rights Act partially repealed the MRFRA by implication.

While no Missouri (or federal) court appears to have interpreted the preemption clause of the Missouri Human Rights Act as it applies to MRFRA, the Court can resolve the matter with the ordinary tools of statutory interpretation that Missouri courts use.  Where "the Supreme Court of Missouri has not addressed an issue, [the Court] must predict how the court would rule." *Davis v. Buchanan Cnty., Missouri*, 5 F.4th 907, 909 (8th Cir. 2021) (quoting *Washington v. Countrywide Home Loans, Inc.*, 747 F.3d 955, 958 (8th Cir. 2014)). That means the Court must "apply Missouri's rules of statutory construction when interpreting Missouri statutes." *In re Dittmaier*, 806 F.3d 987, 989 (8th Cir. 2015); *see also Gershman v. Am. Cas. Co. of Reading, Pa.*, 251 F.3d 1159, 1162–63 (8th Cir. 2001) ("[W]e are bound by Missouri's rules of statutory construction.").  "The seminal rule of statutory construction [in Missouri] is to ascertain the intent of the legislature from the language used and to consider the words used in their plain and ordinary meaning." *Missouri Beverage Co. v. Shelton Bros.*, 669 F.3d 873, 877 (8th Cir. 2012) (quoting *St. Louis Cnty. v. Prestige Travel, Inc.*, 344 S.W.3d 708, 713–14 (Mo. 2011)).

The relevant text of the Missouri Human Rights Act, which the General Assembly amended most recently in 2017, states that "[t]his chapter, in addition to chapter 285 [The Whistleblower's Protection Act] and chapter 287 [The Workers' Compensation Law], shall provide the *exclusive* remedy for any and all claims for injury or damages arising out of an employment relationship."  Mo. Rev. Stat. § 213.070 (emphasis added).  The Act allows for both legal and equitable remedies.  Mo. Rev. Stat. § 213.111.2.  Plaintiffs attempt to bring a claim "arising out of an employment relationship" under the MRFRA, alleging that "[t]he District's

implementation of [the Policy] violates Plaintiffs' exercise of free religion" and seeking declaratory and injunctive relief.  Doc. 24 at ¶¶ 248, 255.  Defendants point to the plain language of the Missouri Human Rights Act, arguing that it bars MRFRA claims arising out of an employment relationship.

The Missouri Human Rights Act does not define the key words—"exclusive" and "remedy"—but "[a]bsent a statutory definition, the plain and ordinary meaning of the specific words used must be followed."  *State ex rel. Broadway-Washington Assocs., Ltd. v. Manners*, 186 S.W.3d 272, 275 (Mo. 2006) (citing *Ports Petroleum Co., Inc. of Ohio v. Nixon,* 37 S.W.3d 237, 240 (Mo. 2001)).  "Exclusive" means "single" or "sole."  *Webster's Third New International Dictionary* 793 (2002).  "Remedy" means "the legal means to recover a right or to prevent or obtain redress for a wrong."  *Id.* at 1920.  Thus, the Missouri Human Rights Act and two other enumerated statutes not at issue here provide the sole means to obtain redress for employment-related wrongs.  Plaintiffs have already stated a religious-discrimination claim under the Missouri Human Rights Act that plausibly involved "unlawful employment practices," Mo. Rev. Stat. § 285.575.3, and that "ar[ose] out of an employment relationship," Mo. Rev. Stat. § 213.070.2.

Concluding that the Missouri Human Rights Act bars claims arising from an employment relationship under the MRFRA presents a difficulty:  implied repeal "is not favored."  *Vining v. Probst*, 186 S.W.2d 611, 615 (Mo. Ct. App. 1945).  A number of countervailing considerations put this worry to rest, however.  First, "[i]f there be any conflict between two statutes dealing with the same common subject matter, the statute which deals with it in a minute and particular way will prevail over one of a more general nature; and the statute which takes effect at the later date will also usually prevail."  *Id.* at 615.  The Missouri Human Rights Act deals with religious-

discrimination claims arising from an employment relationship in a "minute and particular way"—indeed, it defines such claims and grants a cause of action to seek appropriate remedies. Mo. Rev. Stat. §§ 213.055.1, 213.070, 213.111.  The MRFRA, in contrast, broadly bars all "restrict[ions]" on "a person's free exercise of religion"—whether in the employment context or not—and does not specify what, if any, remedies a plaintiff may seek.  Mo. Rev. Stat. § 1.302.1. Further, the General Assembly amended the Missouri Human Rights Act to include the "exclusive remedy" provision in 2017, whereas the MRFRA has remained untouched since 2003. So the Court ought to resolve the conflict in favor of the more specific, more recent Missouri Human Rights Act.  *See Vining*, 186 S.W.2d at 615.

Second, "[i]f the later law did repeal the earlier, in part, by implication, it only did so insofar as the two may be in conflict."  *Vining*, 186 S.W.2d at 615.  Here, the Missouri Human Rights Act surely did not impliedly repeal the MRFRA in its entirety; the Court limits its conclusion to the proposition that the Missouri Human Rights Act partially repeals the MRFRA insofar as religious-discrimination claims arising from an employment relationship are concerned.  The Missouri Human Rights Act appears to leave the MRFRA otherwise untouched.

Third, the Missouri Supreme Court "presume[s] the General Assembly legislates with knowledge of existing laws."  *Turner v. Sch. Dist. of Clayton*, 318 S.W.3d 660, 667–68 (Mo. 2010).  Presumably, then, the General Assembly knew of the MRFRA's broad protection of religious exercise but chose instead to funnel *employment*-related claims through the Missouri Human Rights Act.  The Court has not found, nor have the parties cited, any case in which a court found an exception to the Missouri Human Rights Act's plain "exclusive remedy" language.

Fourth, the Missouri Supreme Court has long applied the maxim "expressio unius est exlusio alterius," which "is never more applicable than in the construction of statutes." *Keane v. Strodtman*, 18 S.W.2d 896, 898 (Mo. 1929). According to this maxim, "the express mention of one thing implies the exclusion of another." *Disalvo Properties, LLC v. Bluff View Com., LLC*, 464 S.W.3d 243, 245 (Mo. Ct. App. 2015) (quoting *McCoy v. The Hershewe Law Firm, P.C.,* 366 S.W.3d 586, 593–94 (Mo. Ct. App. 2012)). "This particular rule, which should be used with great caution, allows an inference that obvious omissions by the legislature are generally presumed to be intentional exclusions." *Id.* (first citing *McCoy*, 366 S.W.3d at 594; and then citing *Six Flags Theme Parks, Inc. v. Dir. of Revenue,* 179 S.W.3d 266, 269–70 (Mo. 2005). The Missouri Human Rights Act expressly mentions three—and only three— "exclusive[]" statutes under which plaintiffs can bring claims arising out an employment relationship and thereby "implie[dly]" excluded other statutes. Accordingly, this maxim further supports the conclusion that the General Assembly intended to preempt MRFRA claims arising from an employment relationship.

Fifth, and relatedly, Missouri Courts "enforce statutes as they are written, not as they might have been written." *Id.* at 249 (quoting *Smith v. McAdams,* 454 S.W.3d 418, 421 (Mo. Ct. App. 2015)). Courts may "not engraft upon [a] statute provisions which do not appear in explicit words or by implication from other words in the statute." *Id.* (quoting *State v. Collins,* 328 S.W.3d 705, 709 n.6 (Mo. 2011)) (alteration in original). Plaintiffs argue that the General Assembly intended to bar only common-law causes of action for claims arising from an employment relationship. Doc. 32 at pp. 23–25. That may be possible, but that is not how the General Assembly drafted the Missouri Human Rights Act. The General Assembly, as noted, excluded the MRFRA from its enumeration of statutes granting a cause of action for claims

arising from an employment relationship, and it expressed no intent to preempt only common-law causes of action. The text of the Missouri Human Rights Act clearly purports to offer, along with two other statutes, the *exclusive* remedy for claims arising from an employment relationship. Mo. Rev. Stat. § 213.070. The Court cannot, even if it wanted to, "engraft" onto the Missouri Human Rights Act a MRFRA exception or a provision stating that the Act bars only common-law claims. Like Odysseus tied to the mast of his ship to resist the alluring call of the sirens, the Court binds itself to the text of the statute to determine the legislature's intent and to avoid the alluring snare of statutory revisionism.

The Court's conclusion here accords with the Eight Circuit's holding that Title VII preempts the federal Religious Freedom Restoration Act. As noted, Missouri courts often look to federal Title-VII caselaw when interpreting the Missouri Human Rights Act. *Brady*, 213 S.W.3d at 113 (citing *Hammond*, 117 S.W.3d at 137). Like Title VII, the Missouri Human Rights Act, along with two other statutes, purports to offer the exclusive remedy for claims arising from an employment relationship. Accordingly, the Eighth Circuit once observed, "Title VII provides the exclusive remedy for . . . claims of religious discrimination," and, therefore, claims for employment-related-religious discrimination claims under RFRA "are barred." *Harrell v. Donahue*, 638 F.3d 975, 984 (8th Cir. 2011).

Because Plaintiffs seek remedies for a claim arising from an employment relationship, they must bring that claim under an appropriate statute (as indeed they have). Accordingly, the Court grants Defendants' motion as to count 6.

### G.     Claim under Mo. Rev. Stat. § 188.120

Plaintiffs finally bring a claim under Mo. Rev. Stat. § 188.120, which the General Assembly passed in 1986 (for simplicity, "the 1986 Act"). The 1986 Act provides a cause of

action to "[a]ny individual injured by any person, association, corporation, or entity by reason of any action prohibited by sections 188.100 to 188.120."  One of these covered provisions defines the following prohibited action:

> 1. It shall be unlawful:
>
> (1) For an employer:
>
> (a) To fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his or her compensation, terms, conditions, or privileges of employment, because of such individual's refusal to participate in abortion.

Mo. Rev. Stat. § 188.105.1(1)(a).  The 1986 Act in turn defines "participate in abortion" as follows:  "to perform, assist in, refer for, promote, procure, or counsel a woman to have an abortion not necessary to save the life of the mother; or to undergo an abortion."  Mo. Rev. Stat. § 188.100(2).

Here, too, the District argues that the Missouri Human Rights Act partially repeals by implication the 1986 Act.  Doc. 28 at p. 27.  Plaintiffs respond that the Missouri Human Rights Act does not repeal the 1986 Act because the 1986 Act employs a broader definition of "employer" than the Missouri Human Rights Act.  The Missouri Human Rights Act states that its definition of "employer" "shall not include . . . [a]n individual employed by an employer."  Mo. Rev. Stat. § 213.010(8)(c).  The 1986 Act, on the other hand, defines "employer" as "the state, or any political or civil subdivision thereof, or any person employing two or more persons within the state, and *any person acting as an agent of the employer*."  Mo. Rev. Stat. § 188.100(1) (emphasis added).  The Missouri Human Rights Act, so the argument goes, does not preempt the 1986 Act because the Missouri Human Rights Act is narrower in scope than the 1986 Act.  The Court need not venture into that analysis because, even if the Missouri Human Rights Act did not preempt the 1986 Act, Plaintiffs have not stated a claim under it.

Plaintiffs' allegations do not raise the reasonable inference that the District discriminated against them for their "refusal to participate in abortion."  Mo. Rev. Stat. § 188.105.1(1)(a) (emphasis added).  The District allegedly terminated or suspended Plaintiffs for refusing to receive vaccines.  Doc. 24 at ¶¶ 256–66.  And the vaccines, Plaintiffs allege, were "developed, tested and/or manufactured using aborted fetuses."  *Id.* at ¶ 261.  The Court assumes that they mean to argue that receiving the vaccine would amount to "promot[ing]" abortion under the 1986 Act, as "promote" is the only verb from the statutory definition that receiving a vaccine could conceivably fall under.  *Id.*  That argument fails.

The parties have not cited, nor has the Court found, any Missouri cases interpreting the 1986 Act.  Indeed, Plaintiffs do not offer any argument in support of claim other than the assertion that "the claim is straightforward," Doc. 32 at p. 27.  The Court, again, must "predict how the [Supreme Court of Missouri] would rule" by applying its rules of statutory interpretation.  *Davis*, 5 F.4th at 909 (quoting *Washington*, 747 F.3d at 958).  Applying those rules here, the Court concludes that the General Assembly did not intend to protect, through this statute, employees who refuse to use or receive products, like the vaccines, that bear some connection to abortion.

Crucially, the statutory definition of "participate in abortion"—i.e., "to perform, assist in, refer for, promote, procure, or counsel a woman to have an abortion not necessary to save the life of the mother; or to undergo an abortion"—lists verbs that relate to "*an* abortion not necessary to save the life of the mother" and "*an* abortion."  Mo. Rev. Stat. § 188.100(2) (emphasis added).  As the article-adjective "an" makes clear, those verbs relate to a particular abortion, not abortion generally.  The plain text of the statute compels this reading.  But even if the statute were

ambiguous as to whether "promote" referred to abortion generally, the Missouri Supreme

Court's methods of statutory interpretation confirm the Court's reading.

Where a "word at issue appears in the statute within a list of words, the [Missouri

Supreme] Court will apply the principle of statutory construction known as *noscitur a sociis*—a

word is known by the company it keeps." *Union Elec. Co. v. Dir. of Revenue*, 425 S.W.3d 118,

122 (Mo. 2014) (citing *Aquila Foreign Qualifications Corp. v. Dir. of Revenue*, 362 S.W.3d 1, 5

(Mo. 2012)). "Under this principle, a court looks to the other words listed in a statutory

provision to help it discern which of multiple possible meanings the legislature intended." *Id.*

(citing *Albanna v. State Bd. of Registration for Healing Arts,* 293 S.W.3d 423, 431 (Mo. 2009)).

The verb "promote" must relate to a single abortion because the adjacent verbs "perform,"

"assist in," "refer for," "procure," "counsel a woman to have," and "undergo" can only relate to a

particular abortion, not abortion writ large.  Mo. Rev. Stat. § 188.100(2).

Plaintiffs, to be sure, do allege that the vaccines relate to single abortions, but abortions

that occurred decades ago.  In particular they allege that the Pfizer and Moderna vaccines "used

fetal cell line HEK 293 during the research and development phase.  All HEK 293 cells are

descended from tissue taken from a 1973 abortion that took place in the Netherlands. . . . [And]

[a]ll PER.C6 cells used to manufacture the Johnson & Johnson vaccine are descended from

tissue taken from a 1985 abortion that took place in the Netherlands."  Doc. 24 at ¶ 115.  But

Plaintiffs fail to establish how receiving a vaccine that bears a connection to an abortion that took

place generations ago amounts to "promot[ing]," and so "participat[ing]" in, that abortion.  Mo.

Rev. Stat. § 188.100(2).

On Plaintiffs allegations, the Court cannot draw the reasonable inference that receiving

the vaccine amounts to "promot[ing]," and so "participat[ing]" in, abortion under the 1986 Act.

Receiving a vaccine that used cells derived from an abortion in its research, development, and/or manufacture does not reasonably fall within the plain meaning of "promot[ing]" an abortion. Because Plaintiffs have failed to state a claim under the 1986 Act, the Court grants Defendants' motion to dismiss as to count 7.

## IV.     Conclusion

Accordingly, the Court fully grants Defendants' motion as to counts 2 (Due Process claim), 6 (MRFRA claim), and 7 (1986 Act claim).  The Court further grants the motion to dismiss counts 4 (MHRA claim) and 5 (Title VII claim) only as to Plaintiffs Wendy Huddleston and Jamell Wren.  The Court fully denies Defendants' motion to dismiss as to counts 1 (First Amendment claim) and 3 (Equal Protection claim).  The Court denies the motion to dismiss counts 4 (MHRA claim) and 5 (Title VII claim) as to all Plaintiffs except Wendy Huddleston and Jamell Wren.

So Ordered this 21st day of June 2023.

_____
STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE