UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| WANDA BRANDON et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:22-cv-00635-SRC |
| | ) | |
| BOARD OF EDUCATION OF THE | ) | |
| CITY OF ST. LOUIS et al., | ) | |
| | ) | |
| Defendants. | ) | |

**Memorandum and Order**

I.     **Terminology**.................................................................................................**3**

    A.     **"Plaintiffs"**....................................................................................**3**

    B.     **"Board" and "school district"**.....................................................**4**

II.    **Plaintiffs' Rule 702 motion**......................................................................**4**

    A.     **Standard**.......................................................................................**5**

    B.     **Discussion**.....................................................................................**7**

III.   **The parties' summary-judgment motions** ..............................................**13**

    A.     **Background** ..................................................................................**13**

        1.     **Factual background** ..........................................................**13**

            a.     **Timeline of events** .................................................**13**

            b.     **Facts about COVID-19 and vaccinations** ...............**23**

        2.     **Procedural background**......................................................**26**

    B.     **Standard**.......................................................................................**27**

    C.     **Discussion**.....................................................................................**28**

|  |  |  |  |
|---|---|---|---|
| **1.** | **Issues common to all claims** | | **28** |
|  | **a.** | **Religiosity** | **29** |
|  | **b.** | **Sincerity** | **34** |
| **2.** | **Free Exercise claim** | | **37** |
|  | **a.** | **Determining the level of scrutiny** | **38** |
|  |  | **i.** | ***Jacobson* deference** | **38** |
|  |  | **ii.** | **Neutrality and general applicability** | **45** |
|  | **b.** | **Applying strict scrutiny** | **49** |
|  | **c.** | **Qualified-immunity defense** | **53** |
| **3.** | **Equal Protection claim** | | **56** |
|  | **a.** | **Similarly situated** | **57** |
|  | **b.** | **Differential treatment** | **65** |
|  | **c.** | **Discriminatory intent** | **65** |
|  | **d.** | **Applying strict scrutiny** | **67** |
|  | **e.** | **Qualified-immunity defense** | **67** |
| **4.** | **Title VII claim** | | **68** |
| **5.** | **MHRA claim** | | **74** |
| **IV.** | **Conclusion** | | **76** |

In fall 2021, the Board of Education of the City of St. Louis, through Superintendent Kelvin Adams and Chief Human Resources Officer Charles Burton, imposed a vaccination mandate on its employees.  Although the Board *invited* requests for religious exemptions (and received nearly 200 of them), it denied every single one of them.  Instead, the Board chose to

suspend or terminate dozens of its employees who refused to comply with the mandate on religious grounds.  Many of the employees brought this suit against the Board, Adams, and Burton.

In this Memorandum and Order, the Court addresses three pending motions.  First, Plaintiffs move, under Federal Rule of Evidence 702, to exclude the proposed expert testimony of Dr. Daniel Salmon.  Doc. 127.  Second, Plaintiffs move for summary judgment on their claim that Defendants violated their Equal Protection rights under the Fourteenth Amendment to the United States Constitution.  Doc. 132.  Third, Defendants move for summary judgment on all claims.  Doc. 129.  The Court addresses the expert motion, and then considers together the summary-judgment motions.

## I.    Terminology

### A.    "Plaintiffs"

The operative complaint lists 43 plaintiffs.  Doc. 24 at 1–2.[1]  As of the date of this Memorandum and Order, six plaintiffs have obtained, through settlement, judgments against Defendants.  Docs. 86–97, 170–71.  Another eight plaintiffs have dismissed their claims against Defendants with prejudice.  Docs. 205–06, 214, 217.  Another 13 plaintiffs have settled their claims against Defendants but have not yet filed stipulations of dismissal, motions to dismiss, or consent judgments.  Docs. 182, 187, 192, 198, 220.  As to these 13 plaintiffs, the Court has denied, without prejudice, all pending motions.  Docs. 185, 190, 194, 200, 227.  When the Court refers to "Plaintiffs" in this Memorandum and Order, it refers only to those plaintiffs who have active claims in the case.  Those plaintiffs include only:  James Apple, Wanda Brandon, Anthony Comparato, Andrew Craig, Alice Crockett, Anne Gillespie, Amira Herndon, Marc Ingram,

---

[1] The Court cites to page numbers as assigned by CM/ECF.

Michelle Johnson, Precious Mabry, Jeffery McCaw, Johnnie McCreary, Tammy O'Connor, Paul Perniciaro, Shenicquel Spotts, and Quinton Stewart. *See* doc. 220.

### B.    "Board" and "school district"

As the Court noted in an earlier order, "[t]he parties, throughout the summary-judgment briefing and other filings, blur the distinction between the Board of Education of the City of St. Louis and the Saint Louis Public School District." Doc. 215 at 1 (citation omitted). The parties have since jointly stipulated "that the Board of Education of the City of St. Louis and the Saint Louis Public School District were the same legal entity" at all relevant times. Doc. 221 at 1. For the sake of consistency, in this Memorandum and Order the Court refers to the entity defendant as the "Board." The Court also uses the term "Board" to refer to Plaintiffs' employer. The Court uses the term "school district" to refer to the collection of schools that comprise the Saint Louis Public School District.

## II.    Plaintiffs' Rule 702 motion

Before the Court can discuss the summary-judgment motions, it must first address Plaintiffs' Motion to Exclude Proposed Expert Testimony of Dr. Daniel Salmon Pursuant to Daubert. Doc. 127. Dr. Salmon works as a professor of global disease epidemiology and control in the Department of International Health at the Johns Hopkins University Bloomberg School of Public Health. Doc. 128-2 at 1. Defendants retained Dr. Salmon to provide opinions in six general areas: (1) the threat of COVID-19 in October 2021, (2) the "[s]afety and [e]fficacy of COVID-19 vaccines," (3) institutions' COVID-19 vaccine mandates, (4) the "[i]mpact of medical and religious exemption requests," (5) "the anti-vaccine movement's impact on mandatory vaccine policies," and (6) the connection between COVID-19 vaccines and stem cells. *Id.* at 2–3.

4

A.      **Standard**

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court of the United

States interpreted the then-effective version of Rule 702 to require district courts to be certain

that expert evidence based on scientific, technical, or other specialized knowledge is "not only

relevant, but reliable."  509 U.S. 579, 589 (1993).  The district court must make a "preliminary

assessment of whether the reasoning or methodology underlying the testimony is scientifically

valid and of whether that reasoning or methodology properly can be applied to the facts in

issue."  *Id.* at 592–93.

Post-*Daubert* amendments to Rule 702 clarify the standard:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a)      the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)      the testimony is based on sufficient facts or data;

(c)      the testimony is the product of reliable principles and methods; and

(d)      the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702 (2023); *see also* Fed. R. Evid. 702 advisory committee's note to 2000

amendment ("Rule 702 has been amended in response to *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and to the many cases applying *Daubert* . . . .").

The Eighth Circuit has further clarified the Rule 702 standard.  Proposed expert

testimony must meet three criteria to be admissible under Rule 702.  "First, evidence based on

scientific, technical, or other specialized knowledge must be useful to the finder of fact in

deciding the ultimate issue of fact.  This is the basic rule of relevancy."  *Lauzon v. Senco Prods.,*

*Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (citation omitted). "Second, the proposed witness must be qualified to assist the finder of fact." *Id.* (citation omitted). "Third, 'the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires . . . .'" *Id.* (alteration in original) (first quoting 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 702.02[3] (2001); and then citing *Daubert*, 509 U.S. at 591). To meet the third criterion, the testimony must be "based on sufficient facts or data" and be "the product of reliable principles and methods," and the expert must have reliably applied "the principles and methods to the facts of the case." Fed. R. Evid. 702(b)–(d).

Rule "702 reflects an attempt to liberalize the rules governing the admission of expert testimony." *Shuck v. CNH Am., LLC*, 498 F.3d 868, 874 (8th Cir. 2007) (quoting *Lauzon*, 270 F.3d at 686). The rule "favors admissibility if the testimony will assist the trier of fact." *Clark ex rel. Clark v. Heidrick*, 150 F.3d 912, 915 (8th Cir. 1998) (citation omitted). Doubt regarding "whether an expert's testimony will be useful should generally be resolved in favor of admissibility." *Id.* (quoting *Larabee v. MM & L Int'l Corp.*, 896 F.2d 1112, 1116 n.6 (8th Cir. 1990)).

Under Rule 702, the district court has a gatekeeping responsibility to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (quoting *Daubert*, 509 U.S. at 597). "When making the reliability and relevancy determinations, a district court may consider" the following:

> (1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) whether the theory or technique has a known or potential error rate and standards controlling the technique's operation; and (4) whether the theory or technique is generally accepted in the scientific community.

*Russell v. Whirlpool Corp.*, 702 F.3d 450, 456 (8th Cir. 2012) (citing *Daubert*, 509 U.S. at 593–94). "This evidentiary inquiry is meant to be flexible and fact specific, and a court should use, adapt, or reject *Daubert* factors as the particular case demands." *Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir. 2005) (citing *Kumho*, 526 U.S. at 141–42). "There is no single requirement for admissibility as long as the proffer indicates that the expert evidence is reliable and relevant." *Id.*

As a general rule, "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Neb. Plastics, Inc. v. Holland Colors Ams., Inc.*, 408 F.3d 410, 416 (8th Cir. 2005) (quoting *Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002)). But "if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury, it must be excluded." *Id.* (citing *Hartley*, 310 F.3d at 1061). An expert opinion is fundamentally unsupported when it "fails to consider the relevant facts of the case." *Id.* (citation omitted).

**B.    Discussion**

Plaintiffs seek to exclude Dr. Salmon's proposed testimony on multiple grounds. *See* doc. 128. The Court goes through Plaintiffs' objections one by one.

First, Plaintiffs challenge the factual basis for Dr. Salmon's opinions. They argue that Dr. Salmon "did not review any . . . documents other than . . . three exhibits," that he did not "know how many exemption[] requests the [Board] received," and that he lacked knowledge about the specific parties in the case. *Id.* at 4–5 (citations omitted). But these objections challenge the factual basis for Dr. Salmon's opinions, so these objections go to the weight, and not to the admissibility, of Dr. Salmon's opinions. *See Hartley*, 310 F.3d at 1061 ("As a general

rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." (quoting *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929–30 (8th Cir. 2001))). At the very least, these objections do not warrant dismissing Dr. Salmon's opinions wholesale. *See id.* (providing that a district court should exclude an expert opinion because of an inadequate factual basis only if the opinion "is so fundamentally unsupported that it can offer no assistance to the jury" (quoting *Bonner*, 259 F.3d at 929–30)).

Second, Plaintiffs argue that Dr. Salmon's opinions lack relevancy because they do not relate to Defendants' stated reasons for denying Plaintiffs' religious exemption requests. Doc. 128 at 5. Specifically, Plaintiffs argue that the only reason that Defendants gave for denying Plaintiffs' exemption requests was the need to "balance the constitutional obligation to provide a free public education" to Missouri youth against the right to the free exercise of religion. *Id.* (quoting doc. 128-3). And Plaintiffs thus argue that any other attempted justification for the denials bears no relevance to the case because "[g]overnment 'justification[s]' for interfering with First Amendment rights 'must be genuine, not hypothesized or invented post hoc in response to litigation.'" *Id.* (second alteration in original) (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)).

In *Virginia*, the Supreme Court of the United States held that justifications for sex-based classifications "must be genuine, not hypothesized or invented post hoc in response to litigation" to survive scrutiny under the Equal Protection clause of the Fourteenth Amendment. 518 U.S. at 533. And in *Kennedy v. Bremerton School District*, the Court quoted that proposition in the First Amendment Free Exercise context. 597 U.S. 507, 543 n.8 (2022). There, the defendant school district invoked the interest of ensuring "order" at football games as a justification for

suppressing the plaintiff football coach's public prayers.  *Id.* at 512–14, 543 n.8.  The Court

rejected the defendant's reliance on that interest because the defendant "never raised concerns

along [those] lines in its contemporaneous correspondence with" the plaintiff.  *Id.* at 543 n.8.

Courts have not thoroughly developed the post-hoc-in-response-to-litigation doctrine in

the individual-rights context.  The *Virginia* Court stated the doctrine in broad terms when

describing the Equal Protection standard, but it did not use the doctrine to rule out any of the

government defendant's asserted interests.  *See* 518 U.S. at 533.  And although the *Kennedy*

Court *did* use the doctrine to reject one of the government defendant's asserted interests, the

Court buried its rejection in a footnote, with no explanation about how *explicitly* and *promptly*

the government must articulate an interest before the government forever loses the right to assert

that interest as a justification for its challenged policies.  *See* 597 U.S. at 543 n.8.

Here, the Court rejects Plaintiffs' argument that Defendants' asserted interest in

neutralizing the threat of COVID-19 amounts to "an invented post hoc response in response to

litigation for the denial of Plaintiffs' religious vaccine exemption requests."  Doc. 128 at 5.  Sure,

the letters denying the religious-exemption requests, described in more detail below, did not

explicitly mention the Board's interest in protecting students and staff from COVID-19.

*See, e.g.*, doc. 124-48.  But the challenged vaccination policy *itself* did, *see* doc. 124-3 at 1 ("The

Board of Education has adopted this policy . . . to safeguard the health and well-being of

employees and their families, and to maintain a public school environment wherein the

recognized hazards associated with COVID-19 are mitigated to the fullest extent possible

through use of approved COVID-19 vaccines."), as did a contemporaneous message that Board

employees received about the policy, *see* doc. 124-2 at 1 ("According to information and advice

from our healthcare partners, mandating a COVID-19 vaccine is our best way to protect our

students, staff, and families.").  Thus, the post-hoc-in-response-to-litigation doctrine does not render Dr. Salmon's opinions irrelevant.  *See Kennedy*, 597 U.S. at 543 n.8 (rejecting an asserted interest where the government defendant "never raised concerns" related to the interest "in its contemporaneous correspondence" with the plaintiff).

Third, Plaintiffs argue that Dr. Salmon's opinions "express factual determinations that a jury is readily capable of making without expert assistance" and that his opinions "are premised on publicly available information regarding the COVID-19 pandemic."  Doc. 128 at 6.  Plaintiffs point to no specific opinions of Dr. Salmon's that they believe a jury would be "readily capable of making without expert assistance."  *Id.*  Seeing none that appear obvious from Dr. Salmon's report, the Court rejects Plaintiffs' argument on this ground as undeveloped.  *See, e.g.*, *In re Vera T. Welte Testamentary Tr.*, 96 F.4th 1034, 1039 (8th Cir. 2024) (noting that the Court is "not obliged to consider [a] perfunctorily raised, undeveloped argument" (citing *United States v. Kirk*, 528 F.3d 1102, 1104 n.2 (8th Cir. 2008))); *Garden v. Cent. Neb. Hous. Corp.*, 719 F.3d 899, 905 n.2 (8th Cir. 2013) (holding an undeveloped argument to be waived because the party had not developed it).

Fourth, Plaintiffs argue that Dr. Salmon's testimony would be "unfairly prejudicial" because it would associate Plaintiffs "with anti-vaccine movements and statements about stem cells."  Doc. 128 at 6.  Defendants respond that "Plaintiffs must establish that their objections to COVID-19 vaccination are religious in nature, rather than political, social, philosophical, or economic."  Doc. 135 at 14 (citation omitted).  And Defendants continue that "Dr. Salmon's knowledge regarding the history of vaccine hesitancy and its impact on mandatory vaccination requirements provide useful context to the jury."  *Id.*

On this ground, the Court agrees with Plaintiffs that Dr. Salmon's opinions about the anti-vaccine movement's impact on mandatory vaccine policies would not help the jury. Dr. Salmon can offer nothing of value on the question of whether Plaintiffs objections were "religious in nature," *id.*, because Dr. Salmon admitted that he "[doesn't] know anything about the plaintiffs in this case," doc. 128-7, Daniel Salmon Depo. Tr. at 21:15–21:19. So although Dr. Salmon might have knowledge about anti-vaccine movements, he does not (and cannot) connect any plaintiff to any anti-vaccine movement. *See generally* doc. 128-2. That means that Dr. Salmon's opinion vis-à-vis the anti-vaccine movement "fails to consider the relevant facts of the case" and therefore the Court must exclude it. *Neb. Plastics*, 408 F.3d at 416 (citation omitted). Thus, the Court grants Plaintiffs' motion as to Part 5 of Dr. Salmon's report: "Anti-vaccine movement's impact on mandatory vaccine policies." Doc. 128-2 at 3, 11–13.

Dr. Salmon's opinions about stem cells and stem cells' connection to COVID-19 vaccines cannot survive Rule 702, either. Plaintiffs alleged in their complaint that their "religious beliefs prevented them from receiving the vaccination due to their use of fetal stem cells taken from aborted fetuses." Doc. 24 at ¶ 114. But, once again, Dr. Salmon admitted that he didn't know anything about Plaintiffs, doc. 128-7, Daniel Salmon Depo. Tr. at 21:15–21:19, and it follows that Dr. Salmon does not (and cannot) opine on the extent to which the stem-cell issue influenced Plaintiffs' objections to COVID-19 vaccination. *Objective* facts about the vaccines' connections to stem cells have no bearing on whether Plaintiffs objected to vaccination based on their religious beliefs, which "need not be acceptable, logical, consistent, or comprehensible to others" to merit protection under the law. *Love v. Reed*, 216 F.3d 682, 687 (8th Cir. 2000) (quoting *Thomas v. Rev. Bd. of the Ind. Emp. Sec. Div.*, 450 U.S. 707, 713 (1981)). Thus, Dr. Salmon's testimony on this point has no relevance, and the Court excludes it.

11

*See Daubert*, 509 U.S. at 591 ("Expert testimony [that] does not relate to any issue in the case is not relevant and, ergo, non-helpful." (citations omitted)).  The Court grants Plaintiffs' motion as to Part 6 of Dr. Salmon's report:  "Stem cells."  Doc. 128-2 at 3, 13–15.

Fifth, Plaintiffs argue that "Defendants intend to offer Dr. Salmon's legal opinions into evidence."  Doc. 128 at 7.  Defendants respond that "Dr. Salmon does not seek to render legal opinions."  Doc. 135 at 14 (emphasis omitted).

On this point, the Court partially agrees with Plaintiffs.  Part 4.d of Dr. Salmon's report answers this question:  "Did institutions have a responsibility to evaluate non-medical exemption requests rather than simply rubber-stamping requests?"  Doc. 128-2 at 9 (emphasis omitted).  Dr. Salmon does not explain what he means by "responsibility."  *See id.* at 9–10.  To the extent that Dr. Salmon attempts to characterize "responsibility" as legal obligation, the Court must exclude Dr. Salmon's testimony as an improper legal opinion.  *See S. Pine Helicopters, Inc. v. Phx. Aviation Managers, Inc.*, 320 F.3d 838 (8th Cir. 2003) ("As we have had occasion to remark before, however, expert testimony on legal matters is not admissible." (citation omitted)).  And to the extent that Dr. Salmon attempts to characterize "responsibility" in a different way (e.g., as moral or ethical responsibility), Defendants have failed to establish that Dr. Salmon has expertise to render opinions in that domain, and they have also failed to identify any reason why any opinions about moral or ethical responsibilities—as opposed to legal obligations—would have any relevance to the issues in this case.  *See* doc. 135.  Thus, the Court excludes Dr. Salmon's testimony to the extent that Dr. Salmon seeks to testify to institutional responsibility of evaluating non-medical exemption requests.

Sixth and finally, Plaintiffs argue, once again, that Dr. Salmon "did not apply any specialized expertise to the evidence."  Doc. 128 at 8.  The Court disagrees.  Dr. Salmon's expert

12

report shows that he largely reached his conclusions based on his assessment, interpretation, and synthesis of numerous scientific studies related to vaccinology and epidemiology. *See generally* doc. 128-2. And Plaintiffs have failed to point to any specific opinions that they believe Dr. Salmon reached without his expertise. The Court rejects Plaintiffs' generic, undeveloped argument on this ground. *See In re Vera T. Welte Testamentary Tr.*, 96 F.4th at 1039; *Garden*, 719 F.3d at 905 n.2.

Accordingly, the Court, as described above, grants in part and denies in part Plaintiffs' Motion to Exclude Proposed Expert Testimony of Dr. Daniel Salmon Pursuant to Daubert. Doc. 127. Now, the Court turns to the pending motions for summary judgment.

## III.    The parties' summary-judgment motions

### A.    Background

#### 1.    Factual background

The Court finds the following facts undisputed for summary-judgment purposes. Where the parties genuinely dispute facts, the Court says so. Due to the number of parties, the length of the record, and the overlap between issues of law and fact as to some of the claims in this case, the Court reserves the discussion of some factual disputes for the discussion section. *See infra* section III.C.

##### a.    Timeline of events

Plaintiffs all work or used to work for the Board. Doc. 124 at ¶¶ 1–39. Adams served as the superintendent of the Board in 2021–2022, and "he was responsible for implementing policies issued by the Board." *Id.* at ¶ 41. At the same time, Burton served as the Chief Human Resources Officer and "was responsible for managing employees." *Id.* at ¶ 42.

13

Between 2020 and 2023, the Board enrolled between 19,000 and 21,000 students in over 65 schools.  *Id.* at ¶¶ 44–45.  In October 2021, the Board had roughly 3,600 employees.  *Id.* at ¶ 46.

The COVID-19 pandemic presented the Board with many challenges in 2020 and 2021.  When the pandemic first broke out in March 2020, the Board directed the school district to "close[] its buildings to in-person learning" and to "educate its students virtually" for the remainder of the 2019–2020 school year.  *Id.* at ¶ 47 (citation omitted).  In July 2020, the St. Louis City Department of Health canceled the school district's graduation ceremonies with less than 48 hours' notice "and mandated that all [Board] employees test for COVID-19" before returning to work.  *Id.* at ¶ 49.

The Board had the school district begin the 2020–2021 school year virtually, too.  *Id.* at ¶ 50.  Throughout the year, the Board had the school district bring "different groups of students back on campus."  *Id.* (citation omitted).  Specifically, the Board "attempted fully in-person instruction in January 2021, but an increase in COVID-19 . . . delayed the return."  Doc. 139 at ¶ 29.  "On March 15, 2021, educators first became eligible to obtain COVID-19 vaccinations" in Missouri, and, the same day, the Board had the school district return to in-person instruction.  *Id.* at ¶ 39 (citation omitted).

"The students stagnated socially and academically during the virtual instruction during the COVID-19 pandemic."  *Id.* at ¶ 43 (citations omitted).  When students had to virtually go to school, they lacked access to many materials, such as art supplies.  *Id.* at ¶ 44.

When the Board had the school district return to in-person instruction in March 2021, the COVID-19 protocols didn't stop.  The Board upped its cleaning protocols for buses, classrooms, common areas, and office spaces.  *Id.* at ¶ 46.  Whenever someone tested positive for COVID-19

in a classroom, the Board shut down the classroom and deep cleaned it. *Id.* And the Board

needed to restructure student transportation. *Id.* at ¶ 47. Instead of the usual procedure of having

each bus make three routes in the morning and three in the afternoon, the Board sent each bus on

only one route in the morning and one route in the afternoon so the Board could deep clean each

bus after each route. *Id.* The Board even restructured lunch periods so that a smaller number of

children would occupy the cafeteria at any given time. *Id.* at ¶ 48.

Fast forward to July 2021. The Delta variant of COVID-19 emerged, and the St. Louis

Department of Health issued an advisory stating that vaccination provided the best way to

combat the Delta variant. *Id.* at ¶ 51. At unspecified times but before the policy discussed

below, the Board encouraged people to get vaccinated. *Id.* at ¶ 52. But the record does not show

that the Board, at any time before August 2021, required any employee to get vaccinated.

In August 2021, the Board adopted Policy 4624, titled "SLPS COVID-19 EMPLOYEE

VACCINATION POLICY." Doc. 124 at ¶ 54; doc. 124-3 (emphasis omitted). Policy 4624

stated that its purpose was "to safeguard the health and well-being of employees and their

families, and to maintain a public school environment wherein the recognized hazards associated

with COVID-19 are mitigated to the fullest extent possible through use of approved COVID-19

vaccines." Doc. 124-3 at 1. Policy 4624 "applie[d] to all employees and staff" of the Board,

"including all school volunteers and vendors providing regular services to students." *Id.*

Policy 4624 said, in relevant part:

> By October 15, 2021, all individuals covered by this policy must either (a) establish
> that they are fully vaccinated, including timely receipt of all booster vaccine doses
> recommended by the CDC; or (b) obtain an approved exemption as an
> accommodation as set forth below. Covered individuals who do not fulfill one of
> these two requirements by October 15, 2021 shall be placed on unpaid leave and/or
> subject to discipline, up to and including termination. <u>Individuals covered under
> this policy that obtain an approved exemption shall be subject to COVID-19 testing
> on Monday and Thursday each week.</u>

15

*Id.* (footnote omitted).  Policy 4624 enumerated three types of exemptions:

> Disability Accommodation
> The [Board] provides reasonable accommodations, absent undue hardship, to qualified individuals with disabilities that enable them to perform their job duties. If you believe you need an accommodation regarding this policy because of a disability, you are responsible for requesting a reasonable accommodation from the Human Resources Department.  You must use and submit the form(s) provided by the [Board] in order to be eligible for an exemption.
>
> Religious Exemption
> The [Board] provides reasonable accommodations, absent undue hardship, to employees with sincerely held religious beliefs, observances, or practices that conflict with getting vaccinated.  If you believe you need an accommodation regarding this policy because of a sincerely held religious belief, you are responsible for requesting a reasonable accommodation from the Human Resources Department.  You must submit the form(s) provided by the [Board] in order to be eligible for an exemption.
>
> Exemption for Other Medical Reasons
> Consistent with applicable CDC guidance and information regarding vaccine risks and vaccine allergies, exemptions for other reasons may be available on a case-by-case basis for a medical condition that is a contradiction to the COVID-19 vaccine even if it does not qualify as a disability under federal, state, or local law. Employees are responsible for requesting any exemption for Other Medical Reasons from the Human Resources Department.  You must use and submit the form(s) provided by the [Board] in order to be eligible for an exemption.

*Id.* at 1–2.

Of the Board's 3,500 employees, approximately 300 requested forms for exemption requests from Policy 4624.  Doc. 124 at ¶ 59.  The Board received 189 requests for religious exemption, including one from each plaintiff here.  *Id.* at ¶¶ 60–61; *see also* doc. 124-7 at 2 (Apple) (referencing Pentecostal beliefs and "the power of prayer for healing and protection against illness and infirmity"); doc. 124-8 at 1 (Brandon) (explaining that the vaccine is "against the beliefs and practices" of "the Nation of Islam"); doc. 124-9 at 5 (Comparato) (citing Bible verses and explaining his belief that taking the vaccine would run afoul of his belief that his body is God's temple); doc. 124-10 at 5 (Craig) (citing Christian beliefs and Bible verses); doc.

16

124-11 at 5 (Crockett) (citing Bible verses and stating that she "discern[s] through scripture and the Holy Spirit that [she is] not to accept the vaccine"); doc. 124-15 at 1–2 (Gillespie) (citing Bible verses and stating that her religion precludes her from taking a vaccine that has used cell lines from aborted fetal tissue during development, testing, or production); doc. 124-17 at 2 (Herndon) (stating that taking this vaccine, or other vaccines or medications, would "defile his temple of God," his body); doc. 124-21 at 1 (Ingram) (stating that taking the vaccine would force him to damage the temple of the Holy Spirit and "perpetuate a lie"); doc. 124-22 at 1 (Johnson) (objecting, on grounds of her Christian religion, to the use of aborted fetal cells in vaccine research and development); doc. 124-24 at 2 (Mabry) (citing her Islamic faith and the importance of keeping her blood pure); doc. 124-26 at 1 (McCaw) (objecting to the use of fetal cells based on his belief that "all human life is created equal and that all human life is sacred"); doc. 124-27 at 1–2, 4 (McCreary) (citing his belief that God would provide him with everything he needs and stating that he attends a Baptist church); doc. 124-33 at 1 (O'Connor) (citing scripture and objecting to the use of fetal cell lines); doc. 124-35 at 2 (Perniciaro) (quoting scripture and objecting to the use of fetal cell lines); doc. 124-38 at 1 (Spotts) (citing "sincerely held religious beliefs"); doc. 124-39 at 2 (Stewart) (citing the Bible and explaining that taking the vaccination would violate his conscience).

The Board tasked Annamaria Lu, a paralegal in the Employee Relations Department, with reviewing the requests for accommodation. Doc. 136 at ¶¶ 7–8 (citations omitted). The parties make no mention of any qualifications that Lu had, or lacked, to make determinations on the accommodation requests. Lu "did not discuss with anyone . . . the sincerity of . . . Plaintiffs' religious beliefs in the process of deciding whether to grant or deny their exemptions." *Id.* at ¶ 10 (citation omitted). The Board had "legal review teams" convene to discuss exemption

17

requests, *id.* at ¶ 11, but the record does not conclusively show what individuals comprised these "legal review teams," *see, e.g.*, doc. 133-2, Kelvin Adams Depo. Tr. at 13:22 ("I do not recall all the parties at the meetings.").  Plaintiffs have provided evidence that the legal-review teams didn't evaluate the religious-exemption requests on a case-by-case basis.  Doc. 136 at ¶ 12 (citing doc. 133-2, Kelvin Adams Depo. Tr. at 14:3–14:7).  In response, Defendants have produced evidence that the administration discussed some individual requests, but Defendants admit that it "did not discuss every single request."  *Id.* (citing doc. 124-3, Kelvin Adams Depo. Tr. at 13:14–14:24).  Thus, the Court finds as undisputed that the Board did not evaluate all the religious-exemption requests on a case-by-case basis.

"Burton made the decision whether to grant or deny the requests for religious exemptions," and then the Human Resources Department made recommendations to Adams "as to whether to grant or deny the requests."  Doc. 124 at ¶¶ 62–63 (citations omitted).  But Burton "did not review all of the religious exemption requests."  Doc. 136 at ¶ 15.  And in fall 2021, the Board denied each of the religious-exemption requests, including each plaintiff's request. Doc. 124 at ¶ 64.  Before denying the religious-exemption requests, the Board "did not evaluate or dispute whether . . . Plaintiffs' religious beliefs were sincerely held."  *Id.* at ¶ 68 (citations omitted).

Each employee whose exemption request the Board rejected received a letter from the Board.  *Id.* at ¶ 75.  Each letter looked about the same.  *Id.*  And it said, in relevant part:

> The Human Resources Department has completed its review of your request for a religious exemption from the requirements of St. Louis Public School District COVID-19 Employee Vaccination Policy [4624].
>
> As a public entity, the [Board] must balance the constitutional obligation to provide a free public education to "all persons in this state within ages not in excess of twenty-one years . . . ," against the individual state and federal constitutional right to the free exercise of religion.  *Art. IX, Sec 1(a), Mo. Const.*  Currently, only

18

students twelve (12) years old or older are authorized by the Food and Drug Administration to receive the COVID-19 vaccine. This, combined with a low vaccination rate levels among middle and high school age students, leaves significant numbers of [the Board's] students who are unvaccinated or ineligible to receive the COVID-19 vaccine, but still retain their right to a free public education under the Missouri Constitution.

After reviewing the information you provided requesting religious exemption from the COVID-19 vaccination policy, there is insufficient information for the [Board] to grant your request for a sincerely held religious exemption. In addition, the balance of competing constitutional interests weigh in favor of the rights of students ineligible to receive the vaccine. At this time, this decision is not subject to review; however, the [Board] may consider additional information not previously presented with the original exemption request.

Doc. 124-48 (second alteration in original). One plaintiff, O'Connor, sought legal representation from Liberty Counsel, who sent Defendants a letter arguing that the Board's policies "unlawfully infringed upon the Constitutional and Statutory rights of . . . Plaintiffs." Doc. 124 at ¶ 79. But the Board pressed forward, between October 2021 and January 2022, with suspending and/or terminating between 100 and 127 employees who had submitted religious-exemption requests. *Id.* at ¶ 81.

The record suggests that each plaintiff fell into one of two categories: (1) employees who had become tenured teachers or achieved "permanent" status under Missouri law and (2) other employees. *See id.* at ¶ 83 ("The [Board] administration must issue a Statement of Charges and conduct an administrative hearing to terminate, or suspend without pay, an employee who has achieved permanent status or is a tenured teacher under Missouri law." (citation omitted)). A teacher becomes a "permanent teacher" (i.e., earns tenure) once he has been "employed as a teacher in the same school district for five successive years" and "continues to be employed as a teacher by the school district" after hitting the five-year mark. Mo. Rev. Stat. § 168.104(4); *see Elrod v. Harrisonville Cass R-IX Sch. Dist.*, 706 S.W.2d 465, 470 (Mo. Ct. App. 1986) (equating "permanent status" under section 168.104(4) with tenured status). Other employees

19

earn permanent status after they complete one year of "satisfactory probationary service." Mo. Rev. Stat. §§ 168.281.1, 168.271. Once a teacher or other employee achieves "permanent" status, the Board may not remove him from his position without cause and written notice of the charges against him. *See* Mo. Rev. Stat. §§ 168.221.3, 168.281.2(1). The relevant statutes define "cause" to include "violation of the published regulations of the school district." *Id.*

Starting in mid-October 2021, Adams issued written Statements of Charges to the first category of plaintiffs, those who had achieved permanent status, and he indicated that he "was suspending them without pay and was seeking their termination with the Board" for purportedly violating Policy 4624. Doc. 124 at ¶¶ 83–85. The Statements of Charges notified those plaintiffs that the Board would, as of the date that the Statement of Charges issued, place them on administrative leave without pay. *Id.* at ¶ 88. In mid-to-late October and early November 2021, shortly after the Statements of Charges issued, the Board suspended these Plaintiffs without pay. *Id.* at ¶ 89. The record does not paint a clear picture of whether any differences exist between administrative leave without pay and suspension, but the Board did not pay "certified teachers" while they were suspended. *Id.* at ¶ 99. The parties do not define the term "certified teacher" anywhere in the record, but the record does not identify any non-certified teachers, so it appears that all tenured teachers were also "certified teachers." To the extent that non-certified teachers are relevant, the record does not show that the Board paid any non-certified teacher while suspended either. And the record does not show that the Board ever paid any employee while on administrative leave. Also in October 2021, the second category of plaintiffs received letters from the Board that they were being terminated for purportedly violating Board policy. *Id.* at ¶ 90. The Board terminated these plaintiffs shortly after the letters issued. *Id.* at ¶ 91.

But those who applied for medical and disability exemptions did not meet with the same fate.  The parties identify only two employees who received medical exemptions (both of whom were formerly plaintiffs in this case):  Jamell Wren and Wendy Huddleston.  *Id.* at ¶ 69; doc. 175.  But the Board granted "between 40 and 50 exemptions for disability and medical exemptions,"—more than it denied—and the Board "engaged in its existing interactive process for accommodations under the Americans with Disabilities Act, including 'one-on-one' meetings with employees who sought a medical exemption."  Doc. 124 at ¶¶ 67, 69, 71 (citations omitted).  Employees who received disability and medical exemptions underwent twice-per-week COVID-19 testing, but they "were able to continue their employment" with the Board.  *Id.* at ¶¶ 72–74 (citations omitted).  The Board "did not deny any requests for medical exemptions where the employee had [a] medical doctor sign off on their paperwork."  Doc. 136 at ¶ 19 (citation omitted).

But the parties dispute whether the Board ever *granted* a medical-exemption request without a medical doctor's approval.  Defendants cite to Lu's deposition and argue that it is undisputed that the Board "required information from a qualified medical provider for the employee seeking a medical exemption" before it would even consider granting or denying a request for a medical exemption.  Doc. 139 at ¶ 66 (citing doc. 124-46, Annamaria Lu Depo. Tr. at 72:10–72:18); *see also id.* at ¶ 67 (citing doc. 124-46, Annamaria Lu Depo. Tr. at 79:1–79:12).  Plaintiffs dispute that Lu's deposition testimony supports this conclusion because, they say, Lu "failed to testify in certain terms."  *Id.* at ¶¶ 66–67.  Lu's deposition testimony says, in relevant part:

> Q.  If someone submitted a request for medical exemption, but did not include any information from medical provider would that request be granted or denied?

> A.  Usually we would ask for information from medical provider, so it wouldn't be approved or denied right away.  It would just be, well, if you forgot to include like this part could you please fill out this stuff from medical provider and give it back to us.

> Q.  And if they failed to provide that information after you requested it, would it be denied at that point?

> A.  I believe so yeah.  Yeah.

Doc. 124-46, Annamaria Lu Depo. Tr. at 72:10–72:22.  The Court agrees with Plaintiffs that the parties genuinely dispute whether the Board ever granted a medical-exemption request without a medical doctor's approval.  Indeed, Lu testified only that the decisionmakers would "[u]sually" ask for medical-provider information if an employee seeking a medical exemption had failed to provide it.  *Id.*  And Lu said only that she "believe[d]" that the Board would deny a request that did not contain information from a qualified medical provider.  *Id.*  In sum, Lu's deposition testimony does not establish beyond dispute that the Board denied every medical-exemption request that did not contain information from a qualified medical provider.

In late September 2021, the Board's employee vaccination rate was only 80%.  Doc. 139 at ¶ 68.  But at an unspecified time after the Board implemented Policy 4624, the rate rose to above 95%.  Doc. 124 at ¶ 96.  In November 2021, the Board reported that it had conducted 3,600 student quarantines up to that point during the 2021–2022 school year and that 343 students had tested positive for COVID-19 during that time.  *Id.* at ¶ 93.

In January 2022, for unknown reasons, the Board re-reviewed the religious-exemption requests.  That month, each certified-teacher Plaintiff received a letter from the Board.  *Id.* at ¶ 98.  Each letter looked about the same and said, in relevant part:

> On January 7, 2022, the St. Louis City Department of Health issued revised guidance regarding COVID-related quarantine protocols.  In particular, the guidance reduced the number of quarantine days required for unvaccinated individuals who were close contacts to a positive COVID case.  Additionally,

within the last few weeks, the Center for Disease Control and Prevention issued revised quarantine guidance and the Food and Drug Administration approved COVID booster vaccinations for students twelve (12) years old or older.  Moreover, the beginning of the new year also saw the prevalence of a new COVID variant with an increased rate of transmission among both vaccinated and unvaccinated individuals.

In light of these changed circumstances, the Human Resources Department completed another review of your previous request for a religious exemption from the requirements of [Policy 4624].  Based on the information you previously provided, the new information and circumstances referenced above, and the current circumstances surrounding the [Board's] COVID mitigation efforts, the [Board] is now able to grant your request for a sincerely held religious exemption.  As is the case for other employee exemptions or accommodations, this decision remains subject to review and alteration if circumstances change in the future necessitating a reevaluation by the [Board].

Doc. 124-56 at 1.  The letter continued that the teacher could "return to work from administrative leave."  *Id.*

Also in January 2022, the Board invited back to work the plaintiffs that it had previously terminated.  Doc. 124 at ¶ 101.  The Board sent these plaintiffs a letter that resembled the letter that it sent to the certified-teacher plaintiffs.  *See* doc. 124-57.  The letter stated that the employee was "eligible for reappointment as an employee" and that the employee did "not need to reapply, interview, or complete a new onboarding process" to go back to work for the Board.  *Id.*  But the Board did not pay any employees in either category for the period while they were suspended or terminated.  *Id.* at ¶¶ 99–100.

### b.    Facts about COVID-19 and vaccinations

"COVID-19 is a communicable, infectious disease meaning that it can be transmitted from one person to another."  Doc. 139 at ¶ 1 (citations omitted).  The disease "can transmit from one person to another without those people touching or physically interacting," and a person without symptoms "can still have the disease and transmit it to other people."  *Id.* at ¶¶ 3–4 (citations omitted).

23

In October 2021, three vaccines were available for COVID-19: Pfizer, Moderna, and Jannsen. *Id.* at ¶ 61. Defendants argue, based on Dr. Salmon's expert report and deposition, that it is undisputed that "[v]accination is more effective to prevent COVID-19 and the spread of other communicable diseases than masking, regular testing, or social distancing" and that "[m]asking is less effective than vaccination because it requires cost, compliance monitoring, and does not reduce the transmission of disease as much as vaccination." *Id.* at ¶¶ 13–14 (citation omitted). Plaintiffs object to this fact as unestablished because Dr. Salmon, the source of the fact, admits in his report that "some people who are vaccinated will still contract and transmit disease." *Id.* (quoting doc. 131-2 at 11). The Court agrees with Plaintiffs that Defendants have failed to establish that this fact is not genuinely disputed. In its attempt to establish this fact, Defendants cite to portions of Dr. Salmon's deposition and expert report. *Id.* The cited portions of Dr. Salmon's deposition do not establish that vaccination is more effective than masking—they show, at most, that it is "harder to implement" a mask policy than it is to obtain vaccination and that masks "usually" do not work as well as vaccines do. Doc. 131-1, Daniel Salmon Depo. Tr. at 45:3–45:16. And the cited portions of Dr. Salmon's expert report point out the advantages and disadvantages of four different approaches to reducing the transmission of disease: vaccination, masking, testing, and social distancing. Doc. 131-2 at 10–11. But the report does not conclude that vaccination is more effective than the other three—at most, it concludes that adopting multiple approaches at the same time presents the "most effective approach." *Id.* at 11.

Defendants argue, based on Dr. Salmon's deposition testimony, that it is undisputed that the COVID-19 vaccines available in October 2021 "were very effective at preventing severe hospitalization and death" and "were also very safe to use." Doc. 139 at ¶ 58 (citation omitted).

24

Plaintiffs object to this fact as unestablished and based on inadmissible evidence.  *Id.*  Having denied Plaintiffs' Motion to Exclude as to this testimony, *see supra* Section II, the Court finds the testimony admissible.  But Defendants, by citing to Dr. Salmon's opinion, have failed to establish to what extent the vaccines were "safe" or "effective" and what the words "safe" and "effective" even mean in the context of Dr. Salmon's opinion.  A jury may reject Dr. Salmon's opinion.  *See* 10B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2738 (4th ed. 2025) ("It should be remembered that even though an affidavit meets the requirements of Rule 56(c)(4) this does not mean that the party presenting the affidavit will be successful in obtaining or defeating a particular summary-judgment motion.  For example, because opinion testimony always is subject to evaluation by the fact finder, it generally has been held not an appropriate basis for summary judgment."); *see also* Manual of Model Civil Jury Instructions for the District Courts of the Eighth Circuit, 3.05 (2023) (instructing jurors that they may "accept . . . or reject" expert-opinion testimony and "give it the weight as [they] think it deserves").  So the Court finds that Defendants have failed to put the "safety" and "effectiveness" of the relevant vaccines out of dispute.

Additionally, Defendants argue, again based on Dr. Salmon's deposition testimony, that it is undisputed that "[a] higher number of exemptions from a vaccination policy increases the risks to the community epidemiologically."  Doc. 139 at ¶ 9 (citation omitted).  Plaintiffs object to this fact as unestablished and inadmissible.  *Id.*  Having denied Plaintiffs' Motion to Exclude as to this opinion, *see supra* Section II, the Court finds the testimony admissible.  But this general, vague proposition does not establish an undisputed fact about the impact that exemptions from Policy 4624 had.  Dr. Salmon merely testified that "ultimately, what matters epidemiologically is how many unvaccinated people you have."  Doc. 131-1, Daniel Salmon

25

Depo. Tr. at 27:25–28:2.  That does not establish anything beyond dispute about the epidemiological impact that exemptions from Policy 4624 had or would have had on the Board. And a reasonable jury could reject the opinion in part or in whole.  *See* 10B Wright & Miller, *supra*, § 2738; *see also* Manual of Model Civil Jury Instructions, *supra*, 3.05.

## 2. Procedural background

In June 2022, Plaintiffs sued the Board, Adams, and Burton.  Doc. 1.  Three months later, the Court granted Plaintiffs leave to file an amended complaint, doc. 23, which became the operative complaint in this case, doc. 24.

The complaint named 43 plaintiffs and asserted seven counts:  (1) a 42 U.S.C. section 1983 claim, against Defendants, for violation of the First Amendment's Free Exercise Clause, *id.* at ¶¶ 164–87; (2) a section 1983 claim, against Defendants, for violation of the Fourteenth Amendment's Due Process Clause, *id.* at ¶¶ 188–201; (3) a section 1983 claim, against Defendants, for violation of the Fourteenth Amendment's Equal Protection clause, *id.* at ¶¶ 202–15; (4) a claim against the Board for violation of the Missouri Human Rights Act (MHRA), *id.* at ¶¶ 216–30; (5) a claim against the Board for violation of Title VII of the Civil Rights Act of 1964, *id.* at ¶¶ 231–38; (6) a claim against Defendants for violation of the Missouri Religious Freedom Restoration Act, *id.* at ¶¶ 239–55; and (7) a claim against all Defendants for violation of Missouri Revised Statute section 188.100, *id.* at ¶¶ 256–66.  Plaintiffs sought declaratory relief and money damages, among other things.  *Id.* at 41–42.

In June 2023, the Court dismissed Plaintiffs' second, sixth, and seventh counts.  Doc. 34. In the interim, 27 plaintiffs have settled their claims against Defendants, lowering the number of plaintiffs to 16.

26

Now, Defendants move for summary judgment on the remaining claims, doc. 129, and Plaintiffs move for summary judgment on the Equal Protection claims, doc. 132.  The Court turns to these motions now.

### B.    Standard

Federal Rules of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In ruling on a motion for summary judgment, the Court is required to view the evidence in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts.  *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987).  The moving party bears the initial burden of showing both the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56(a).

In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis omitted) (quoting Fed. R. Civ. P. 56(e)).  Self-serving, conclusory statements without support are insufficient to defeat summary judgment.  *Armour & Co., Inc. v. Inver Grove Heights*, 2 F.3d 276, 279 (8th Cir. 1993).  Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

27

## C.    Discussion

The Court begins by discussing issues common to all claims.  Then it will turn to issues related to the specific claims.

### 1.    Issues common to all claims

The gravamen of Plaintiffs' remaining claims is that their religious beliefs and practices were entitled to protection under the United States Constitution and the relevant statutes.  *See generally* doc. 24.  But Defendants challenge whether Plaintiffs, at the time they objected to Policy 4624, held sincere religious beliefs at all and, if they did, whether those beliefs really motivated their objections.  *See, e.g.*, doc. 130 at 17 (arguing that "several of the Plaintiffs[] objected to the vaccination based on nonprotected beliefs of a medical, scientific, or philosophical nature").

Defendants argue that the law doesn't protect Plaintiffs' beliefs because those beliefs, in Defendants' view, don't qualify as "religious."  *Id.* at 13–18.  Defendants argue that "nonprotected beliefs"—such as beliefs about the safety of COVID-19 vaccines—motivated Plaintiffs' objections to the policy, while religious beliefs didn't.  *Id.* at 17.  Defendants also challenge the sincerity of Plaintiffs' beliefs.  *See, e.g.*, doc. 144 at 5 (arguing that "Plaintiffs who were willing to receive the COVID-19 vaccination with a liability waiver did not establish sincerity of beliefs" (emphasis omitted)).  For all Plaintiffs, the Court disagrees with Defendants' arguments on this point and finds that genuine issues of material fact exist about whether sincerely held religious beliefs motivated Plaintiffs' objections to Policy 4624.  As a result, Defendants have failed to meet their initial summary-judgment burden of showing that no genuine dispute of material fact exists as to Plaintiffs' sincere religious beliefs.  The Court first discusses religiosity and then turns to sincerity.

28

a.    **Religiosity**

The parties seem to agree that the Constitution, Title VII, and the MHRA draw the line between protected religious beliefs and nonprotected beliefs in the same place.  *See, e.g.*, doc. 130 at 14–17 (discussing both First Amendment and Title VII cases and simultaneously applying those cases to this one); doc. 177 at 1 (arguing that Plaintiffs' proposed definition of religion provides "an accurate summary of cases interpreting religious beliefs in the context of Title VII and First Amendment claims").  The Court agrees that precedent supports this indistinction.  *See, e.g.*, *Wiggins v. Sargent*, 753 F.2d 663, 666 (8th Cir. 1985) (citing, in the First Amendment context, *United States v. Seeger*, 380 U.S. 163, 184–85 (1965), for the scope of protectable religious beliefs); 29 C.F.R. § 1605.1 (citing *Seeger* in EEOC regulations); *Ringhofer v. Mayo Clinic, Ambulance*, 102 F.4th 894, 901–02 (8th Cir. 2024) (citing First Amendment Free Exercise cases to define the scope of protectable religious beliefs under Title VII); *Shiffman v. Kansas City Royals Baseball Club, LLC*, 687 S.W.3d 443, 469 (Mo. Ct. App. 2024) (holding that a state trial court "properly relied on both Missouri and federal law" in assessing an MHRA claim).

"First Amendment protection only attaches to beliefs rooted in religion, as opposed to purely secular beliefs or personal preferences."  *Love*, 216 F.3d at 687 (citations omitted).  A "sincere and meaningful" belief qualifies for protection if the belief "occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God."  *Seeger*, 380 U.S. at 165–66; *see also* 29 C.F.R. § 1605.1 (providing that the EEOC "will define religious practices to include moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views").  A belief that is both secular *and* religious qualifies for protection.  *Love*, 216 F.3d at 689.  While the question of whether a belief qualifies as

"religious" often presents "a difficult and delicate task," *id.* at 687 (quoting *Thomas*, 450 U.S. at 714), courts may not "deny a man the right to his religion simply because he is still struggling to assimilate the full scope of its doctrine," *id.* at 688.  Indeed, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection."  *Id.* at 687 (quoting *Thomas*, 450 U.S. at 714).

Defendants cite *Africa v. Commonwealth of Pennsylvania*, 662 F.2d 1025 (3d Cir. 1981), and propose a three-part test for determining whether a belief qualifies as religious.  Doc. 130 at 13–15.  In *Africa*, the Third Circuit identified three "useful indicia" to determine the existence of a religious belief:  (1) the addressing of "fundamental and ultimate questions having to do with deep and imponderable matters," (2) a "comprehensive" belief system, and (3) "the presence of certain formal and external signs."  662 F.2d at 1032.  The *Africa* court then, weighing those factors, affirmed the district court's determination that a prisoner's demand for a special raw-food diet didn't arise from a religious belief.  *Id.* at 1036–37.

But the Eighth Circuit doesn't put *Africa* on the same pedestal as Defendants would.  The Eighth Circuit has cited *Africa* three times, and *never* has it used the case to reject a party's claim to a protectable religious belief.  *See Love*, 216 F.3d at 691 (upholding First Amendment claim); *Wiggins*, 753 F.2d at 666 (reversing the district court's determination that the plaintiff's beliefs were "purely secular"); *Stanko v. Patton*, 228 F. App'x 623, 625 (8th Cir. 2007) (per curiam) (reversing the district court's determination that a prisoner's First Amendment claim was frivolous, because no evidence in the record answered the question of whether a protectable religious belief existed).  The *Love* court accepted the *Love* defendant's framework and applied *Africa* as a test (en route to concluding that the plaintiff's purported religion satisfied the test), but the court emphasized that *Africa* does not impose a rigid test for defining a religion.

*Love*, 216 F.3d at 687. The *Love* court also explained that courts must assess each belief system flexibly. *Id.* That is, not based solely on a checklist.

Thus, the Court considers the *Africa* factors like the Eighth Circuit has—as "useful" but decidedly not dispositive "indicia." *Love*, 216 F.3d at 691; *Africa*, 662 F.2d at 1032. The failure to satisfy one of the *Africa* factors may counsel against a finding of protectable religious beliefs. But it doesn't, on its own, doom a plaintiff's claims. After all, federal and state courts around the country have held that many nontraditional and unusual beliefs qualify as protected religious beliefs. *See, e.g.*, *Seemodarae v. Mercy Health Servs.*, 456 F. Supp. 2d 1021, 1023 n.1 (N.D. Iowa 2006) (Wicca); *Flanagan v. State*, 846 P.2d 1053, 1057 (Nev. 1993) (Satanism); *Kaufman v. Pugh*, 733 F.3d 692, 697 (7th Cir. 2013) (Atheism). In this context, Plaintiffs' views, as discussed below, easily survive Defendants' arguments that those beliefs do not qualify as religious.

Here, the evidence shows that each plaintiff, at the time that he or she submitted an exemption request, articulated to the Board a religious reason for his or her objection:

- Apple referenced Pentecostal beliefs and "the power of prayer for healing and protection against illness and infirmity." Doc. 124-7 at 1.

- Brandon stated that she was seeking an exemption because the vaccine is "against the beliefs and practices" of "the Nation of Islam." Doc. 124-8 at 1.

- Comparato quoted Bible verses and explained his belief that receiving the vaccine would run afoul of his belief that his body is God's temple. Doc. 124-9 at 5.

- Craig referenced his Christian beliefs and cited Bible verses. Doc. 124-10 at 5.

- Crockett cited Bible verses and stated that she "discern[ed] through scripture and the Holy Spirit that [she was] not to accept the vaccine." Doc. 124-11 at 5.

- Gillespie cited Bible verses and stated that her religion precludes her from receiving a vaccine that has used cell lines from aborted fetal tissue during development, testing, or production.  Doc. 124-15.

- Herndon stated that receiving the COVID-19 vaccine, or other vaccines or medications, would "defile his temple of God," his body.  Doc. 124-17 at 2.

- Ingram stated that receiving the vaccine would force him to destroy the temple of the Holy Spirit and "perpetuate a lie."  Doc. 124-21 at 1.

- Johnson objected, on grounds of her Christian religion, to the use of aborted fetal cells in vaccine research and development.  Doc. 124-22 at 1.

- Mabry cited her Islamic faith and the importance of keeping her blood pure.  Doc. 124-24 at 2.

- McCaw objected to the use of fetal cells based on his belief "that all human life is created equal and that all human life is sacred."  Doc. 124-26 at 1.

- McCreary cited a belief that God would provide him with everything he needs, and he stated that he attends a Baptist church.  Doc. 124-27 at 1–2, 4.

- O'Connor quoted scripture and objected to the use of fetal cell lines.  Doc. 124-33 at 1.

- Perniciaro cited scripture and objected to the use of fetal cell lines.  Doc. 124-35 at 2.

- Spotts cited her "sincerely held religious beliefs" and stated that the development of the vaccines was "spiritually offensive, immoral[,] and ungodly."  Doc. 124-38 at 1.

- Stewart quoted the Bible and explained that receiving the vaccination would violate his conscience.  Doc. 124-39 at 2.

The same evidence shows that a reasonable jury could find that these plaintiffs' religious beliefs motivated their objections to receiving the vaccine.  That suffices to show a protected belief. *See Love*, 216 F.3d at 689 (finding a protected religious exercise where the government policy "interfere[d] with" the plaintiff's ability to practice his religious beliefs).

Defendants reject this conclusion.  They argue that many plaintiffs failed to establish religious grounds for their objections because many plaintiffs objected to the vaccine for "medical" or "scientific" reasons.  Doc. 144 at 4–5.  But "a belief can be both secular and religious," and "[t]he [F]irst [A]mendment . . . protects the area where the two overlap."  *Love*, 216 F.3d at 689 (quoting *Wiggins*, 753 F.2d at 666–67).  A person can believe that he shouldn't receive a vaccine because he believes that (1) the vaccine would have deleterious side effects and (2) his religion precludes him from taking the vaccine.  That the person holds the belief for both secular and religious reasons doesn't make that belief underserving of constitutional or statutory protection.  *See id.*  The most that this Court can say right now is that a genuine dispute of fact exists as to whether religious belief really did motivate Plaintiffs' objections to the policy, and a jury will have to decide the issue.  And that makes summary judgment against Plaintiffs improper.

b.    **Sincerity**

Defendants also question the sincerity of Plaintiffs' religious grounds for objection to Policy 4624.  *See* doc. 144 at 5–8.  Defendants argue that some plaintiffs *would have* agreed to receive the vaccine had the Board agreed to assume liability for any adverse events and that others admitted that their religious beliefs didn't conflict with receiving the vaccine.  *Id.*  The

33

Court finds that the relevant plaintiffs have established genuine disputes of material fact on sincerity.

A religious belief is sincerely held if the belief reflects "an honest conviction." *Thomas*, 450 U.S. at 716.  A religious belief can be sincerely held even if "the believer admits that he is 'struggling' with his position or because his beliefs are not articulated with the clarity and precision that a more sophisticated person might employ." *Id.* at 715.

First, Defendants argue that Stewart was "willing to receive the COVID-19 vaccination with a liability waiver." Doc. 144 at 5 (emphasis removed).  The record doesn't support the premise that Defendants put forward.  Much less does it support their conclusion, and still less does it do so conclusively.

Stewart did testify that he had demanded "assurances that the vaccine ha[d] been fully, independently, and rigorously tested against control groups." Doc. 131-41, Quinton Stewart Depo. Tr. at 125:8–125:13.  But Stewart also testified that he had made this demand to "spark conversation." *Id.* at 125:17–125:22.  While Stewart indicated that he would have kept an open mind to receiving the vaccine had the Board acceded to his demand, *see id.* at 125:23–126:6, he nowhere stated or otherwise indicated that the Board's refusal of his demand *caused* his refusal to take the vaccine.  Stewart testified that his demand amounted to a "last cry," not the gravamen of his request for an exemption.  *Id.* at 127:16–127:22.  A reasonable jury could agree.

Next, Defendants argue that five plaintiffs—Gillespie, Johnson, Crockett, O'Connor, and Spotts—"admitted that their religious beliefs d[id] not actually conflict with COVID-19 vaccination." Doc. 144 at 7 (emphasis omitted).  The Court disagrees with Defendants' characterization of these plaintiffs' testimony.

Gillespie testified that her religion prohibited her from "[k]nowingly" "taking or putting into [her] body anything that was derived from an aborted fetus." Doc. 131-17, Anne Gillespie Depo. Tr. at 52:12–52:17. Defendants argue that Gillespie "testified that she is not aware of any other things that she knowingly puts into her body that was [derived] from aborted fetal cells." Doc. 148 at ¶ 4 (citing doc. 131-17, Anne Gillespie Depo. Tr. at 52:18–52:24). Sure. But "perfect adherence to burdened beliefs is not required" to demonstrate sincerity. *Holt v. Payne*, 85 F.4th 873, 879 (8th Cir. 2023) (per curiam) (citing, in a Religious Land Use and Institutionalized Persons Act case, *Love*, a Free Exercise case, for the scope of protected religious beliefs). And the testimony that Defendants point to doesn't even support the conclusion that Gillespie failed to abide by her religious beliefs, because Gillespie testified that her religious belief prevented her only from "[k]nowingly" putting into her body a vaccine derived from aborted fetuses. Doc. 131-17, Anne Gillespie Depo. Tr. at 52:12–52:17. And Gillespie testified that she had not, to her knowledge, ever knowingly put into her body things that were derived from aborted fetal cells. *Id.* at 52:18–52:21. Defendants' argument on this point fails.

Defendants argue that Johnson cancelled a scheduled vaccination appointment only after she received an article from her relative about safety issues related to the vaccines. Doc. 144 at 7 (citing doc. 143 at ¶ 6). But the evidence in the record fails to establish that this email, or safety issues generally, *caused* the cancellation while Johnson's religious beliefs didn't. Johnson testified that she had signed up to take the vaccine only because she "felt pressure" to do so and because she hadn't researched the decision yet. Doc. 131-24, Michelle Johnson Depo. Tr. at 139:10–139:16. But once she did research and learned about the connection between the vaccines and the fetal stem cells, she developed the religious view that she could not take the

vaccine. *Id.* at 81:16–82:5. Although Johnson did not clarify exactly *when* she began to hold

this religious view, *see id.* at 82:13–83:5, even if she had developed it *before* she initially signed

up to take the vaccine, that wouldn't make the view insincere. At most, it would suggest that

Johnson struggled in her view. And that doesn't render her view insincere. *See Love*, 216 F.3d

at 688 (holding that "[i]t is not the place of the courts to deny a man the right to his religion

simply because he is still struggling to assimilate the full scope of its doctrine").

As for Spotts, Defendants argue that she "believed COVID-19 was part of a conspiracy,"

and objected to vaccination only because she "did not like that it was mandated," not because

vaccination conflicted with a sincere religious belief. Doc. 144 at 4–7 (citing doc. 143 at ¶ 30,

which in turn cites doc. 131-40, Shenicquel Spotts Depo Tr. at 49:7–49:10, 50:4–50:7). But the

cited portions of Spotts's deposition testimony, in context, don't conclusively establish this.

Although Spotts stated that she had a problem with "being intimidated" or "being forced" to

receive the vaccination, she also explained that she refused vaccination because she wanted to

"adhere to" her belief that her "body is a temple of the Holy Spirit," that she relied on her view

of what "God has [her] here for," and that she prayed and fasted about the decision.

Doc. 131-40, Shenicquel Spotts Depo. Tr. at 51:10–51:18; 78:14–78:18. Thus, the Court finds

genuinely disputed the factual issue of whether Spotts objected to vaccination based on a sincere

religious belief, and again a jury will have to decide.

The Court's prior analysis squarely rejects Defendants' arguments with respect to

Crockett and O'Connor. *See* doc. 144 at 7 (citing doc. 143 at ¶ 12, which alleges that Crockett

"testified to receiving, as an adult, the flu vaccine, whooping cough and tetanus vaccination"));

*id.* (citing doc. 143 at ¶ 13, which alleges that O'Connor had previously taken the influenza

vaccine)). Accordingly, the Court rejects Defendants' argument that they are entitled to

summary judgment on the sincerity issue for any of the plaintiffs because, as shown above, Defendants have failed to satisfy their burden of showing that no genuine dispute of material fact exists on whether Plaintiffs objected to Policy 4624 based on sincerely held religious beliefs.

### 2. Free Exercise claim

Plaintiffs, asserting claims under section 1983, allege that Defendants violated Plaintiffs' First Amendment right to the free exercise of religion.  Doc. 24 at ¶¶ 164–87.

Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

And the First Amendment says, in full:  "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

Defendants move for summary judgment on this claim as to all plaintiffs.  Doc. 129 at ¶ 6.  As discussed below, the Court denies the Board's motion as to the Free Exercise claims but grants Adams's and Burton's motion as to these claims.

### a. Determining the level of scrutiny

The parties disagree sharply about what level of scrutiny applies to Plaintiffs' Free Exercise claims:  rational-basis review or strict scrutiny.  *See, e.g.*, doc. 130 at 24–30 (arguing that rational-basis review applies); doc. 138 at 12–14 (arguing that strict scrutiny applies). Defendants put forward two reasons for why rational-basis review applies.  First, they argue that the deferential standard of review from *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), applies

"when determining the constitutionality of state action during public health crises."  Doc. 130 at 24 (citing *Jacobson*, 197 U.S. 11); *see also Heights Apartments, LLC v. Walz*, 30 F.4th 720, 726 (8th Cir. 2022) (noting that *Jacobson* applied rational-basis review).  Second, they argue that Policy 4624 "is both neutral and generally applicable."  *Id.* (citing *Fulton v. City of Philadelphia*, 593 U.S. 522, 531 (2021)).  The Court takes these arguments in turn.

### i.    *Jacobson* deference

In *Jacobson*, the Supreme Court of the United States upheld a Massachusetts statute that allowed for mandatory vaccination against a petitioner's challenge that the statute violated his individual rights. 197 U.S. at 11.  The statute provided that a city or town could mandate vaccination of its inhabitants if the vaccination was "necessary for the public health or safety" and that failure to comply with such a mandate would result in a $5 fine.  *Id.* at 12.  Pursuant to that statute, the city of Cambridge ordered its residents vaccinated against smallpox.  *Id.* at 12–13.  But Henning Jacobson didn't comply with the mandate, and the government prosecuted him for it.  *Id.* at 13.  Jacobson asked the trial court to instruct the jury to return a not-guilty verdict because, he argued, the state statute violated his rights under the Fourteenth Amendment, but the trial court refused.  *Id.* at 14.  At the Supreme Court, Jacobson argued that the statute "invaded" his liberty and proved "hostile to the inherent right of every freeman to care for his own body and health in such way as to him seems best."  *Id.* at 26.  But the Court rejected that argument and explained that "the liberty secured by the Constitution of the United States to every person within its jurisdiction does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint."  *Id.*  The Court also reasoned that "a community has the right to protect itself against an epidemic of disease which threatens the safety of its

members" and that Cambridge's board of health had acted reasonably when it ordered the mandate. *Id.* at 27. At bottom, the Court held the statute constitutional. *Id.* at 39.

The Eighth Circuit has cited *Jacobson* twice since the onset of the COVID-19 pandemic. The first time, the court used *Jacobson* offensively to uphold a public-health regulation. *See In re Rutledge*, 956 F.3d 1018 (8th Cir. 2020). The second time, the court distinguished *Jacobson* and reversed a trial court's determination that *Jacobson* barred a plaintiff's challenge to a regulation enacted in the name of public health. *See Heights Apartments*, 30 F.4th 720. The Court summarizes those cases next.

The Eighth Circuit decided *Rutledge* in April 2020. In that case, the district court entered an ex parte temporary restraining order that enjoined the State of Arkansas from enforcing a public-health directive that prohibited an abortion provider from performing "non-emergency abortion surgeries." 956 F.3d at 1024–25. Arkansas petitioned the Eighth Circuit for "a writ of mandamus directing the district court to dissolve the ex parte TRO." *Id.* at 1025. The court granted the petition and ordered the district court to dissolve the TRO. *Id.* at 1033. The court found that the district court abused its discretion because, although the district court applied then-controlling Supreme Court precedent that "restrict[ed] states from 'prohibit[ing] any woman from making the ultimate decision to terminate' a pre-viability pregnancy," *id.* at 1027 (second alteration in original) (quoting *Gonzales v. Carhart*, 550 U.S. 124, 146 (2007)), the district court "failed to meaningfully apply the Supreme Court's framework for reviewing constitutional challenges to state actions taken in response to a public[-]health crisis," *id.* The "framework" that the Eighth Circuit referred to was a test from *Jacobson*:

> a state action is susceptible to constitutional challenge only if it, "purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law[.]"

39

*Id.* at 1027–28 (alteration in original) (quoting *Jacobson*, 197 U.S. at 31).  The Eighth Circuit reasoned that the directive served the state's public-health interest "in conserving PPE resources and limiting social contact among patients, healthcare providers, and other staff."  *Id.* at 1029. And the court held that the directive did "not operate as an outright ban on all or virtually all pre-viability abortions" because (1) medication abortions were still available and (2) the directive, which wouldn't last more than 60 days, merely *delayed* abortions.  *Id.* at 1030.  Thus, the directive survived the *Jacobson* test.

In April 2022, the Eighth Circuit charted a different course in *Heights Apartments*. There, Minnesota Governor Tim Walz "mandate[d] a statewide residential eviction moratorium" in March 2020 and extended it "for an indeterminate time."  *Heights Apartments*, 30 F.4th at 723–24.  Heights Apartments, raising claims under the Contract Clause, First Amendment, Fifth Amendment, and Fourteenth Amendment, sued Walz in September 2020.  *Id.* at 724–25. The district court, applying the deferential standard of *Jacobson* and *Rutledge*, granted Walz's motion to dismiss for failure to state a claim.  *Id.* at 725–26.  But the Eighth Circuit reversed.  *Id.* at 736.  And, in so doing, it limited the scope of *Rutledge*:

> When this Court decided *In re Rutledge*, we were in the early days of the pandemic. Much was unknown at the time—governmental leaders were acting on the best information available and needed to move quickly given the nature of the emergency.  At a time when local authorities were confronted with a public health crisis that was rapidly developing, poorly understood, and in need of immediate and decisive action, *Jacobson* seemed to be the best guide for navigating constitutional challenges to emergency public health initiatives.  The public health crisis has since evolved, and time is available for more reasoned and less immediate decision-making by public health officials.  In addition, the Supreme Court has since given guidance that is instructing regarding our standard of review during public health crises.
>
> Heights alleges violations of its rights beginning in March 2020.  Some of the damages it allegedly suffered likely occurred during the public health crisis when *Jacobson* deference would be applicable.  Some likely occurred after the immediate

40

public health crisis dissipated, and traditional levels of scrutiny are applicable. It is a factual determination left to the district court on remand to resolve when during the pandemic the constitutional lens shifted from *Jacobson* deference to the modern tiers of scrutiny.

*Id.* at 726–27 (citations omitted).

The Court takes note of a few important lessons from *Heights Apartments*. First, *Heights Apartments* suggests that *Jacobson* deference applied to public-health actions for a limited period at the beginning of the COVID-19 pandemic but that, once the pandemic "evolved," *Jacobson* deference no longer applied. The quoted excerpt above evidences this dichotomy because it draws a distinction between actions "during the public health crisis" and actions "after the immediate public health crisis dissipated." *Id.* at 727. Providing further evidence of the dichotomy, the Eighth Circuit asked the district court to, on remand, "resolve [as a factual matter] when during the pandemic the constitutional lens shifted from *Jacobson* deference to the modern tiers of scrutiny," which suggests that, once *Jacobson* ceased to apply, it ceased to apply for good. *Id.* Second, *Heights Apartments* suggests that *Jacobson* deference ceased to apply at some point before April 2021. Proof of that proposition comes from the fact that the *Heights Apartments* court relied on *Tandon v. Newsom*, 593 U.S. 61, 62–63 (2021) (per curiam), as evidence that *Jacobson* deference doesn't apply forever. *Id.* And the *Tandon* Court applied the tiers of scrutiny—without even a passing mention of *Jacobson*—in April 2021, to reverse the Ninth Circuit's denial of an injunction of a California law that burdened religious exercise. 593 U.S. at 62–63.

Defendants attempt to distinguish *Heights Apartments* on two grounds. First, they argue that the *Heights Apartments* court resolved a motion to dismiss, while this Court must resolve a motion for summary judgment. Doc. 144 at 10. And second, they argue that a public-health

41

crisis "specific to the City of St. Louis" existed at the time the Board enforced Policy 4624 and
that that public-health crisis renders *Jacobson* deference applicable to the policy.  *Id.*

On Defendants' first argument, the Court recognizes the effect that the procedural posture
of a case has on the case's disposition.  That's why this order looks much different from the
motion-to-dismiss order that this Court entered earlier in this case.  *See* doc. 34.  But *Heights
Apartments* still controls here for several reasons.  First, the *Heights Apartments* court didn't
apply its discussion *merely* to the disposition of the motion to dismiss—the court also used the
discussion to instruct the district court about how to determine the standard of review on remand.
*See* 30 F.4th at 727 ("It is a factual determination left to the district court on remand to resolve
when during the pandemic the constitutional lens shifted from *Jacobson* deference to the modern
tiers of scrutiny.").  Surely the Eighth Circuit's instruction on this proposition applies with equal
force to this Court as it did to that district court on remand.  And perhaps more importantly, the
*Heights Apartments* court referenced *not* the motion-to-dismiss standard or the well-pleaded
allegations in the complaint when it described the dichotomy of *Jacobson* deference—it instead
relied on intervening Supreme Court precedent and general knowledge about how the COVID-19
pandemic had "evolved" since *Rutledge*.  *See id.* at 726–27.

Defendants' second argument doesn't justify distinguishing *Heights Apartments*, either.
Defendants argue that "COVID-19 unquestionably presented a crisis for the [Board] in October
of 2021."  Doc. 130 at 25.  And they cite evidence in the record that "the rates of infection for
schoolchildren in the City of St. Louis increased over time" into 2021 and that the infection
levels did not improve from "an emergency level starting in July 2021."  *Id.* (citing doc. 124
at ¶ 51; doc. 131 at ¶¶ 50, 53–55).  But the evidence that Defendants cite shows, at most, that
COVID-19 presented a significant problem for the Board.  It does not show that the crisis "was

42

rapidly developing, poorly understood, and in need of immediate and decisive action." *Heights Apartments*, 30 F.4th at 726.  On the contrary, Defendants' own cited evidence—which considers COVID-19 data from January 2021 through August 2021, *see* doc. 124 at ¶ 51; doc. 131 at ¶¶ 50, 53–55—suggests that "time [was] available for more reasoned and less immediate decision[] making by public health officials," *Heights Apartments*, 30 F.4th at 727.

Defendants also point to this Court's administrative orders from June and July 2021 which, among other things, "imposed different entry requirements for vaccinated and unvaccinated individuals."  Doc. 130 at 26 (citing *In re:  Courthouse Operations Due To COVID-19 Response*, https://www.moed.uscourts.gov/sites/moed/files/documents/administrative-orders/arod-0060.pdf (July 30, 2021)).  Again, that might show that COVID-19 presented a significant problem in St. Louis.  But it doesn't prove that *Jacobson* deference applies to Policy 4624 because a public-health problem, however significant, doesn't, on its own, invite *Jacobson* deference.  *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 23 (2020) (Gorsuch, J., concurring) (arguing that "*Jacobson* hardly supports cutting the Constitution loose during a pandemic"); *Heights Apartments*, 30 F.4th at 726 (citing Justice Gorsuch's concurrence with approval).

The very circumstances surrounding Policy 4624's implementation all but prove that *Jacobson* deference doesn't apply.  The Board adopted Policy 4624 on August 24, 2021, but the policy didn't require employees to establish that they had received the vaccine until October 15, 2021, nearly two months later.  *See* doc. 124 at ¶ 54.  And in the interim, the Board had legal-review teams convene to discuss the exemption requests.  Doc. 136 at ¶ 11.  Defendants explain that employees had so much time to comply because some of the then-available vaccines

required a "two-dose regimen" with three weeks in between the doses.  Doc. 144 at 11 (citations omitted).  But Policy 4624 still gave employees well over a month and a half to comply, which hardly suggests that the Board felt a "need" for "immediate and decisive action."  *Heights Apartments*, 30 F.4th at 726.

Finally, in a last-ditch effort to avoid the tiers of scrutiny, Defendants, citing to *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1 (1973), and *Open Our Oregon v. Brown*, Civ. No. 6:20-cv-773-MC, 2020 WL 5371915 (D. Or. Sept. 8, 2020), argue that "the Supreme Court has long respected and deferred to the states' authority to make laws and regulations concerning education" and that "[t]he voters who elected the Board of Education entrusted them to decide what education policies are most appropriate for the [school district], considering the specific circumstances and needs of the community, and those decisions are entitled to deferential review by the Court."  Doc. 130 at 26–27.  Defendants' argument, which would essentially throw the Constitution out of public schools, proves too much.  *See, e.g.*, *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969) ("It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943) ("Observance of the limitations of the Constitution will not weaken government in the field appropriate for its exercise.").  And more importantly, the cases that Defendants rely on don't apply here.  The *Rodriguez* Court gave deference to the school district's decision only *after* the Court reasoned that the case did not involve "laws that create suspect classifications or impinge upon constitutionally protected rights."  411 U.S. at 40, 42.  And *Open Our Oregon*, a non-bonding district-court order, didn't mention education or schools at all but merely relied on

*Jacobson* to dismiss the plaintiffs' civil-rights claims. 2020 WL 5371915, at *1–3. But, as already explained, *Jacobson* doesn't apply here.

### ii.    Neutrality and general applicability

Next, Defendants argue that rational-basis review applies because, they contend, Policy 4624 was "both neutral and generally applicable." Doc. 130 at 24 (citing *Fulton*, 593 U.S. at 531). Plaintiffs concede that Policy 4624 was "facially neutral" because it provided "exemptions for both secular and religious reasons." Doc. 138 at 12. But Plaintiffs argue that Policy 4624 was "not generally applicable because it contain[ed] provisions for individualized exemptions." *Id.* The Court agrees with Plaintiffs.

In *Employment Division, Department of Human Resources of Oregon v. Smith*, the Supreme Court held that, in general, "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" 494 U.S. 872, 879 (1990) (quoting *United States v. Lee*, 455 U.S. 252, 263 n.3 (1982) (Stevens, J., concurring in judgment)); *see also Fulton*, 593 U.S. at 533 ("*Smith* held that laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." (citing *Smith*, 494 U.S. at 878–82)). But a policy's failure to satisfy *either* neutrality *or* general applicability leaves the policy exposed to strict scrutiny, unprotected by *Smith*. *See Fulton*, 593 U.S. at 533 (declining to decide neutrality because it was "more straightforward to resolve th[e] case under the rubric of general applicability").

"A law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized

exemptions.'" *Id.* (alteration in original) (quoting *Smith*, 494 U.S. at 884). "A law also lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* at 534 (citation omitted).

In *Fulton*, the Supreme Court held that the City of Philadelphia violated the Free Exercise Clause when it refused to enter a foster-care contract with Catholic Social Services (CSS) unless CSS agreed to certify same-sex couples as foster parents. The city argued that CSS's refusal to certify same-sex couples violated the city's standard foster-care contract, which provided that an agency could not "reject a child or family including, but not limited to, . . . prospective foster or adoptive parents, for Services based upon . . . their . . . sexual orientation . . . *unless an exception is granted by the Commissioner or the Commissioner's designee, in his/her sole discretion*." *Id.* at 534–35 (emphasis added) (ellipses in original). Even though the city argued that the contract was generally applicable because the Commissioner had never granted an exception, the Court rejected that argument:

> Finally, the City and intervenor-respondents contend that the availability of exceptions under [the contract] is irrelevant because the Commissioner has never granted one. That misapprehends the issue. The creation of a formal mechanism for granting exceptions renders a policy not generally applicable, regardless whether any exceptions have been given, because it "invite[s]" the government to decide which reasons for not complying with the policy are worth of solicitude— here, at the Commissioner's "sole discretion."

*Id.* at 537 (quoting *Smith*, 494 U.S. at 884).

Defendants rely heavily on *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266 (2d Cir. 2021) (per curiam). *See, e.g.*, doc. 130 at 28. There, New York State attempted to enforce an "emergency rule requiring healthcare facilities to ensure that certain employees [were] vaccinated against COVID-19." *We The Patriots*, 17 F.4th at 272 (citation omitted). The plaintiffs argued that the policy, which contained a medical exemption but not a religious one,

violated the Free Exercise Clause, and they asked the district courts to preliminarily enjoin the policy's enforcement.  *Id.*  One district court granted an injunction, but another denied one.  *Id.*  The Second Circuit held that the plaintiffs had failed to meet their burden of showing a likelihood of success on the merits because they had failed to show that the policy was "not a neutral law of general applicability."  *Id.* at 273.  The mere presence of medical exemptions, the court reasoned, did not "create[] a mechanism for individualized exemptions" because the policy "provide[d] for an objectively defined category of people to whom the vaccine requirement [did] not apply:  employees who present[ed] a certification from a physician or certified nurse practitioner attesting that they ha[d] a pre-existing health condition."  *Id.* at 289.

But the Second Circuit's reasoning doesn't apply to the facts of this case, because, unlike the policy in *We The Patriots*, Policy 4624 *did* create "a mechanism for individualized exemptions."  *Id.*  Even ignoring the availability of medical and disability exemptions, the Court notes that the parties agree that Policy 4624 allowed Plaintiffs to apply for an exemption from the policy on *religious* grounds.  Doc. 124 at ¶ 56.  And the parties agree that "Burton made the decision whether to grant or deny the requests for religious exemptions."  *Id.* at ¶ 62 (citation omitted).  In other words, Policy 4624 allowed Burton—indisputably serving as a public employee, *see id.* at ¶ 42—"to decide which reasons for not complying with the policy [were] worthy of solicitude," *Fulton*, 593 U.S. at 537.  And that renders the policy not generally applicable.  *Compare* doc. 124 at ¶ 62 ("As the Chief Human Resources Officer, Burton made the decision whether to grant or deny the requests for religious exemptions."  (citation omitted)) *with Fulton*, 593 U.S. at 535 ("Provider shall not reject a child or family including, but not limited to, . . . prospective foster or adoptive parents, for Services based upon . . . their . . . sexual orientation . . . unless an exception is granted by the Commissioner or the Commissioner's

47

designee, in his/her sole discretion." (alterations in original) (citation omitted)); *contra We The Patriots*, 17 F.4th at 289 (distinguishing *Fulton* because the policy "provide[d] for an objectively defined category of people to whom the vaccine requirement [did] not apply").

Defendants argue that "the [Board]'s implementation of Policy 4624 was actually more favorable toward religious objectors to vaccination than the policy in *We The Patriots*" because "[t]he [Board] quickly re-employed the religious objectors when circumstances changed." Doc. 130 at 30. But that argument only hammers home the point. The Board's (by all appearances arbitrary) decision to *re-review* and *grant* the religious-exemption requests in January 2022, *see* doc. 124 at ¶ 97, tends to prove that the decision to *deny* them in the first instance amounted to a purely discretionary act. That makes this case even stronger than *Fulton*, where the availability of exceptions proved fatal to general applicability even where the government had "never granted" an exception. *Fulton*, 593 U.S. at 537.

Axiomatically, the contract in *Fulton* was more favorable to religion than it would have been had the contract not allowed *any* exemptions from the non-discrimination policy. But the very *providing* of exemptions rendered the contract not generally applicable because it "'invite[d]' the government to decide which reasons for not complying with the policy [were] worthy of solicitude." *Fulton*, 593 U.S. at 537 (quoting *Smith*, 494 U.S. at 884). So too here— whether Policy 4624 was more or less *favorable* to religious objectors than the policy in *We The Patriots* doesn't bear on whether Policy 4624 was "generally applicable" in the same way that the policy in *We The Patriots* was. 17 F.4th at 281. For these reasons, the Court holds that the strict-scrutiny standard governs here.

48

### b.    Applying strict scrutiny

"A law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). "To satisfy the commands of the First Amendment, a law restrictive of religious practice must advance 'interests of the highest order' and must be narrowly tailored in pursuit of those interests." *Id.* (quoting *McDaniel v. Paty*, 435 U.S. 618, 628 (1978)). The policy at issue cannot survive strict scrutiny if its enforcement was "overbroad or underinclusive in substantial respects," if the government failed to pursue its interest "with respect to analogous non-religious conduct," or if the interest "could [have been] achieved by narrower [policies] that [would have] burdened religion to a far lesser degree." *Id.* "Rather than rely on 'broadly formulated interests,' courts must 'scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants.'" *Fulton*, 593 U.S. at 541 (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006)).

Defendants point to three interests that Policy 4624 purportedly served: (1) education, (2) stemming the spread of COVID-19, and (3) promoting "the health, safety, and general welfare of students." Doc. 130 at 21. Defendants describe these interests as "interrelated"— Defendants argue that Policy 4624 was necessary to providing "children of any and all backgrounds safe access to education, social mobility, and athletic, cultural[,] and social development." *Id.* at 30. The Court agrees that these interests are compelling. *See Murphy v. Arkansas*, 852 F.2d 1039, 1042 (8th Cir. 1988) (holding that "it is 'settled beyond dispute, as a legal matter, that the state has a compelling interest in ensuring that all its citizens are being adequately educated.'" (citation omitted)); *Cuomo*, 592 U.S. at 18 ("Stemming the spread of COVID-19 is unquestionably a compelling interest . . . ."). But the Court disagrees that

49

Defendants have satisfied their summary-judgment burden and proven that Policy 4624 was narrowly tailored to serve those interests.

First, Defendants argue that "[t]he narrowly tailored nature of the [Board's] implementation of Board Policy 4624 is evidenced by the fact that the [Board] actually attempted numerous less restrictive means throughout the course of the pandemic" to little avail. Doc. 130 at 30. They give five examples of those means: (1) "fully virtual instruction," (2) face masks and social distancing, (3) heightened cleaning protocols, (4) changes to transportation protocols, and (5) encouraging staff to take COVID-19 vaccines. *Id.* at 31–32 (citing doc. 124 at ¶ 47; doc. 131 at ¶¶ 20, 22–24, 30, 39, 41–48, 52). Despite these alternatives, Defendants argue, "the unvaccinated population was still too high for the [Board] to [have the school district] function normally" and "[t]he vaccination requirement in Policy 4624 was necessary to raise [the] [Board's] employee vaccination rate to 95%." *Id.* at 32.

But Defendants fail to account for a less-restrictive alternative that could have *also* helped them achieve their interests: mandating vaccination generally but giving religious exemptions to those who applied for them. *Cf. Fulton*, 593 U.S. at 541 ("The question, then, is not whether the City has a compelling interest in enforcing its non-discrimination policies generally, but whether it has such an interest in denying an exception to CSS."). The parties agree that the Board granted somewhere between 40 and 50 total disability and medical exemptions to Policy 4624. Doc. 124 at ¶ 69. And the parties agree that the Board received 189 requests for religious exemption out of roughly 3,500 total employees. *Id.* at ¶¶ 59–60. That means that the Board could have granted *every* request for religious exemption, while still granting all the disability and medical exemptions that it granted, and achieved a total employee vaccination rate of between $93.1\% = \frac{3,500 - 50 - 189}{3,500}$ and $93.4\% = \frac{3,500 - 40 - 189}{3,500}$. Sure, those

numbers fall short of 95%.  But Defendants point to no evidence in the record that a 95%

vaccination rate among Board employees would have sufficed to achieve their interests while a

93.1% vaccination rate (while keeping in mind that everyone who received any type of

exemption would have been required to undergo twice-per-week testing, *see* doc. 124 at ¶ 74)

would not have.  *See generally* docs. 130, 144.  Plus, the binary construct the policy artificially

created—vaccinate and work versus don't vaccinate, don't work—failed to leave room for other,

less-restrictive accommodations.  And that renders Policy 4624 not narrowly tailored.  *See*

*Fulton*, 593 U.S. at 541–42 ("Maximizing the number of foster families and minimizing liability

are important goals, but the City fails to show that granting CSS an exception will put those

goals at risk.").

In response, Defendants argue that *any* exemption from a vaccination mandate "increases

the risk to the community as a whole, as each unvaccinated person is more likely to transmit

COVID-19 to everyone who interacts with that person."  Doc. 144 at 12 (citing doc. 131 at ¶¶ 8–

9).  But that doesn't prove that Policy 4624 was narrowly tailored, because the Board's decision

to allow dozens of disability and medical exceptions, *see* doc. 124 at ¶ 69, proves that the Board

could, would, and did tolerate a less-than 100% vaccination rate.  *See Fulton*, 593 U.S. at 542

("The creation of a system of exceptions under the contract undermines the City's contention that

its non-discrimination policies can brook no departures."  (citation omitted)).  And while the

number of requests for religious exemptions exceeded the number of granted disability and

medical exceptions, *see* doc. 124 at ¶¶ 60, 69, Defendants, again, point to no evidence that they

could not have *both* achieved their interest of safely and effectively educating students *and*

granted Plaintiffs' requests for exemptions and the accommodation of twice-per-week testing, or

other, less-restrictive accommodations.  *See generally* docs. 130, 144.

51

Defendants rely on *We The Patriots* to support the proposition that granting medical exemptions doesn't render Policy 4624 not narrowly tailored.  Doc. 144 at 12.  But Defendants' reliance on *We The Patriots* wrongly conflates the general-applicability issue and the narrow-tailoring issue.  *We The Patriots* doesn't apply to the latter because *We The Patriots* applied rational-basis review, not strict scrutiny, so the court never needed to (and thus didn't) decide whether the policy at issue in that case was narrowly tailored to achieve a compelling government interest.  *See* 17 F.4th at 290.

Defendants also point to the fact that "it is undisputed that the [Board] actually *granted* the Plaintiffs' religious exemptions from Policy 4624 in January 2022, after the federal government allowed younger children to become vaccinated and the City of St. Louis's Department of Health reduced its quarantine requirement for unvaccinated individuals." Doc. 144 at 12–13 (citing doc. 131 at ¶ 73; doc. 136 at ¶ 1).  But axiomatically, that doesn't constitute proof that Policy 4624 was narrowly tailored *at the time the Board suspended and terminated Plaintiffs* for noncompliance.

Defendants also point out that the Board manages "nearly 20,000 students over 65 schools" and that, at the time it adopted Policy 4624, some schools had vaccination rates as high as 90% while others had rates as low as 50%.  *Id.* at 13–14.  But this argument reinforces rather than weakens the Court's conclusion.  The purported necessity of not allowing *any* religious exemptions, *see* doc. 130 at 32 (arguing that denying religious exemptions "was necessary to raise the [Board]'s employee vaccination rate to 95%"), clearly differed from school to school.  But the Board still denied *every* religious exemption request.  Doc. 124 at ¶ 64. That's not narrow tailoring.  *See Lukumi*, 508 U.S. at 546 (holding that the ordinances at issue were not narrowly tailored because they were "overbroad or underinclusive in substantial

respects"). And, coupled with the 40 to 50 grants of medical exemptions, doc. 124 at ¶ 69, it suggests outright hostility to those seeking religious exemptions.

### c.    Qualified-immunity defense

Adams and Burton move for summary judgment on an independent ground. Doc. 129 at ¶ 7. They argue that "[t]o the extent that . . . Plaintiffs sue them in their official capacity, those claims are duplicative of the claims against the [Board]." *Id.* And, they continue, "[t]o the extent that . . . Plaintiffs sue them in their individual capacity, . . . Adams and . . . Burton are entitled to official immunity because their decisions were discretionary and did not violate clearly established law at the time." *Id.* Plaintiffs concede that "the claims against . . . Burton and . . . Adams in their official capacity are duplicative of the claims against" the [Board], but they argue that Adams and Burton are not entitled to qualified immunity, in their individual capacities, "because they violated clearly established constitutional rights which a reasonable person would have known." Doc. 138 at 21. On this point, the Court agrees with Adams and Burton.

"Qualified immunity shields public officials from liability for civil damages if their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Thurmond v. Andrews*, 972 F.3d 1007, 1011 (8th Cir. 2020) (quoting *Dillard v. O'Kelley*, 961 F.3d 1048, 1052 (8th Cir. 2020) (en banc)). The Court "must therefore determine '(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant['s] alleged misconduct." *Id.* (quoting *Brown v. City of Golden Valley*, 474 F.3d 491, 496 (8th Cir. 2009)). Given that Plaintiffs have already made out a violation of their First Amendment rights, *see supra* Section III.B.2.b, the Court turns to the clearly-established prong.

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* at 1012 (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). The Court must not "define clearly established law at a high level of generality." *Id.* (quoting *Dillard*, 961 F.3d at 1052). Instead, the Court must "look for a controlling case or a robust consensus of cases persuasive authority. There need not be a prior case directly on point, but 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *Dillard*, 961 F.3d at 1052).

Here, at the correct level of generality, *see id.*, Plaintiffs have failed to point to any precedent, and this Court has not found any precedent, to suggest that Plaintiffs' rights to be free from a COVID-19-vaccination mandate were clearly established in October 2021 when Adams and Burton decided to enforce Policy 4624, *see* doc. 124 at ¶ 64; doc. 138 at 21–23. Plaintiffs point to *Lukumi* and *Cantwell v. Connecticut*, 310 U.S. 296 (1940) as evidence that "[t]here is . . . a long history of caselaw protecting [f]ree [e]xercise of religion under the First Amendment." Doc. 138 at 22. The Court doesn't disagree. But "the articulation of this broad right does not answer" whether the courts had settled, at the time of the decision, the *specific question* of whether mandating COVID-19 vaccination ran afoul of those rights "beyond debate." *Thurmond*, 972 F.3d at 1012 (citation omitted); *see id.* (reversing a district court's denial of qualified immunity because "the definition of the asserted constitutional right embraced by the district court—a right to sanitary prison conditions—was impermissibly broad" (citation omitted)).

On the contrary, the legal landscape in October 2021 left plenty of room for debate. At that time, *Heights Apartments* amounted to nothing more than a twinkle in the eye of the Eighth Circuit. And at no point before then did the Eighth Circuit cabin the holdings of *Jacobson* and

*Rutledge*, so there existed "no controlling case . . . to place the question beyond debate" because an expansive reading of those cases without *Heights Apartments*'s clarification may have supported Adams's and Burton's decisions regarding Policy 4624. *Id.* "Likewise, there [was] a dearth of persuasive authority from outside the Eighth Circuit" in October 2021. *Id.* at 1013. Plaintiffs point to no precedent—and this Court has found no precedent—even from outside the Eighth Circuit—that would suggest that Plaintiffs' Free Exercise rights, as Plaintiffs have framed them, were clearly established at the relevant time. *See* doc. 138 at 21–23.

Plaintiffs argue that they need only show that "the state actor had fair warning that the conduct violated a right" and that Adams and Burton received that warning from the Liberty Counsel letter. *Id.* at 22 (citing *Northland Baptist Church of St. Paul v. Walz*, 530 F. Supp. 3d 790, 806 (D. Minn. 2021)). But that argument misconstrues the standard. While the court in *Northland Baptist Church* referenced a "fair warning," the court later clarified that the fair warning must come from "existing circuit precedent that involves sufficiently similar facts to squarely govern the individual defendants' conduct in the specific circumstances at issue, or, in the absence of binding precedent, . . . a robust consensus of persuasive authority constituting settled law." 530 F. Supp. 3d at 806–07 (quoting *Bus. Leaders in Christ v. Univ. of Iowa*, 991 F.3d 969, 980 (8th Cir. 2021)). And that same court, analyzing whether a Free Exercise claim in the context of Governor Walz's executive orders that restricted church attendance amid the COVID-19 pandemic was clearly established, came out exactly the same way that this Court does here:

> Here, Plaintiffs have not identified any existing circuit precedent involving sufficiently similar facts to squarely govern the conduct of Governor Walz in his individual capacity. Plaintiffs have not clearly defined the scope of the constitutional rights that they allege have been violated, let alone tied those allegations to binding Eighth Circuit precedent or a robust consensus of persuasive authority involving sufficiently similar facts. Governor Walz issued executive

55

orders in the midst of a novel global pandemic.  Certainly, the existence of an ongoing pandemic does not eradicate constitutional rights.  But when assessing the facts as they appeared to state actors, ignoring this unprecedented context would result in defining constitutional rights with an excessive degree of generality.  As such it is not clear that Governor Walz had fair warning that the [executive orders] violated Plaintiffs' rights, if they in fact do so.

For these reasons, existing precedent did not clearly establish Plaintiffs' rights at the time of the alleged violations so as to put Governor Walz's conduct beyond debate.

*Id.* at 807 (citations omitted).

Accordingly, the Court grants Adams's and Burton's Motion for Summary Judgment, doc. 129, as to the Free Exercise claims.  But because the Board has failed to meet its burden of showing that no genuine dispute of material fact exists as to whether Policy 4624 satisfies strict scrutiny, the Court denies the Board's Motion for Summary Judgment, *id.*, as to the Free Exercise claim.

### 3.    Equal Protection claim

Next, Plaintiffs, asserting more section 1983 claims, allege that Defendants violated their Equal Protection rights under the Fourteenth Amendment.  Doc. 24 at ¶¶ 202–15.  The gravamen of the claim is that Defendants violated the Equal Protection Clause "by favoring and enforcing policies that treat [Plaintiffs] differently than other groups desiring exemptions from the COVID-19 mandate."  *Id.* at ¶ 205.  Both Plaintiffs *and* Defendants move for summary judgment on the Equal Protection claim.  *See* docs. 129, 132.

The Fourteenth Amendment to the United States Constitution provides:

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.  No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV, § 1.  The Equal Protection Clause provides "essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985) (citation omitted).  In addition to proving that he was treated differently than others who were similarly situated, an Equal Protection plaintiff must show "the presence of an unlawful intent to discriminate against the plaintiff for an invalid reason," like his religion, to prevail on his claim.  *Altman v. Minn. Dep't of Corr.*, 251 F.3d 1199, 1203 n.3 (8th Cir. 2001) (quoting *Batra v. Bd. of Regents*, 79 F.3d 717, 721 (8th Cir. 1996)).  And once the plaintiff shows that discrimination, only satisfying strict scrutiny can save the discriminatory state action from unconstitutionality.  *See Peter v. Wedl*, 155 F.3d 992, 996 (8th Cir. 1998) (applying strict scrutiny to an Equal Protection claim alleging "discrimination based on religion" (citation omitted)).

### a.    Similarly situated

The parties have not cited—nor has the Court found—any binding authority that answers whether the similarly-situated inquiry presents a question of law (that the Court can resolve at summary judgment) or a question of fact (that must go to a jury) on an Equal Protection claim. The Court *has* found some cases where the Eighth Circuit affirmed grants of summary judgment to governmental defendants on Equal Protection claims where the plaintiffs had failed to show a genuine issue of material fact on the similarly-situated issue.  *See, e.g.*, *Flowers v. City of Minneapolis*, 558 F.3d 794, 798 (8th Cir. 2009); *Plaintiff A v. Park Hill Sch. Dist.*, 97 F.4th 586, 592 (8th Cir. 2024).  But those cases don't prove that the question could *never* go to a jury, because in those cases, the parties didn't genuinely dispute *the facts* that gave rise to the courts' conclusions that the plaintiffs were not similarly situated to their comparators, and the courts relied heavily on those same facts in granting summary judgment.  *See Flowers*, 558 F.3d at 798

57

(relying on "the undisputed facts" in holding that Flowers was not similarly situated to other inhabitants of his neighborhood block); *Plaintiff A*, 97 F.4th at 592 (rejecting Equal Protection claim where the plaintiffs pointed to "no evidence" that they were similarly situated to their comparators and where, even assuming the plaintiffs' version of the facts, the comparator "was still not similarly situated" to the plaintiffs).

Similarly (pun intended), the Eighth Circuit did hold in *Klingler v. Department of Corrections*, that the plaintiffs in that case were "as a matter of law . . . not similarly situated" to their comparators.  31 F.3d 727, 733 (8th Cir. 1994).  But again, in that case, the court relied heavily on facts in the record to conclude that the inmates at the female prison were not similarly situated to the inmates at the male prison.  *See id.* at 731–33 (pointing out differences in the size of the prisons, the average length of inmate stays at the prisons, and levels of security at the prisons, and also relying on witness testimony that female inmates had "special characteristics distinguishing them from male inmates").

At least four reasons support the conclusion that the similarly-situated inquiry presents a question of fact.  First, consider the very nature of the question, which the Eighth Circuit has compared to determining whether plaintiffs and their comparators are like "apples" and "oranges."  *Id.* at 733.  Sure, if the undisputed facts in the record show that the plaintiff was an apple while his comparator was an orange (as was the case in the Eighth Circuit cases discussed above), then all that remains is a pure legal question:  does an apple have an Equal Protection right to be treated the same way as an orange?  But what if, at the summary-judgment stage, the plaintiff apple produced some evidence of another apple, but the defendant produced some evidence that the alleged apple was actually an orange dyed red?  If the parties dispute the underlying facts, then the law alone cannot provide an answer.

58

Second, other circuits that have considered the issue have agreed that, on an Equal Protection claim, "determining whether individuals are 'similarly situated' is generally a factual issue for the jury." *Loesel v. City of Frankenmuth*, 692 F.3d 452, 463 (6th Cir. 2012) (quoting *Eggleston v. Bieluch*, 203 F. App'x 257, 264 (11th Cir. 2006)).  Even courts that have affirmed grants of summary judgment on the issue have agreed with this general proposition.  *See, e.g.*, *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004) ("As a general rule, whether individuals are similarly situated is a factual question for the jury.  However, a court may properly grant summary judgment where it is clear that no reasonable jury could find that the similarly situated requirement has been met."  (citing *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001))).

Third, the Eighth Circuit has recognized the factual nature of the similarly-situated inquiry, albeit in the Title VII employment-discrimination context.  Like in the Equal Protection context, a Title VII employment-discrimination plaintiff has the burden of proving that he and his comparators were "similarly situated in all relevant respects."  *Oniyah v. St. Cloud State Univ.*, 684 F.3d 711, 717 (8th Cir. 2012) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1051 (8th Cir. 2011)).  And in Title VII cases, the Eighth Circuit has held that the similarly-situated issue presents "a question of fact."  *Smith v. URS Corp.*, 803 F.3d 964, 970 (8th Cir. 2015) (reversing a grant of summary judgment); *see also Jones v. Evergreen Packaging, Inc.*, 536 F. App'x 661, 662 (8th Cir. 2013) (per curiam) (reversing a grant of summary judgment because "a reasonable jury could find that [the plaintiff] was similarly situated to" his comparator (citations omitted)).  The Court sees no reason why the identical test in the Equal Protection context would present any less of a factual issue.

59

Fourth, the parties agree that this issue should go to the jury.  When the Court gave the parties proposed jury instructions for this case, the Court included an instruction on the issue of whether Defendants treated Plaintiffs differently than Defendants "treated others who were similarly situated to" Plaintiffs.  Doc. 204-1 at 5.  Plaintiffs did not object to this instruction. Doc. 204 at 10.  And while Defendants did object, they objected to the *language* of the instruction, not to the *propriety* of the instruction.  *See id.*  Defendants proposed that the Court should instruct the jury on whether Defendants treated Plaintiffs differently than Defendants treated "others who were similarly situated <u>in all relevant respects</u> to" Plaintiffs.  *Id.*  And the parties knew how to tell the Court that an instruction would be improper because such an instruction would invite the jury to decide a legal issue.  *See id.* at 7 (noting that Plaintiffs object to an instruction on the neutral-and-generally-applicable issue because, they argue, "[i]nterpretations of a written policy is a role for the court," not the jury); *id.* (noting that Defendants object to the neutral-and-generally-applicable instruction because, they argue, "[t]he level of scrutiny applied to constitutional claims is a question of law for the district court judge to decide, not a question for the jury to resolve").  In sum, the similarly-situated issue presents a question of fact.

Next, the Court turns to the evidence of the similarities and differences between Plaintiffs and their comparators to determine whether a genuine factual dispute exists.  Based on how Plaintiffs have framed their claim, Plaintiffs must show that they were similarly situated to the employees who sought (and many of whom obtained) medical and disability exemptions. Doc. 24 at ¶ 205.

Start with the evidence of the similarities between Plaintiffs and their comparators. Plaintiffs argue that "[t]he health risks from COVID-19 are the same regardless of whether the

exemption is for medical or religious reasons."  Doc. 141 at 2–3.  The parties don't dispute that

"COVID-19 is a communicable, infectious disease," doc. 139 at ¶ 1, and Defendants do not

contest Plaintiffs' argument that a person who obtains an exemption on *medical* or *disability*

grounds is just as likely to spread COVID-19 as a person who obtains an exemption on *religious*

grounds.  Plaintiffs also point out that the two groups sought identical accommodations from

Policy 4624.  *See* doc. 141 at 2 ("The disability and medical exemptions contained the same

accommodation that the religious exemptions would have received—twice per week testing."

(citation omitted)).  The undisputed facts establish this similarity, too.  *See* doc. 136 at ¶ 33.

Next, consider the differences between the groups.  Defendants identify three potentially

relevant ones:  (1) the size of the classes, *e.g.*, doc. 144 at 12 ("It is undisputed that there were

nearly four times the number of religious exemptions sought than properly supported medical

exemptions . . . ."  (citing doc. 124 at ¶¶ 60, 69)), (2) the members' medical capabilities of

obtaining vaccinations, *e.g.*, doc. 130 at 20 ("As the Second Circuit has stated when examining

an employer's COVID-19 vaccination, while 'individuals who object to receiving the vaccines

on religious grounds have a hard choice to make, they do have a choice.'"  (quoting *We The*

*Patriots*, 17 F.4th at 293–94)), and (3) the barriers to showing grounds for an exemption, *e.g.*, *id.*

at 29 ("Unless a licensed medical provider certified that the COVID-19 vaccination itself was

medically harmful to the employee, the employee had to either undergo vaccination or forgo

employment with the [Board]."  (citing doc. 131 at ¶¶ 66–67)).

Start with the second.  The Court rejects Defendants' argument wholesale.  Defendants'

premise—that those who have good-faith religious objections to vaccination have more of a

"choice" over vaccination than those who have objections based on medical conditions or

disabilities, doc. 130 at 20 (quoting *We The Patriots*, 17 F.4th at 293–94)—makes a mockery out

of religion, the freedom to exercise of which the Constitution guarantees.  Religious exercise (even more so than any medical condition or disability) deserves special protection under the Constitution, and that protection would mean nothing if the government could compel religious people to violate their sincerely held beliefs just because religious people can "choose" to violate their beliefs.  *See* U.S. Const. amend. I.  Not to mention that Defendants' argument also flies in the face of Supreme Court precedent, which provides that a person's "choice" between his mission and his religious beliefs is really nothing more than an impermissible burden.  *Fulton*, 593 U.S. at 532.  In sum, this distinction does not make a difference.  People who object to a vaccination policy based on good-faith religious beliefs (including Plaintiffs) are just as unable to receive vaccination as people who object based on medical conditions or disabilities.

And the proposition that those seeking medical exemptions "do not have a choice" to receive the vaccine rests on a series of false premises.  First, it elevates medical knowledge and medical advice over religious knowledge and religious advice.  What if a person believed, as a religious tenet, that seeking medical treatment was against God's will, as some religions teach?  And further, what if a person seeking a religious exemption believed, based on the advice of a pastor, preacher, or prophet, that receiving the vaccine was a mortal sin?  The notion that those seeking medical exemptions "do not have a choice" and those seeking religious exemptions do have a choice elevates science above religion.  Yet our Constitution does not divest the citizenry of the right to take actions contra a medical practitioner's advice; our Constitution does, however, guarantee the free exercise of following a priest, pastor, or prophet's teaching.

Second, the do-not-have-a-choice proposition rests on the false premise that all those seeking medical exemptions had absolute clarity that they must not receive the vaccine, lest fatal or catastrophic consequences befall them.  Indeed, not all medical decisions involve absolute

62

clarity but instead involve tradeoffs such as "if you receive the vaccine, it may (or might or could) have adverse consequences," requiring the patient—not the physician—to weigh the pros and cons and make an individualized decision of what risks and tradeoffs the patient him or herself chooses to accept.

Third, the record—which contains almost no evidence of the medical-exemption requests that the Board granted—does not establish that those seeking medical exemptions were somehow barred, as a matter of medical certainty or otherwise, from receiving the vaccine.  For such exemptions, the record suggests (but doesn't conclusively demonstrate) that a medical provider may have made some unspecified recommendation that the person not receive the vaccine. *See, e.g.*, doc. 124-46, Annamaria Lu Depo. Tr., at 12:3–12:6 ("[People seeking medical exemptions] had to take it to their doctor.  Their doctor had to provide their expert opinion or medical background that would support them having a medical exemption.").

The Court now turns to Defendants' first and third arguments.  Unlike their second argument, these arguments show that a genuine dispute of fact exists about whether Plaintiffs were similarly situated to those who obtained medical and disability exemptions.  It is undisputed that 189 employees applied for religious exemptions, doc. 124 at ¶ 60, while only between 40 and 99 applied for medical and disability exemptions, *see id.* at ¶¶ 69, 71.  But disputed facts and gaps in the record prevent the Court from coming to a conclusion on whether this difference in number rendered the two groups not similarly situated.

As the Court explained in the factual-background section, *see supra* Section III.A.1, the parties dispute the consequences that a higher number of Policy 4624 exemptions would have had on the spread of COVID-19 and on Board operations.  Some of the dispute hinges on what weight a jury would give Dr. Salmon's opinions and what inferences a jury would draw from

those opinions, and some of it hinges on facts absent from the summary-judgment record, such as the distribution of exemption requests across locations within the school district.

The parties also genuinely dispute whether those who sought medical or disability exemptions faced the unique barrier (as compared to those seeking religious exemptions) of obtaining information from a qualified medical provider before applying for an exemption. A reasonable jury could resolve all these disputed facts and gaps in the record in Defendants' favor (and thus conclude that the groups were not similarly situated), but a different (but no less reasonable) jury could resolve the disputed facts and gaps in the record in Plaintiffs' favor (and thus conclude that the groups *were* similarly situated). Or a reasonable jury could find some facts in favor of Plaintiffs and others in favor of Defendants. It is entirely the province of the jury to make those determinations. Further still, a jury could compare the total number of exemptions requested, medical or otherwise, to the total number of employees of the Board; and further that the number of requestors was devastating to, or perhaps inconsequential to, the operations of the Board, or something in between. Perhaps a jury would assess the positions and skill levels of the requestors and determine that some were easily replaced and others irreplaceable, and others still somewhere in between.

Because genuine disputes of material fact exist as to the similarly-situated issue, and because Plaintiffs must carry their burden on the similarly-situated issue to prevail on their claim, the Court denies Plaintiffs' Motion for Summary Judgment, doc. 132. The Court now proceeds to analyze the remaining elements to determine if Plaintiffs' claims can survive Defendants' Motion for Summary Judgment, doc. 129, on this claim.

### b.    Differential treatment

The parties don't dispute that the Board treated the two groups differently, and the clear-as-day record on this point explains why.  Not only did the Board, in fall 2021, grant "more requests for disability and medical exemptions than it denied," doc. 124 at ¶ 71 (citation omitted), while religious-exemption requests went 0-for-189, *see id.* at ¶¶ 60, 64, but also the Board employed vastly different procedures for evaluating the different types of requests.  For the disability- and medical-exemption requests, the Board "engaged in its interactive process for accommodations under the Americans with Disabilities Act, including 'one-on-one' meetings with employees who sought a medical exemption."  *Id.* at ¶ 67 (citation omitted).  And the Board "did not deny any requests for medical exemptions where the employee had [a] medical doctor sign off on their paperwork."  Doc. 136 at ¶ 19 (citation omitted).  In contrast, the Board did not even "evaluate or dispute whether . . . Plaintiffs' religious beliefs were sincerely held prior to denying their requests in October 2021."  Doc. 124 at ¶ 68 (citation omitted).  In sum, the record at a minimum strongly indicates that the Board denied all religious-exemption requests wholesale, and Plaintiffs thus received vastly different treatment than their comparators did.

### c.    Discriminatory intent

Plaintiffs marshal evidence that the Board denied Plaintiffs' religious-exemption requests because the Board thought that the religious-exemption requests were less important than other exemption requests. With this evidence, Plaintiffs more than show that a genuine dispute of material fact exists as to whether Defendants unlawfully intended to discriminate against Plaintiffs based on Plaintiffs' protected religious beliefs.

In *Altman*, the Eighth Circuit reversed a district court's grant of summary judgment on an Equal Protection claim where the plaintiff had shown evidence of intentional, religious

discrimination.  There, the Minnesota Department of Corrections mandated that the employee plaintiffs attend a seventy-five minute training program titled "Gays and Lesbians in the Workplace."  *Altman*, 251 F.3d at 1201.  While attending the training, the employees "silently read their Bibles."  *Id.*  For that, the Department of Corrections issued them written reprimands. *Id.*  The employees sued, asserting an Equal Protection claim, among other claims.  *Id.* at 1202. The employees argued that the Department of Corrections did not discipline similarly situated persons—other inattentive attendees—like it disciplined the employees.  *Id.*  The Eighth Circuit found that a genuine dispute of material fact existed merely because the employees "were selected out for punishment after conveying their opposition by reading the Bible," so a trial might have established "that the reason for the discipline was [the employees'] . . . religion."  *Id.* at 1203.

Here, *Altman* suggests that the differential treatment *itself*, which the Board administered after Plaintiffs asked for religious exemptions, provides enough of a factual issue on intent for Plaintiffs' Equal Protection claims to survive summary judgment.  But even if that weren't enough, more evidence of discrimination exists here than existed in *Altman*.  More than just the mere correlation of having their exemption requests rejected after stating their religious beliefs as the basis for their requests, Plaintiffs have pointed to strong evidence of religious discrimination. When Plaintiffs' counsel asked Lu, at her deposition, to explain the differential treatment between the employees who had applied different types of exemptions, Lu gave the following answer:

> Well, one was—one is a medical exemption.  We had people who had had adverse reactions to vaccines in the past where they ended up paralyzed in like a hospital room.  We had people who had allergies to ingredients in the vaccines and things like that, so they were medical.  And religious ones, it wasn't necessarily that they couldn't get it for a physical reason.  It was for a religious reason.  So those are different.

Doc. 124-46, Annamaria Lu Depo. Tr. at 36:9–36:17.  In other words, Lu's testimony suggests that the Board denied the religious-exemption requests *because they were religious*, and therefore, in its opinion, not as important as other kinds of exemptions.  In sum, the evidence strongly suggests the Defendants elevated medicine over religion based on hostility to religion, in derogation of the First and Fourteenth amendments. Plaintiffs have established a genuine issue of material fact as to whether Defendants discriminated against them with an unlawful, discriminatory intent.  *See Altman*, 251 F.3d at 1203 n.3 (describing religious discrimination as a form of unlawful intent).

### d.    Applying strict scrutiny

As explained in Section III.C.2.b, *supra*, Plaintiffs have established a genuine issue of material fact that the denial of their religious-exemption requests cannot survive strict scrutiny. Thus, the Court denies the Board's Motion for Summary Judgment, doc. 129, as to the Equal Protection claim.

### e.    Qualified-immunity defense

As they did on the Free Exercise claim, Adams and Burton, citing qualified immunity, move for summary judgment on the Equal Protection claim.  Doc. 130 at 32–40.  Plaintiffs oppose summary judgment on this basis.  Doc. 138 at 21–23.  Here, the Court agrees with Defendants that Plaintiffs' Equal Protection rights—as Plaintiffs have framed them—weren't clearly established in October 2021.

Much of the Court's analysis on qualified immunity with respect to the Free Exercise claim applies with equal force to its analysis of qualified immunity on the Equal Protection claim.  *See supra* Section III.B.2.c.  In fact, that Plaintiffs' Free Exercise rights weren't clearly established provides enough, without more, for the Court to hold that Plaintiffs' Equal Protection

67

rights arising from the same context weren't clearly established, either.  *See Locke v. Davey*, 540 U.S. 712, 720 n.3 (2004) (holding that, where a program does not violate the Free Exercise Clause, rational-basis scrutiny, not strict scrutiny, applies to the program under the Equal Protection clause).  Under both *Rutledge* and *Locke*, Plaintiffs' rights were not so "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Thurmond*, 972 F.3d at 1011 (citation omitted).  Thus, the Court grants Adams's and Burton's Motion for Summary Judgment, doc. 129, as to Plaintiffs' Equal Protection claims.

### 4. Title VII claim

Plaintiffs assert a Title VII claim against the Board only.  Doc. 24 at ¶¶ 231–38.  They allege that the Board committed "unlawful employment practices" that caused them injury.  *Id.* at ¶ 235.  The Board moves for summary judgment on this claim.  Doc. 129.  In their response brief, Plaintiffs abandoned all Title VII claims except those based on the Board's failure to accommodate their religious beliefs.  *See* doc. 138 at 24 ("Plaintiffs are not pursuing their Title VII and MHRA claims under a harassment or hostile working environment theory.").  Thus, the Court addresses the failure-to-accommodate theory only.

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1).  Title VII "includes," in its definition of "religion," "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."  42 U.S.C. § 2000e(j).  "The failure to reasonably accommodate an

68

employee's religious practices and singling out religious adherents for inequitable treatment both constitute religious discrimination under Title VII."  *Cole v. Group Health Plan, Inc.*, 105 F.4th 1110, 1114 (8th Cir. 2024) (citation omitted).  In their response brief to Defendants' Motion for Summary Judgment, Plaintiffs clarified that their claims arise from the Board's alleged "failures to accommodate their known religious beliefs."  Doc. 138 at 24.

To prevail on his failure-to-accommodate claim, each Plaintiff must show that:  (1) he had "a [genuine] religious belief that conflict[ed] with an employment requirement," (2) he informed his employer of that belief, and (3) his employer disciplined him "for failing to comply with the conflicting requirement of employment."  *Ringhofer*, 102 F.4th at 900 (quoting *Jones v. TEK Indus., Inc.*, 319 F.3d 355, 359 (8th Cir. 2003)); *see also Pinner v. Am. Ass'n of Orthodontists*, No. 4:22 CV 870 CDP, 2024 WL 4241006, at *4 (E.D. Mo. Sept. 19, 2024) (applying this test on a motion for summary judgment).  To be sure *Ringhofer* resolved a motion to dismiss, not a motion for summary judgment.  102 F.4th at 902.  But, in their jury-instruction report, the parties agree that *Ringhofer* provides the factual elements that Plaintiffs would need to prove to prevail at trial.  *See* doc. 204-1 at 6 (proposing the *Ringhofer* elements for a jury instruction); doc. 204 at 11 (noting that Plaintiffs have no objection to this instruction); *id.* (noting that Defendants "believe that the term 'genuinely [sic] religious belief' should be replaced with 'sincerely held religious belief'" for consistency purposes but otherwise have "no objection").

Here, the Court's prior analysis of Plaintiffs' exemption requests, *see supra* Section III.C.1, shows that each Plaintiff has identified a genuine dispute of material fact as to the first two elements.  And not even the Board disputes that the Board disciplined Plaintiffs for failing to comply with Policy 4624.  *See* doc. 130.  Thus, the Court finds that Plaintiffs have established a

genuine dispute of material fact as to each element of the Title VII failure-to-accommodate claim.

But the Board also argues that accommodating Plaintiffs' beliefs would have imposed an "undue hardship" on it.  Doc. 130 at 50–55.  Although Title VII references "undue hardship" as a carve-out to the definition of "religion," *see* 42 U.S.C. § 2000e(j), the Supreme Court has described "undue hardship" not as an element of a Title VII plaintiff's claim, but as a defense upon which the defendant bears the burden of proof, *see, e.g.*, *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 772 n.2 (2015) (noting that the employer has "the burden of establishing an 'undue hardship' defense"); *Groff v. DeJoy*, 600 U.S. 447, 472 (2023) ("An employer who fails to provide an accommodation has a defense only if the hardship is 'undue,' . . . .").  Thus, the Court considers the Board's undue-hardship arguments under this framework.

An undue hardship exists when "the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of [the defendant's] particular business." *Groff*, 600 U.S. at 470 (citation omitted).  "[C]ourts must apply the test in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, 'size and operating cost of [an] employer.'" *Id.* at 470–71 (second alteration in original) (citation omitted).

Here, the Board points to several costs that, it argues, it would have incurred had the Board granted Plaintiffs' exemption requests.  Doc. 130 at 52–55.  First, the Board argues that "[w]hen an unvaccinated employee was a close contact with someone with COVID-19, the [Board] was required to quarantine them for two weeks even if the employee was not ill." *Id.*

at 52–53 (citing doc. 131[2] at ¶ 38).  And the Board asserts that, whenever an employee needed to quarantine, "the [Board] was required to find a vaccinated employee to cover that employees [sic] job duties with little to no notice."  *Id.* at 53 (citing doc. 131 at ¶ 35).  But the Board fails to tie this hypothetical scenario to a concrete cost, and even less has the Board shown that those costs would have "rise[n] to an 'excessive' or 'unjustifiable' level," *Groff*, 600 U.S. at 469, which would require evidence of the Board's "operating cost," *id.*, which the Board has failed to provide any evidence of, *see* doc. 130 at 52–55; *see generally* doc. 131; *see also Varkonyi v. United Launch Alliance, LLC*, No. 2:23-cv-00359-SB-MRW, 2024 WL 1677523, at *6 (C.D. Cal. Feb. 21, 2024) ("Given the gaps in the evidentiary record—especially concerning the cost of accommodating the request—[the defendant] has not shown that a reasonable jury must necessarily find that accommodating [the plaintiff] would impose undue hardship.").

Next, the Board argues that "[b]efore October 2021, more than 20% of the [Board's] 3,500 employees were unvaccinated, creating an administrative debacle to find coverage for teaching students, disinfecting classrooms, and other necessary job duties."  Doc. 130 at 53 (citing doc. 131 at ¶ 68).  But this evidence amounts to nothing more than a red herring because it shows, at most, what would have happened *had the Board not adopted Policy 4624 at all*, not what would have happened *had the Board adopted Policy 4624 but granted religious exemptions to those who applied for them* (even on the condition of twice-per-week testing or alternative requirements less restrictive of Plaintiffs' religious beliefs than vaccination), which constitutes

---

[2] Technically, the Board cites to doc. 124.  *See* doc. 130 at 53.  But paragraph 38 of doc. 124 doesn't appear relevant to the Board's argument, while paragraph 38 of doc. 131 does.  *Compare* doc. 124 at ¶ 38 ("Plaintiff Virgil Williams is an individual.  He has worked for SLPS as a Special Education Instructor Care Aide since 2017.  He is a resident of Saint Louis City, Missouri.") *with* doc. 131 at ¶ 38 ("In March 2021, following CDC guidance, the City of Department of Health changed its quarantine requirements.  Fully vaccinated people who were in close contact with someone with a COVID-19 infection did not have to quarantine at all unless they started showing symptoms.  Unvaccinated people, however, were required to quarantine for fourteen (14) to twenty-four (24) days, even if they did not have symptoms."  (citations omitted)).

the proper analysis for undue-hardship purposes. *See Groff*, 600 U.S. at 470 (holding that, to establish undue hardship, "an employer must show that the burden *of granting an accommodation* would result in substantial increased costs in relation to the conduct of its particular business" (emphasis added) (citation omitted)).  As previously discussed, the Board's employee vaccination rate still would have exceeded 93% had the Board granted every request for religious exemption, *see supra* Section III.B.2.b, and the Board has provided no evidence on whether and to what extent an "administrative debacle" would have existed even with this higher vaccination rate and with the twice-per-week testing that those who would have received religious exemptions would have needed to undergo, *see generally* doc. 131.

Many of the Board's other arguments fall short in similar respects—either because the Board has merely presented evidence of costs that existed *before* the Board adopted Policy 4624 or because the Board has failed to present evidence of costs at all.  For instance, the Board argues that the quarantine requirements imposed on it the burden of "contact tracing," which required at least one employee to work some seventy-hour weeks.  Doc. 130 at 54 (citing doc. 131 at ¶ 34).  But the Board fails to provide any evidence of how many employees would have needed to work long hours like this *had the Board granted the requests for religious exemption*.  *See id.*  Next, the Board points out that, for employees granted medical exemptions, it had "incurred the burden of identifying and paying for a vendor who could conduct the COVID-19 tests."  *Id.* at 54 (citing doc. 131 at ¶ 71).  But the Board fails to provide any evidence of how much this vendor cost the Board and how much it would have cost the Board had the Board granted the religious exemptions.  *See id.*

Next, the Board argues that "[t]he employees who underwent exemption testing frequently did so during school hours, requiring the [Board] to find coverage for their job

72

duties." *Id.* (citing doc. 131 at ¶ 27).  But the cited statement of fact does not support the assertion that these employees frequently tested during school hours, *see* doc. 131 at ¶ 27 ("The [Board] turned three (3) school locations across the city into testing centers and worked with the City of St. Louis to identify other sources of tests."  (citation omitted)), and even if it did, once more, the Board fails to tie this impact to a concrete cost or otherwise relate the cost to the size and operating costs of the Board, *see Varkonyi*, 2024 WL 1677523, at *6.

Finally, the Board concludes its undue-hardship argument by pointing to "the fact that COVID-19 was and is a communicable, very infectious disease that causes serious illness and death" and by discussing other general risks that COVID-19 presented to the Board.  Doc. 130 at 54–55 (citation omitted).  The Court acknowledges the Board's evidence, but the Court still finds that evidence insufficient to justify summary judgment on the undue-hardship affirmative defense because, once again, the Board has failed to paint a clear picture of the specific costs that granting the religious exemptions would have had on the Board.  *See id.*

The Board cites three out-of-circuit district-court cases where the courts granted employers' motions for summary judgment on the undue-hardship defense when a vaccination mandate was at issue.  Doc. 130 at 51.  Two of these cases are distinguishable because the defendant employers in those cases, unlike the Board here, provided concrete evidence of the harms that would have accrued to them, relative to their business operations, if they would have allowed religious exemptions.  *See DeVore v. Univ. of Ky. Bd. of Trs.*, 693 F. Supp. 3d 757, 765–66 (E.D. Ky. 2023) (noting that the plaintiff "was the only administrative employee" and that the defendant would have needed to incur "an indefinite payment of an entire salary for duplicative work" if it would have granted the accommodation (citation omitted)); *Bordeaux v. Lions Gate Ent., Inc.*, 703 F. Supp. 3d 1117, 1135–36 (C.D. Cal. 2023) (noting that the plaintiff's "mere

73

exposure to someone who had tested positive for COVID-19 would have resulted in a guaranteed ten-day shutdown" which would have cost the defendant "between $150,000–$300,000" per day).  As for the third, in *Lavelle-Hayden v. Legacy Health*, the plaintiffs requested an accommodation from their employer, a regional health-care provider, that would have allowed them "to have direct, in-person contact with patients," "many of whom were particularly susceptible to severe illness and death to their age and/or pre-existing medical conditions, or at a heightened risk of infection."  744 F. Supp. 3d 1135, 1141, 1158 (D. Or. 2024) (citation omitted).  But here, the Board has not pointed to any similar justification.  *See generally* doc. 130.  Thus, the Court denies the Board's Motion for Summary Judgment, doc. 129, as to the Title VII claims.

### 5.    MHRA claim

Plaintiffs allege that the Board violated the MHRA by, among other things, "discriminat[ing] against Plaintiffs based upon their religion."  Doc. 24 at ¶ 220.  The Board moves for summary judgment on the MHRA claim.  Doc. 129 at ¶ 10.

The MHRA makes it unlawful for an employer "because of the race, color, religion, national origin, sex, ancestry, age or disability of any individual" to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment."  Mo. Rev. Stat. § 213.055.1(1).  Missouri Commission on Human Rights regulations provide that the prohibition on religious discrimination requires an employer to reasonably accommodate an employee's religious beliefs.  *See* 8 CSR 60–3.050 ("The employer has an obligation to make reasonable accommodations to the religious needs of employees and prospective employees where these accommodations can be made without undue hardships on the conduct of the employer's business.").

74

The parties don't point to any distinctions between the Title VII claims and the MHRA claims. *See, e.g.*, doc. 130 at 49–55; doc. 138 at 24–44. In addition, the parties have not identified any state-court cases discussing the failure-to-accommodate theory of religious discrimination, and the Court has found none through its own research. But the Court agrees with the parties' tacit assumption that the Title VII claims and the MHRA claims contain no relevant legal differences.

"The MHRA and Title VII are coextensive, *but not identical*, acts." *Brady v. Curators of Univ. of Mo.*, 213 S.W.3d 101, 112 (Mo. Ct. App. 2006) (quoting *Hammond v. Mun. Corr. Inst.*, 117 S.W.3d 130, 136 (Mo. Ct. App. 2003)). "Missouri Courts have adopted federal Title VII case law when interpreting analogous discrimination statutes in the Missouri Human Rights Act." *Id.* (citation omitted). But "the MHRA is not merely a reiteration of Title VII." *Id.* (citation omitted). "The Act is in some ways broader than Title VII, and in other ways is more restrictive." *Id.* (citation omitted). Thus, "[i]f the wording in the MHRA is clear and unambiguous, then federal case law [that] is contrary to the plain meaning of the MHRA is not binding." *Id.* (citation omitted).

Here, given the dearth of on-point authority, the Court sees no reason why the MHRA would diverge from Title VII in any way that matters with respect to the failure-to-accommodate claim. Reading the statutory nondiscrimination provisions back-to-back would leave the reader with a feeling of déjà vu. *Compare* 42 U.S.C. § 2000e–2(a)(1) (providing that an employer may not "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion") *with* Mo. Rev. Stat. § 213.055.1(1)(a) (providing that an employer may not "fail or refuse to hire or to discharge any individual, or otherwise to

75

discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion").  And both the Title VII "religion" definition and the Missouri Commission on Human Rights regulations enumerate the same undue-hardship standard.  *Compare* 42 U.S.C. § 2000e(j) ("The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business") *with* 8 CSR 60–3.050(1) ("The employer has an obligation to make reasonable accommodations to the religious needs of employees and prospective employees where these accommodations can be made without undue hardships on the conduct of the employer's business.").  Thus, applying the Court's Title VII analysis, *see supra* Section III.C.4, the Court denies the Board's Motion for Summary Judgment, doc. 129, as to the MHRA claim.

## IV.    Conclusion

Accordingly, the Court grants in part and denies in part, as described above, Plaintiffs' [128] Motion to Exclude Proposed Expert Testimony of Dr. Daniel Salmon.  The Court grants in part and denies in part Defendants' [129] Motion for Summary Judgment.  The Court enters judgment in favor of Adams and Burton on all remaining Free Exercise claims (Count I) and Equal Protection claims (Count III) against Adams and Burton.  The Court denies Plaintiffs' [132] Motion for Summary Judgment.  The Court dismisses, with prejudice, Adams and Burton from the case.  A separate judgment accompanies this Memorandum and Order.

So ordered this 8th day of May 2025.

_____
STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE