UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| WANDA BRANDON et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:22-cv-00635-SRC |
| | ) | |
| BOARD OF EDUCATION OF THE | ) | |
| CITY OF ST. LOUIS, | ) | |
| | ) | |
| Defendant. | ) | |

**Memorandum and Order**

I.     **Background**

On August 24, 2021, the Board of Education of the City of St. Louis adopted Policy 4624 requiring all employees to get vaccinated against COVID-19.  Doc. 24 at 10 (The Court cites to page numbers as assigned by CM/ECF.).  Many employees objected on religious grounds.  Thus arose this litigation.  At its early stages, this case had 43 plaintiffs alleging seven claims against three defendants:  the Board and two of its employees.  *See id.*  After many parties left this case by settlement or dismissal at various junctures, 13 plaintiffs marched to a trial by jury against the Board, alleging that it violated their religious liberty rights under the Constitution's Free Exercise Clause and Equal Protection Clause, the Missouri Human Rights Act (MHRA), and Title VII.  *See* doc. 346 (the jury's verdict form detailing the claims).  The jury found for Plaintiffs on all four counts, *see id.*, and awarded them a total judgment of $4,008,175— consisting of actual damages of $1,018,175 and punitive damages, under Plaintiffs' MHRA claim, of $2,990,000, *see* doc. 348 at 3.

Now, as this litigation draws to a close, the Court addresses the following motions: (i) the Board's Motion for Judgment as a Matter of Law, or in the alternative, for a new trial (the

"JMOL motion"), doc. 368; (ii) Plaintiffs' motion for attorneys' fees and costs, docs. 353, 355; and (iii) Adams and Burton's motion for costs, docs. 350, 351.

For the reasons explained below, the Court denies the Board's JMOL motion, doc. 368, grants Plaintiffs' motions for attorneys' fees and costs, docs. 353, 355, and denies Adams and Burton's motion for costs, docs. 350, 351.

## II.   The Board's JMOL motion

The Court first considers the Board's JMOL motion.  Doc. 368.

### A.   Legal Standard

#### 1.   Judgment as a matter of law

Rule 50 of the Federal Rules of Civil Procedure governs motions for judgment as a matter of law.  It provides, in part:

(a)  Judgment as a Matter of Law.

> (1) *In General.* If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
>
>> (A) resolve the issue against the party; and
>>
>> (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.
>
> (2) *Motion.* A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury. The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment.

(b) Renewing the Motion After Trial; Alternative Motion for a New Trial. If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment—or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged—the movant may file

a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may:

> (1) allow judgment on the verdict, if the jury returned a verdict;
>
> (2) order a new trial; or
>
> (3) direct the entry of judgment as a matter of law.

Fed. R. Civ. P. 50(a)–(b). "Rule 50(b) provides for post-trial renewal of a Rule 50(a) trial motion for judgment as a matter of law. A court reviewing a Rule 50(b) motion is limited to consideration of only those grounds advanced in the original, Rule 50(a) motion." *Nassar v. Jackson*, 779 F.3d 547, 551 (8th Cir. 2015) (citing *Graham Constr. Servs. v. Hammer & Steel Inc.,* 755 F.3d 611, 617–18 (8th Cir. 2014)).

"[T]he law places a high standard on overturning a jury verdict because of the danger that the jury's rightful province will be invaded when judgment as a matter of law is misused." *Bavlsik v. Gen. Motors, LLC*, 870 F.3d 800, 805 (8th Cir. 2017) (alteration in original) (quoting *Hunt v. Neb. Pub. Power Dist.*, 282 F.3d 1021, 1029 (8th Cir. 2002)). "Judgment as a matter of law is appropriate only when all of the evidence points one way and is susceptible of no reasonable inference sustaining the position of the nonmoving party." *Allstate Indem. Co. v. Dixon*, 932 F.3d 696, 702 (8th Cir. 2019) (cleaned up). Thus, when considering a motion for judgment as a matter of law, the Court must:

> (1) consider the evidence in the light most favorable to the prevailing party, (2) assume that all conflicts in the evidence were resolved in favor of the prevailing party, (3) assume as proved all facts that the prevailing party's evidence tended to prove, and (4) give the prevailing party the benefit of all favorable inferences that may reasonably be drawn from the facts proved. That done, the court must then deny the motion if reasonable persons could differ as to the conclusions to be drawn from the evidence.

*Bavlsik*, 870 F.3d at 805 (quoting *Ryther v. KARE 11*, 108 F.3d 832, 844 (8th Cir. 1997) (en

3

banc)).

## 2. New Trial

"The court may, on motion, grant a new trial on all or some of the issues—and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A).  Under Rule 59(a)(1)(A), "[a] new trial is appropriate when the first trial, through a verdict against the weight of the evidence, an excessive damage award, or legal errors at trial, resulted in a miscarriage of justice." *Gray v. Bicknell*, 86 F.3d 1472, 1480 (8th Cir. 1996) (citations omitted).  A miscarriage of justice does not result whenever the parties, Court, or jury commit errors at trial; instead, the party seeking a new trial must demonstrate that prejudicial error occurred.  *Buchholz v. Rockwell Int'l Corp.*, 120 F.3d 146, 148 (8th Cir. 1997).  "Motions for new trials are generally disfavored and will be granted only where a serious miscarriage of justice may have occurred." *United States v. Petroske*, 928 F.3d 767, 774 (8th Cir. 2019) (quoting *United States v. Morris*, 817 F.3d 1116, 1121 (8th Cir. 2016)).

District courts have "great deference" in ruling on motions for new trial.  *Wilson v. Lamp*, 995 F.3d 628, 631 (8th Cir. 2021) (citation omitted).  In fact, "[w]hen the basis of the motion for a new trial is that the jury's verdict is against the weight of the evidence, the district court's denial of the motion is virtually unassailable on appeal." *Lincoln Composites, Inc. v. Firetrace USA, LLC*, 825 F.3d 453, 459 (8th Cir. 2016) (citation omitted).  In determining whether the jury's verdict runs against the weight of the evidence, the Court "can rely on its own reading of the evidence—it can weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict." *Id*. (cleaned up).  "The crucial determination 'is whether a new trial should have been granted to avoid a miscarriage of justice.'" *PFS*

*Distrib. Co. v. Raduechel*, 574 F.3d 580, 589 (8th Cir. 2009) (quoting *Keeper v. King*, 130 F.3d 1309, 1314 (8th Cir. 1997)).

**B.     Discussion**

The Board makes eight arguments in support of judgment as a matter of law or for a new trial, and the remittitur of punitive damages. *See* docs. 368, 369. Because on a renewed JMOL motion, the Court can "consider[] . . . only those grounds advanced in the original" JMOL motion, *Nassar*, 779 F.3d at 551, the Court considers only the following arguments on the Board's JMOL motion: (1) "Plaintiffs failed to present sufficient evidence that their sincerely held religious beliefs prohibited and conflicted with vaccination"; (2) "The clear weight of the evidence establishes that the [Board]'s implementation of Policy 4624 was rationally related to its compelling interests and narrowly tailored to the same"; (3) "Plaintiffs failed to present evidence that they were treated differently than similarly situated employees"; (4) "The [Board]'s evidence established that employing the Plaintiffs from October 2021 to January 2022 while they were unvaccinated was an undue hardship for the MHRA and Title VII claims"; (5) "The Court erred in instructing the jury on punitive damages because Plaintiffs failed to make a submissible case [on punitives]." Doc. 369 at 2–5, 11–14.

To determine whether the Board is entitled to a new trial, the Court will analyze the above arguments and the following: (1) "[T]he award of punitive damages is 'grossly excessive' and should be remitted"; (2) "The [Board] should have a new trial because it was prohibited from discovering Plaintiffs' medical records" (original capitalized); (3) "The given jury instructions contain substantial errors." *Id.* at 7–11. The Court takes each argument up in turn. The Court also analyzes whether the punitive damages should be remitted.

**1.     The Board's arguments for judgment as a matter of law or a new trial**

**a.     Whether Plaintiffs failed to present sufficient evidence that**

**their sincerely held religious beliefs prohibited and conflicted with vaccination**

To prevail on religious discrimination claims, plaintiffs must "plausibly allege" a sincere "religious belief that was burdened by an employment requirement." *Kale v. Aero Simulation, Inc.*, 139 F.4th 684, 688 (8th Cir. 2025). A religious belief is sincere if it reflects an "honest conviction." *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 716 (1981); *see also* doc. 340 at 24 (Jury Instruction Number 8 defining a religious belief as the same); doc. 366 at 107:8–108:4. At trial, the jury found that all Plaintiffs had sincerely held religious beliefs against the COVID-19 vaccine. *See* doc. 346. The Board now argues that "Plaintiffs failed to present sufficient evidence that their sincerely held religious beliefs prohibited and conflicted with vaccination." Doc. 369 at 11. The Court disagrees. Every plaintiff at trial testified—at length— how his or her sincerely held religious beliefs conflict with taking the COVID-19 vaccination:

- Paul Perniciaro. *See* doc. 358 at 28:6–32:18.

- Anne Gillespie. *Id.* at 205:24–209:6.

- Shenicquel Spotts. Doc. 359 at 41:17–51:1.

- Alice Crockett. Doc. 360 at 32:11–40:17.

- Jeffery McCaw. *Id.* at 96:9–103:12.

- James Apple. *Id.* at 208:20–215:13.

- Wanda Brandon. Doc. 361 at 88:19–93:25.

- Andrew Craig. *Id.* at 163:21–175:15.

- Anthony Comparato. Doc. 362 at 35:7–42:23.

- Amira Herndon. *Id.* at 121:10–132:6.

- Marc Ingram. *Id.* at 203:23–213:2.

- Tammy O'Connor. Doc. 363 at 77:2–90:13.

- Johnnie McCreary. *Id.* at 205:3–213:11.

The Court finds that the Board essentially asks the Court to reweigh the evidence and evaluate it differently from the jury's evaluation. Doc. 369 at 11–12; doc. 339 at 7–9. This the Court will not do. The Board thus fails to prove that "all of the evidence" at trial points in the Board's favor to justify this Court granting it judgment as a matter of law on this ground. *Allstate Indem. Co.*, 932 F.3d at 702. Additionally, given the evidence in Plaintiffs' favor, the jury's conclusion on these facts was not against the weight of the evidence, *Gray*, 86 F.3d at 1480, and thus the jury's verdict was not "a serious miscarriage of justice" sufficient to warrant a new trial, *Petroske*, 928 F.3d at 774.

> **b.  Whether the clear weight of the evidence establishes that the Board's implementation of its vaccine mandate served its compelling interests and narrowly tailored to the same**

This argument concerns Plaintiffs' claims on the Equal Protection Clause and the Free Exercise Clause. Doc. 369 at 12. The Equal Protection Clause provides "that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citation omitted). To allege an Equal Protection claim, a plaintiff must prove that (i) he was treated differently compared to others who were similarly situated, and (ii) defendants had "an unlawful intent to discriminate against [him] for an invalid reason," like his religion. *Altman v. Minn. Dep't of Corr.*, 251 F.3d 1199, 1203 n.3 (8th Cir. 2001) (quoting *Batra v. Bd. of Regents*, 79 F.3d 717, 721 (8th Cir. 1996)). Once a plaintiff proves those facts, a defendant can prevail only if its discriminatory action satisfies strict scrutiny. *See Peter v. Wedl*, 155 F.3d 992, 996–97 (8th Cir. 1998).

Here, the jury found that the Board treated Plaintiffs differently than others similarly situated, triggering strict scrutiny. *See* doc. 346 at 1, 6, 11, 16, 21, 26, 31, 36, 41, 46, 51, 56, 61. The Court similarly held that the strict-scrutiny standard applies to Plaintiffs' Free Exercise

claims. *See* doc. 229 at 37–48.  To survive strict scrutiny, the Board's policy had to serve compelling interests and be narrowly tailored to accomplish those interests.  *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993) (defining strict scrutiny in this way in the Free Exercise context); *Peter*, 155 F.3d at 996–97 (defining strict scrutiny in this way in the Equal Protection context).

The Board claims that the "evidence at trial clearly established, by the greater weight of the evidence, that [it] could not have accomplished its compelling interests [in stemming the spread of COVID-19] . . . through means less restrictive of Plaintiffs' religious beliefs."  Doc. 369 at 12.  It argues that it presented evidence at trial that "removing unvaccinated adults from the building was the least restrictive means to stabilize [its] workforce and keep students in class."  *Id*.  The Board further notes that its attempts at "numerous, less restrictive means" caused many other problems.  *See id.*

But this does not warrant casting aside the jury's verdict, granting judgment in the Board's favor, or granting a new trial.  Plaintiffs presented evidence at trial that the Board's policies of masking, social distancing, temperature monitoring, regular cleaning, and other protocols could have been adequate to keep students safe without needing to deny Plaintiffs' religious-exemption requests.  *See, e.g.*, doc. 358 at 25:15–28:5 (Paul Perniciaro discussing the school district's various protocols for masking, sanitizing, temperature checking, and social distancing and his experience of their adequacy); doc. 361 at 157:17–157:21 (Andrew Craig discussing teaching in a large airplane hangar); doc. 359 at 39:24–40:15 (Shenicquel Spotts mentioning having a large teaching room conducive to social distancing).  Various witnesses presented additional evidence that the Board engaged in virtual instruction and developed sufficient technological and support resources to do so.  *See, e.g.*, doc. 361 at 102:1–103:19

(Wanda Brandon discussing how she taught remotely); doc. 364 at 83:13–90:14 (Kelvin Adams discussing the Board's provision of devices, internet hotspots, and support services to students to facilitate virtual learning).

Plaintiffs also claim that the Board "never actually reviewed [Plaintiffs'] religious[-]exemption requests at the time of their original submission."  Doc. 373 at 11.  They say that the Board decided to "deny religious[-]exemption requests no matter what they included" and "never reviewed the Plaintiffs' individual circumstances" regarding the feasibility of alternative learning arrangements.  *See id.* at 11–12.  The Court agrees with Plaintiffs that sufficient evidence at trial supports their conclusion.

During the cross-examination of Charles Burton, he conceded that the Board "decided that [it could] not . . . sustain" accommodating "the number of religious exemptions" it received. Doc. 365 at 200:21–200:25.  Based on that determination, the Board denied every one of the religious-exemption requests after "look[ing] at them all individually . . . for unique circumstances or . . . something connected to a medical reason."  *Id.* at 201:1–201:7.[1]  Similarly, Annamaria Lu stated that the Board convened a meeting in which it decided to deny all religious-exemption requests—including those requests already made and those forthcoming.  *See id.* at 316:19–323:10.

All these facts could prove to a jury that (i) the Board had alternative options to promote its compelling interests in ways that were less restrictive of the Plaintiffs' religious rights, and

---

[1] At a hearing on February 27, 2024, the Board's lawyer suggested that the Board evaluated exemption requests based on the strength of their medical—not religious—grounds: "[W]e were talking about the difference between medical and non-medical exemptions to the requests. . . . If someone is allergic to a component of the COVID-19 vaccine, it doesn't make logical sense for the [school] district to force that person to get vaccinated; so those requests were granted immediately. For the religious exemptions, . . . it wouldn't harm anyone's health to be vaccinated; they just had a religious belief against the vaccination. And so it was a burden to have 200 unvaccinated people in and out of the building."  Doc. 68 at 31:4–31:16.  This further evinces the Board's intent to deny all religious-exemption requests.

9

yet, (ii) the Board chose not to explore these alternatives in favor of dismissing Plaintiffs' requests.  Importantly, the Board vigorously argued to the jury that it could not have accomplished its compelling interests through less restrictive means, the instructions plainly explained the applicable law to the jury, and the jury resoundingly rejected the Board's arguments.

When denying the Board's initial JMOL motion, the Court found the above evidence sufficient to conclude that a reasonable jury could find for Plaintiffs on the least-restrictive means issue.  *See* doc. 366 at 80:25–82:16.  In its summary judgement order, the Court similarly concluded that the Board "fail[ed] to account for . . . less-restrictive alternative[s]."  Doc. 229 at 50.  The Court now stands by its earlier determination.  Based on the record, the Court finds that the jury was reasonable in concluding that the Board could have accommodated Plaintiffs' religious beliefs through "means less restrictive" of Plaintiffs' beliefs than those the Board implemented.  Doc. 346 at 1, 6, 11, 16, 21, 26, 31, 36, 41, 46, 51, 56, 61.  The Board thus fails to prove that "all of the evidence" points in the Board's favor to justify this Court granting it JMOL on this ground.  *Allstate Indem. Co.*, 932 F.3d at 702.  Additionally, given the evidence in Plaintiffs' favor, the jury's conclusion on these facts was not against the weight of the evidence, *Gray*, 86 F.3d at 1480, and thus the jury's verdict was not "a serious miscarriage of justice" sufficient to warrant a new trial, *Petroske*, 928 F.3d at 774.

### c.   Whether Plaintiffs failed to present evidence that the Board treated them differently than similarly situated employees

As discussed above, the Equal Protection Clause provides "that all persons similarly situated should be treated alike."  *City of Cleburne*, 473 U.S. at 439.  At trial, the jury concluded that the Board treated Plaintiffs differently than others similarly situated, doc. 346 at 1, 6, 11, 16, 21, 26, 31, 36, 41, 46, 51, 56, 61.  The Board now argues that Plaintiffs failed to present evidence

10

sufficient to establish that they were treated differently than other similarly situated Board employees.  *See* doc. 369 at 12–13.

The Court found that the Board "treated . . . medical exemption requests differently from . . . religious[-]exemption requests."  Doc. 366 at 84:13–84:15.  Whether the Board's actions violated the Equal Protection Clause turns on whether Plaintiffs and employees who received a medical exemption were similarly situated.  The Board suggests that Plaintiffs are similarly situated to all other employees medically able to take the COVID-19 vaccine.  Doc. 369 at 12–13.  And, the argument goes, because the Board required those employees—just like Plaintiffs—to take the COVID-19 vaccine, Plaintiffs were not treated differently from those to whom they were similarly situated.  *See id.*  Plaintiffs respond that their relevant comparators are instead employees who "obtained an exemption on medical or disability grounds," because those employees and Plaintiffs both wanted an exemption from Policy 4624 and were equally likely to spread COVID-19 if their exemptions were granted.  *See* doc. 373 at 12.

The Court previously found that whether two groups are similarly situated is a question of fact, not law.  Doc. 229 at 57–64.  Likewise, when denying the Board's first JMOL motion, the Court declared that "[i]t's for the jury to decide" whether Plaintiffs were similarly situated to "medical claimants . . . [or] others."  Doc. 366 at 84:13–84:20.  The jury found against the Board on this issue.  The jury's finding was not against the weight of the evidence, *Gray*, 86 F.3d at 1480, or "a serious miscarriage of justice" sufficient to warrant a new trial, *Petroske*, 928 F.3d at 774.

> **d.      Whether the Board's evidence established that employing the Plaintiffs from October 2021 to January 2022 while they were unvaccinated was an undue hardship under Title VII and Missouri Human Rights Act**

Both Title VII and the MHRA provide that an employer must accommodate an

11

employee's religious beliefs, unless the employer can establish that such an accommodation would impose an "undue hardship" on it. *See* 42 U.S.C. § 2000e-2(a); 42 U.S.C. § 2000e(j); Mo. Rev. Stat. § 213.055.1; 8 CSR 60-3.050. At trial, the jury concluded that the Board could have accommodated Plaintiffs' religious beliefs "without undue hardship." Doc. 346 at 3, 8, 13, 18, 23, 28, 33, 38, 43, 48, 53, 58, 63. The Board, however, claims that the evidence it presented at trial "clearly establishes . . . that [it] lawfully denied [Plaintiffs'] requests for religious exemption from the vaccination policy because granting the requested religious exemptions would have resulted in an undue hardship on [it]." Doc. 369 at 13.

To support its claim, the Board highlights much trial testimony suggesting that the school district (i) lacked sufficient resources to manage the logistics of accommodating those asking for religious exemptions and (ii) could not manage the unpredictability of handling that many unvaccinated employees, especially given how extensive the City's quarantine requirements were. *Id.* at 13–14. The Board also states that it faced an undue hardship from the "negative impact remote learning was having on students." Doc. 374 at 12.

Plaintiffs first respond that the Board "never presented an actual dollar cost for their supposed claim of increased costs" associated with the logistics of accommodating Plaintiffs. Doc. 373 at 14–15. The Court found the same when ruling on the parties' motions for summary judgment. *See* doc. 229 at 70–71. Nor, Plaintiffs continue, did the Board highlight the quantity of resources it would have had to expend on such logistics and why such an expenditure would be an undue hardship. *See* doc. 373 at 14–15. In fact, evidence at trial suggested that the Board received more than $180 million dollars of aid from the federal government to implement COVID protocols, at least some of which was available to the Board before implementing its vaccine policy. *See* doc. 365 at 58:8–60:18; *see also* doc. 373 at 15.

The jury rejected the Board's undue-hardship arguments, and the Court finds that the jury's conclusion was reasonable.  *See* doc. 346 at 3, 8, 13, 18, 23, 28, 33, 38, 43, 48, 53, 58, 63. The Board fails to prove that "all of the evidence" points in the Board's favor to justify this Court granting its JMOL.  *Allstate Indem. Co.*, 932 F.3d at 702.  Additionally, given the evidence in Plaintiffs' favor, the jury's conclusion on these facts was not against the weight of the evidence, *Gray*, 86 F.3d at 1480, and thus the jury's verdict was not "a serious miscarriage of justice" sufficient to warrant a new trial, *Petroske*, 928 F.3d at 774.

### e.    Whether Plaintiffs failed to make a submissible case for punitive damages under the MHRA, thereby making the punitive-damages jury instruction improper

"Plaintiffs who seek punitive damages . . . [u]nder the MHRA . . . [have] the burden to show that [a defendant's] conduct was outrageous because of its evil motive or reckless indifference to the rights of others."  *Lawrence v. CNF Transp., Inc.*, 340 F.3d 486, 495 (8th Cir. 2003) (citation modified).  At trial, Plaintiffs presented evidence that the Board "decided that [it could] not . . . sustain" accommodating "the number of religious exemptions" it received, as discussed above.  Doc. 365 at 200:21–200:25.  Based on that determination, the Board denied every one of the religious-exemption requests after "look[ing] at them all individually . . . for unique circumstances or . . . something connected to a medical reason."  *Id.* at 201:1–201:7.  The Board also decided to deny all religious-exemption requests—including those requests already made and those forthcoming.  *See id.* at 316:19–323:10.

The Court instructed the jury that it could assess punitive damages against the Board under the MHRA only if it found, "by clear and convincing evidence," that the Board's conduct "was outrageous because of [the Board's] evil motive or reckless indifference to the rights of [Plaintiffs]."  *See* doc. 366 at 112:14–113:3.  This instruction properly follows from controlling law.  Based on all the evidence, the jury awarded punitive damages, meaning that it agreed with

13

Plaintiffs that the Board acted with "evil motive" or "reckless indifference to the rights of" every plaintiff. *See id.*; doc. 346 at 5, 10, 15, 20, 25, 30, 35, 40, 45, 50, 55, 60, 65.

The Board disagrees that it had "evil motive" or reckless indifference; therefore, it argues that the Court's punitive damages instruction under MHRA was improper. Doc. 369 at 3. The Board claims that Plaintiffs presented no evidence that the Board's decision-makers "acted out of any religious animus or made any negative comments, used any crude names, slurs, offense [sic] language, or physical altercations related to any of the Plaintiffs' stated beliefs about COVID-19 vaccination." *Id.* Instead, the Board argues that the evidence at trial established that its actions were merely motivated by a desire to "reduce the number of COVID-19-related quarantines and infections." *Id.* In fact, the Board "granted religious exemptions" to Plaintiffs "as soon as the quarantine requirements for unvaccinated individuals became less stringent," which it maintains evidences no malice or recklessness. *Id.*

The Board additionally claims that applicable law at the time of the Board's vaccine mandate empowered it to deny religious accommodations if they would "require the employer to 'bear a more than de minimis cost.'" *Id.* at 4–5 (first quoting *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977); then citing *Harrell v. Donahue*, 638 F.3d 975, 980 (8th Cir. 2011)). The Board states that accommodating Plaintiffs would have imposed more than a de minimis cost on the Board, making its decision to deny Plaintiffs' requested exemptions legally justified. *See id.* at 4–5. And if the Board's actions were legal, they cannot be "evil" or "reckless[ly] indifferen[t]," thus precluding any award of punitive damages. *Id.* at 5–6; *see also Lawrence*, 340 F.3d at 495.

The Court finds that Plaintiffs made a submissible case of punitive damages under the MHRA. First, it is beside the point whether the Board expressed religious animus, made any

negative comments towards Plaintiffs, or desired to control the spread of COVID-19; a submissible case of punitive damages under the MHRA only requires either "evil motive" or "reckless indifference" to Plaintiffs' rights. *See Lawrence*, 340 F.3d at 495. In this regard, the Court already explained how the Board elevated medicine over religion, in disregard of the First Amendment, and essentially accorded religious-accommodation requests second-class status, when the law requires the opposite. *See* doc. 229 at 61–63. Second, even though the Board granted Plaintiffs' religious exemptions later on, this does not determine whether the Board's initial denial was based on evil motive or reckless indifference.

Third, the trial record contains sufficient evidence that the Board either had an evil motive or reckless indifference towards Plaintiffs' free-exercise rights, as mentioned above. A reasonable jury could also find that the Board had more than enough funds to cover the expenses associated with accommodating Plaintiffs. *See* doc. 365 at 58:8–60:18; *see also* doc. 373 at 15. Based on these facts, a jury could conclude that the Board's actions evince "evil motive" or "reckless indifference to the rights of" every plaintiff. *Lawrence*, 340 F.3d at 495; *see also* doc. 346 at 5, 10, 15, 20, 25, 30, 35, 40, 45, 50, 55, 60, 65.

Fourth, the Board's interpretation of *Hardison* and *Harrell*—which it called "controlling case law" at the time of its initial denial, doc. 369 at 4—is incorrect. As the Supreme Court said in *Groff v. DeJoy*, an employer following *Hardison* and denying a religious accommodation must show that the accommodation would impose a substantial burden on it. *See* 600 U.S. 447, 468 (2023). *Harrell* also requires that employers make this showing on a case-by-case basis. *Harrell*, 638 F.3d at 979. The Board did neither of these things. Even if the Board's interpretation of controlling law was accurate, the Court is not convinced—in the face of no evidence to the contrary—that the Board *indeed would have* faced more than a de minimis cost

to accommodate Plaintiffs.  *See* doc. 229 at 70–71 (the Court finding that the Board never presented an actual dollar cost for its claims of increased costs when ruling on the parties' motions for summary judgment.).  The Board was able to accommodate medical exemption requests, *see* doc. 364 at 243:25–252:9, and while religious-exemption requests outnumbered medical exemption requests, *see id.*, the Board failed to convince the jury that accommodating the latter would impose more than a de minimis cost on the Board, especially in light of the $180 million dollars of aid that the Board received from the federal government.  *See* doc. 365 at 58:8–60:18; *see also* doc. 373 at 15.

Therefore, the Board fails to prove that "all of the evidence" regarding the propriety of the Court's punitive-damages instruction points in the Board's favor to justify the Court's granting it judgment.  *Allstate Indem. Co.*, 932 F.3d at 702.  Additionally, given the evidence in Plaintiffs' favor, the Court properly instructed the jury, and its instruction was not against the weight of the evidence, *Gray*, 86 F.3d at 1480, nor was it "a serious miscarriage of justice" sufficient to warrant a new trial, *Petroske*, 928 F.3d at 774.

### 2.    The Board's arguments for a new trial

#### a.    Whether the jury's award of punitive damages is "grossly excessive" and should be remitted, or whether the Court should grant a new trial

At the close of trial, the jury awarded Plaintiffs actual damages of $1,018,175 and punitive damages of $2,990,000—under three times the amount of actual damages.  Doc. 348 at 3.  The Board argues that the jury's award of punitive damages is "grossly excessive" in violation of the due process clauses of the Federal Constitution's 14th Amendment and Missouri's Constitution.  *See* doc. 369 at 6.  The Board first claims that "Plaintiffs utterly failed to produce legally sufficient evidence that the harm [Plaintiffs incurred] was the result of reckless disregard, much less intentional malice or trickery or deceit."  *Id.* at 7.  Second, the

Board argues that its decision to deny Plaintiffs' religious accommodations was in line with "controlling precedent," making the decision "reasonable, not punishable." *Id.* The Board cites *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996). Doc. 369 at 7. Therefore, the Board argues that the "award transcends the constitutional limit and should be remitted, or in the alternative a new trial [should be] awarded." *Id.*

"Compensatory damages are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct[,] . . . [whereas] punitive damages . . . are aimed at deterrence and retribution." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). For actions under the Missouri Human Rights Act, a court "may award to the plaintiff actual and punitive damages." Mo. Rev. Stat. § 213.111.2. Missouri law requires that "[n]o award of punitive damages against any defendant shall exceed the greater of:  (1) Five hundred thousand dollars; or (2) Five times the net amount of the judgment awarded to the plaintiff against the defendant." Mo. Rev. Stat. § 510.265.1. The Fourteenth Amendment's Due Process Clause imposes a second limitation on punitive damages:  neither a court nor a jury can "impos[e] . . . grossly excessive or arbitrary punishments." *State Farm*, 538 U.S. at 416. To ensure that a punitive damages award does not violate Due Process, the Supreme Court "instructed courts reviewing punitive damages to consider three guideposts:  (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Id.* at 418 (citation omitted); *see Wilkins v. Bd. of Regents of Harris-Stowe State Univ.*, 519 S.W.3d 526, 546 (Mo. Ct. App. 2017) (applying the same test to the Missouri Constitution).

The Board challenges only the jury's punitive damages award on the first *State Farm* guidepost: the degree of reprehensibility of the defendant's misconduct. *See* doc. 369 at 6–7; *State Farm*, 538 U.S. at 418. It does not contest the amount of the award based on its disparity with either Plaintiffs' actual damages or with punitive damages amounts in comparable cases. *See* doc. 369 at 6–7; *State Farm*, 538 U.S. at 418. Nevertheless, because punitive damage awards should be proportional to the Defendant's conduct, *see BMW of N. Am., Inc.*, 517 U.S. at 575, the Court finds it persuasive that the jury's award provides a single-digit ratio of less than three-to-one between punitive and compensatory damages, *see State Farm*, 538 U.S. at 425 ("Our jurisprudence and the principles it has now established demonstrate . . . that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process."). This single-digit ratio is also less than Missouri's statutory limit of five-to-one. *See* Mo. Rev. Stat. § 510.265.1.

So while an enormous punitive-damages award would have required a finding of "particularly reprehensible conduct," *BMW of N. Am., Inc.*, 517 U.S. at 576, the jury here need not have found that to justify their comparatively smaller punitive damages award, *see id.* at 575 (noting that the "damages imposed on a defendant should reflect 'the enormity of his offense.'" (citation omitted)). However, the evidence of the Board's reprehensibility supports the jury's punitive-damages award as well. As the Court found above, Plaintiffs produced enough evidence of the Board's reckless disregard and/or intentional malice towards Plaintiffs' religious rights. *See infra* Section II.B.1.e. Testimony from Charles Burton and Annamaria Lu suggests that the Board decided to deny Plaintiffs' religious-exemption requests wholesale—even before many of them were submitted—unless the requests contained "other" reasons for an exemption besides religion. *See* doc. 365 at 201:1–201:7, 316:19–323:10. The only concrete evidence at

18

trial showed that the Board had more than enough funds to cover the expenses associated with accommodating Plaintiffs.  *See* doc. 365 at 58:8–60:18; *see also* doc. 373 at 15.  And the jury accordingly found that the Board denied Plaintiffs' requests for religious exemption "because of intentional or purposeful religious discrimination."  Doc. 346 at 2, 7, 12, 17, 22, 27, 32, 37, 42, 47, 52, 57, 62.

The Board's second argument is equally unavailing.  As discussed above, the Board did not properly rely on controlling law at the time of its denial of Plaintiffs' religious-exemption requests.  *See infra* Section II.B.1.e.  The Board's interpretation of *Hardison* and *Harrell*—which it called "controlling law" at the time of its initial denial—is incorrect.  As the Supreme Court said in *Groff*, an employer following *Hardison* and denying a religious accommodation must show that the accommodation would impose a "substantial burden" on it.  *See Groff*, 600 U.S. at 468.  *Harrell* also requires that employers make this showing on a case-by-case basis.  *Harrell*, 638 F.3d at 979.  The Board did neither of these things and put the Plaintiffs' religious liberties in the back seat.  *See* doc. 229 at 61–63.

However, even if the Board reasonably interpreted controlling law at the time of its initial denial, that would still not justify the Court remitting the punitive damages award or granting a new trial.  The Board cites *BMW* for the proposition that a corporation's reasonable interpretation of the law is "not punishable."  Doc. 369 at 7.  But *BMW* does not extend that far.  In that case, the Supreme Court stated that the defendant corporation's "reasonabl[e] interpret[ation]" of the law was not "sufficiently reprehensible to justify a $2 million award of punitive damages," 517 U.S. at 578—an amount "500 times the amount of . . . actual harm," *id.* at 582.  But the Supreme Court's finding does not preclude an award of less than three times the amount of actual harm for a similar reasonable interpretation.  And the Board rests its argument

19

on the assumption that the Board's interpretation of controlling law was reasonable—a premise the Court rejects.

Therefore, the Court will neither remit the punitive damages award nor award a new trial on the basis of excessive punitive damages.

> ### b.      Whether the Board should have a new trial because it was prohibited from discovering Plaintiffs' medical records

The Board also challenges the Court's denial of certain discovery requests the Board made earlier in the case. *See* doc. 369 at 10. The Board points to three specific requests:

1.  An Interrogatory asking each Plaintiff to identify and list all vaccinations, pharmaceutical products, medications, medicines, remedies, pills, cures, drugs, vitamins, medical treatments, antidotes, or supplements that they have taken, used, ingested, or received since December 1, 2015, regardless of whether they were prescribed, purchased over-the-counter, obtained at a dispensary, or obtained in violation of any federal, state, or local laws, and a Request for Production asking for any documents or correspondence relating to those categories from August 1, 2015 to the present;
2.  A Request for Production seeking any communications between Plaintiffs and any other person regarding his or her medical conditions or injuries, pharmaceutical products, medications, medicines, remedies, pills, cures, drugs, vitamins, medical treatments, antidotes, or supplements from December 1, 2019 to the present; and
3.  A Request for Production seeking each Plaintiff's healthcare records from January 1, 2021 to present, and it was requested that Plaintiffs execute a healthcare record release for each physician.

*Id.* (numbering added). The Court denied requests 2 and 3 and only granted request 1 with respect to Plaintiffs' past vaccinations since December 1, 2015. Doc. 68 at 34:8–35:8. The Court reasoned that the other requests were "overly broad," "not narrowly tailored," "not proportional to the needs of the case," and "[did not] take into account all of the [Rule 26(b)(1)] factors." *Id.* Therefore, these requests did not favorably "balance . . . intrusiveness . . . [with] the likelihood of discovery of relevant information." *Id.* at 35:4–35:6. The Board argues that these determinations were erroneous and warrant a new trial. Doc. 369 at 10.

20

Federal Rule of Civil Procedure 26(b)(1) provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." The "management of discovery is committed to the sound discretion of the trial court." *In re Mo. Dep't of Nat. Res.*, 105 F.3d 434, 435 (8th Cir. 1997). And the Court has "substantial discovery discretion." *In re Lauer*, 371 F.3d 406, 415 (8th Cir. 2004).

The Eighth Circuit's review of a district court's discovery rulings "is both narrow and deferential." *Sallis v. Univ. of Minn.*, 408 F.3d 470, 477 (8th Cir. 2005) (citation modified). The court "will grant a new trial only where the [district court's discovery] errors amount to a gross abuse of discretion resulting in fundamental unfairness." *Moses.com Secs., Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1060 (8th Cir. 2005) (citation modified). Even if the district court does not set forth its reasoning in ruling on a discovery motion, the Eighth Circuit will not reverse its decision if the decision was within the court's discretion, and the complaining party did not suffer prejudice because of the ruling. *See id.*

The Board first claims that the "Plaintiffs' medical records were directly relevant to their claims." Doc. 369 at 10. Given that "*all* the Plaintiffs claim that they are unvaccinated because their religious beliefs prohibit COVID-19 vaccination," the Board argues that "[w]hether any of the Plaintiffs received any COVID-19 vaccinations is directly relevant to all of their claims." *Id.* at 10–11. And yet, "the [Board] had no ability to test the veracity of their unvaccinated status by reviewing relevant medical records," it claims. *Id.* Second, the Board argues that "some of the Plaintiffs stated in their religious exemption paperwork that they do not take any medications, or avoid medications developed using fetal stem cells because of their religious beliefs," so it

should have been allowed to discover information about other medications the plaintiffs took besides vaccines.  *Id.* at 11 (emphasis removed).

The Board's first argument misstates the Court's ruling.  The Court never held that the Board's discovery request sought no relevant information—only that the request swept too broadly.  *See* doc. 68 at 34:17–35:8.  The Board didn't just seek vaccination records in general or COVID-19 vaccination records in particular—it sought all of Plaintiffs' healthcare records, healthcare-related communication, and used pharmaceutical products.  Doc. 60 at 1.  After the Court ruled on the discovery motion, *see* docs. 64, 68, the parties still had nearly six months to conduct discovery, *see* doc. 44 at 2.  The Board could have reissued its request in a narrower fashion.  But it did not.  And the Court's prior discovery ruling does not provide grounds for a new trial.

The Board's second argument does not entitle it to relief, either.  In response to the Court's ruling, the Board could have tailored its discovery requests on a plaintiff-by-plaintiff basis.  Further, even if the evidence the Board requested was admissible and did suggest that Plaintiffs acted inconsistently with their stated religious beliefs, the jury would still likely have found for them, because the jury instructions (correctly) told the jury that Plaintiffs' "[r]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit protection under the law."  Doc. 340 at 24; *see Love v. Reed*, 216 F.3d 682, 687 (8th Cir. 2000).  And "perfect adherence to burdened beliefs is not required" for Plaintiffs to demonstrate the sincerity of their religious beliefs.  *Holt v. Payne*, 85 F.4th 873, 879 (8th Cir. 2023) (per curiam) (citing *Love*, 216 F.3d at 688) (discussing sincerity in the context of the Religious Land Use and Institutionalized Persons Act of 2000).

Additionally, the Board's new-trial argument that it should have been allowed to discover information about other medications the plaintiffs took besides vaccines, doc. 369 at 11, fails for another reason:  the Board failed to adduce any admissible evidence regarding the alleged religious objectionability of other medications.  *See* doc. 365 at 7:6–17:15.  The Board does not explain that it would have adduced other evidence in this regard, or what that evidence would have been.  *See* doc. 369 at 10–11.  And based on the dubious "evidence" the Board attempted to sneak in over the transom through its expert, the Board fails to show how it suffered any prejudice.  *See* doc. 365 at 7:6–17:15.

Therefore, the Court's discovery ruling was not "a gross abuse of discretion resulting in fundamental unfairness," and the Board cannot establish that it consequently suffered prejudice.  *Moses.com Secs., Inc.*, 406 F.3d at 1060.  The Board thus provides the Court with no basis to grant a new trial.

### c.    Whether the Court's given jury instructions contain substantial errors, warranting a new trial

The Board takes issue with jury instructions 8, 9, 10, 11, 12, 13, 15, and 16, and argues that the errors in these instructions "warrant[] a new trial or judgment as a matter of law."  *See* doc. 369 at 7–9.  The Board did not make these arguments in its initial JMOL motion, *see* doc. 338, or in its memorandum in support, *see* doc. 339.  And because a court reviewing a renewed JMOL motion can only "consider[] . . . those grounds advanced in the original[,]" *Nassar*, 779 F.3d at 551, the Court will consider only the Board's arguments advanced in the initial JMOL motion to determine whether to grant a new trial.

The Court "has a great deal of discretion in framing the jury instructions and the court need not give the exact language desired by the parties."  *Ryther v. KARE 11*, 108 F.3d 832, 847 (8th Cir. 1997) (quoting *Campbell v. Vinjamuri*, 19 F.3d 1274, 1277 (8th Cir. 1994)).  The

23

Eighth Circuit limits its review for instructional error to "whether the instructions, taken as a whole and viewed in the light of the evidence and applicable law, fairly and accurately submitted the issues to the jury." *Lincoln Composites, Inc. v. Firetrace USA, LLC*, 825 F.3d 453, 461 (8th Cir. 2016) (quoting *Slidell, Inc. v. Millennium Inorganic Chems., Inc.*, 460 F.3d 1047, 1054 (8th Cir. 2006)).  A court abuses its discretion in denying a new trial based on erroneous jury instructions only if "the errors misled the jury or had a probable effect on the jury's verdict." *Id.* With this standard in mind, the Court now addresses each of the Board's objections.

### i.    Jury Instruction No. 8

Jury Instruction No. 8 reads:

> To determine whether Plaintiff X had a sincerely held religious belief, you must decide two things:  One, whether Plaintiff X had a religious belief and, two, whether Plaintiff X sincerely held that belief.

> First, legal protection only attaches to belief rooted in religion as opposed to purely secular beliefs or personal preferences. A sincere and meaningful belief qualifies for protection if the belief occupies in a place in the life of its possessor parallel to that filled by the orthodox belief in God. But a belief does not qualify as religious if it is essentially political, sociological, or philosophical.

> Nevertheless, a belief can . . . be both secular and religious. Religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit protection under the law.

> Second, a religious belief is sincerely held if it reflects an honest conviction. A religious belief can be sincerely held even if the believer admits that he is struggling with his position or because his beliefs are not articulated with the clarity and precision that a more sophisticated person might employ.

Doc. 340 at 24; doc. 366 at 107:8–108:4.  The Board argues that the instruction "should have included the three factors to determine whether a belief is religious" that the Third Circuit Court of Appeals developed in *Africa v. Commonwealth of Pennsylvania*, 662 F.2d 1025 (3rd Cir. 1981).  Doc. 369 at 8.  The Board also says that the instruction "should have provided factors that allowed the jury to assess the credibility of the Plaintiffs [sic] stated religious beliefs," as the Board's proposed instructions did.  *Id.*; *see* doc 254 at 4; doc. 204 at 3–4.

24

First, in *Africa*, the Third Circuit identified three "useful indicia" to determine whether a plaintiff's stated belief is religious:  whether (1) it addresses "fundamental and ultimate questions having to do with deep and imponderable matters," (2) it's part of a "comprehensive" belief system, and (3) it manifests "certain formal and external signs."  662 F.2d at 1032.  The *Africa* court, weighing those factors, affirmed the district court's determination that a prisoner's demand for a special raw-food diet didn't arise from a religious belief.  *Id.* at 1036–37.

While the Board argues that the Eighth Circuit "examined" these factors in *Love*, 216 F.3d at 687, the Eighth Circuit doesn't put *Africa* on the same pedestal as the Board does.  *See* doc. 229 at 30–31.  As this Court observed in its summary judgment order, the Eighth Circuit has cited *Africa* three times, and it has *never* used the case to reject a party's claim to a protectable religious belief.  *See Love*, 216 F.3d at 691 (upholding the Free Exercise claim); *Wiggins v. Sargent*, 753 F.2d 663, 666 (8th Cir. 1985) (reversing the district court's determination that the plaintiff's beliefs were "purely secular"); *Stanko v. Patton*, 228 F. App'x 623, 625 (8th Cir. 2007) (per curiam) (reversing the district court's determination that a prisoner's First Amendment claim was frivolous).  While the *Love* court applied *Africa* as a test (and concluded that the plaintiff's purported religious beliefs passed the test), the court emphasized that *Africa* does not impose a rigid test for defining a religion.  *Love*, 216 F.3d at 687.  Instead, courts must assess belief systems with flexibility, and the *Africa* factors can be helpful "indicia" for that assessment.  *See id.*

Second, the Court disagrees that its instruction limited the jury's ability to assess Plaintiffs' credibility.  Jury Instruction No. 8 specifically asked the jury to decide whether Plaintiffs sincerely held their religious beliefs.  *See* doc. 366 at 107.  The jury's examination of Plaintiffs' sincerity includes a credibility determination.

25

The Board does not allege that the Court's instructions failed to "fairly and accurately submit[] the issues to the jury." *Lincoln*, 825 F.3d at 461.  And the Board does not claim that the Court's alleged errors, even if true, "misled the jury or had a probable effect on the jury's verdict." *Id.* (citation modified).  Therefore, the Board provides the Court with no basis to grant a new trial.

### ii.     Jury Instruction No. 9

Jury Instruction No. 9 reads:

> You must find for Plaintiff X and against Defendant Board of Education of the City of St. Louis ("Defendant") for Section 1983 Free Exercise of Religion if Plaintiff X has shown, by the greater weight of the evidence, that Defendant prevented Plaintiff X from engaging in a sincerely motivated religious exercise. Plaintiff X will have made this showing if he or she has shown that Defendant suspended without pay or terminated Plaintiff X for engaging in conduct motivated by his or her sincerely held religious beliefs.

> However, you must find for Defendant and against Plaintiff X if you find that Plaintiff X is not entitled to recovery by reason of Instruction No. 11.

Doc. 340 at 25; doc. 366 at 108:6–17.  The Board protests that this instruction erroneously asked the jury to find for Plaintiffs if the Board prevented them from engaging in conduct "motivated by" their religious beliefs.  *See* doc. 369 at 8.  Instead, the Board argues that the Court should have instructed the jury on the "'substantial burden' standard for free exercise."  *Id.*

First, the Board does not allege that the Court's instructions failed to "fairly and accurately submit[] the issues to the jury." *Lincoln*, 825 F.3d at 461.  Second, the Board does not claim that the Court's alleged errors, even if true, "misled the jury or had a probable effect on the jury's verdict." *Id.* (citation modified).  Nor could the Board make such claims.  In *Kennedy v. Bremerton School District*, the Supreme Court found that the plaintiff successfully established a free exercise violation when his employer disciplined him for his decision to persist in a sincerely motivated religious exercise.  *See* 597 U.S. 507, 525–26 (2022).  Here, the Court's

26

instruction asks the jury to determine whether a free exercise violation occurred based on the same framework of facts.  Therefore, the Board provides the Court with no basis here to grant a new trial.

### iii.    Jury Instruction No. 10

Jury Instruction No. 10 reads:

> If you find for Plaintiff X for Section 1983 Free Exercise of Religion under Instruction No. 9, then you must also find for Plaintiff X and against Defendant for Section 1983 Equal Protection if Plaintiff X has shown, by the greater weight of the evidence, each of the following:
>
>> *First*, When Defendant denied Plaintiff X's request for a religious exemption, Defendant treated Plaintiff X differently than Defendant treated others who were similarly situated in all relevant respects to Plaintiff X, and
>>
>> *Second*, Defendant, in subjecting Plaintiff X to disparate treatment, treated Plaintiff X differently because of intentional or purposeful religious discrimination.
>
> However, you must find for Defendant and against Plaintiff X if you find that Plaintiff X is not entitled to recovery by reason of Instruction No. 11.

Doc. 340 at 26; doc. 366 at 108:19–109:8.  The Board claims that this instruction "blended" Plaintiffs' Equal Protection and Free Exercise claims, "improperly instruct[ing] the jury that they must find for a [p]laintiff on the Equal Protection Claim if they find for that [p]laintiff on the Free Exercise claim when they are wholly separate claims with different elements and requirements."  Doc. 369 at 8.  The Court disagrees.

The instruction does not *require* the jury to find for Plaintiffs on Equal Protection just because the jury found for them on Free Exercise.  Instead, the instruction says that if the jury found for Plaintiffs for Free Exercise, the jury must find for Plaintiffs on Equal Protection only if they make two additional conclusions:  (i) the Board treated Plaintiffs differently from others similarly situated, and (ii) it did so because of intentional and

purposeful religious discrimination.  *See* doc. 366 at 108:19–109:8.

The instruction comports with the law.  The Equal Protection Clause provides "that all persons similarly situated should be treated alike."  *Cleburne*, 473 U.S. at 439 (citation omitted).  To allege an Equal Protection claim, a plaintiff must prove that (i) he was treated differently compared to others who were similarly situated, and (ii) defendants had "an unlawful intent to discriminate against [him] for an invalid reason," like his religion.  *Altman*, 251 F.3d at 1203 n.3.  The instruction's additional two elements mirror those requirements; they ask the jury to determine whether Plaintiffs were treated differently from others similarly situated based on the Board's purposeful religious discrimination.

So, the Court's instructions "fairly and accurately submitted the issues to the jury." *Lincoln*, 825 F.3d at 461.  And the Board does not claim that the Court's alleged errors, even if true, "misled the jury or had a probable effect on the jury's verdict."  *Id.* (citation modified). Therefore, the Board provides the Court with no basis to grant a new trial.

### iv.    Jury Instruction No. 11

Jury Instruction No. 11 reads:

> You must find for Defendant and against Plaintiff X for Section 1983 Free Exercise of Religion and Section 1983 Equal Protection if Defendant has proven, by the greater weight of the evidence, each of the following:
>
> > *First*, Denying Plaintiff X an exemption from the vaccination policy was necessary to:
> >
> > > a. Ensure that Defendant could adequately educate all students in the school district, or
> > >
> > > b. Stem the spread of COVID-19.
> >
> > *Second*, Defendant could not have achieved either of these interests through alternative means less restrictive of Plaintiff X's sincerely held religious beliefs.

28

Doc. 340 at 27; doc. 366 at 109:10–21.  The Board first protests that "[t]his instruction requires the jury to apply strict scrutiny to the constitutional claims when the jury should have been instructed on the rational basis test."  Doc. 369 at 9.  The Board further argues that "the Court should have included a third compelling interest – protecting the health, safety, and welfare of the students."  *Id.*

Unlike what the Board's first argument claims, strict scrutiny is the proper standard to evaluate Plaintiffs' Equal Protection and Free Exercise claims.  As discussed above, *see infra* Section II.B.1.b, when a plaintiff claiming an Equal-Protection violation shows that he faced unlawful discrimination compared to those similarly situated, only satisfying strict scrutiny can save the discriminatory state action from unconstitutionality.  *See Peter*, 155 F.3d at 996–97.  Here, the jury found that the Board treated Plaintiffs differently than others similarly situated, triggering strict scrutiny for Plaintiffs' Equal Protection claim.  *See* doc. 346 at 1, 6, 11, 16, 21, 26, 31, 36, 41, 46, 51, 56, 61.  In its summary judgment order, the Court similarly found that strict scrutiny applies to Plaintiffs' Free Exercise claims.  *See* doc. 229 at 37–48.  The Board claims that "[m]ultiple federal circuit courts have applied the rational basis test to COVID-19 vaccination," doc. 369 at 9, but provides no concrete legal basis from binding authority to challenge this Court's prior determinations.

The Board's second argument does not invalidate the Court's instruction, either.  First, the Board provides no authority mandating that the Court's instruction contain additional compelling interests.  Additionally, the compelling interest of "[stemming] the spread of COVID-19," *see* doc. 366 at 109:18, provided by the Court's instruction, includes the Board's proposed compelling interest.  Because the spread of COVID-19 caused the only relevant threats to the "health, safety, and welfare" of the Board's students, and the Court's instruction allowed

29

the jury to consider the Board's interest in stopping the spread of COVID-19, the instruction

thereby allowed the jury to examine the Board's interest in protecting its students by stemming

the spread of the threat.  And the Board provides no reason why it suffered prejudice from the

Court's formulation of this interest.  Therefore, the Board provides the Court with no basis to

grant a new trial.

**v.    Jury Instruction No. 12**

Jury Instruction No. 12 reads:

> You must find for Plaintiff X and against Defendant for Title VII failure to accommodate and MHRA failure to accommodate if Plaintiff X has shown, by the greater weight of the evidence, each of the following:
>
> > *First*, Plaintiff X had a sincerely held religious belief that conflicted with an employment requirement.
> >
> > *Second*, Plaintiff X informed Defendant of this belief.
> >
> > Third, Defendant suspended without pay or terminated Plaintiff X for failing to comply with the conflicting requirement of employment.
>
> However, you must find for Defendant and against Plaintiff X if you find that Plaintiff X is not entitled to recovery by reason of Instruction No. 13.

Doc. 340 at 28; doc. 366 at 109:23–110:11.  The Board first argues that the Court "improperly

combine[d] the MHRA and Title VII claims."  Doc. 369 at 9.  Second, it claims that Plaintiffs

"pleaded religious discrimination claims . . . and never even mentioned accommodations."  *Id.*

Third and finally, the Board states that "MHRA and Title VII religious discrimination claims

have different elements and damages; accordingly, the Court should have instructed the jury

based on the Missouri Approved Instructions and 8th Circuit Model Jury Instructions."  *Id.*

To the Board's first argument, the Court finds that its jury instructions "fairly and

accurately submitted the issues to the jury."  *Lincoln*, 825 F.3d at 461.  "The failure to

reasonably accommodate an employee's religious practices . . . constitute[s] religious

discrimination under Title VII."  *Cole v. Grp. Health Plan, Inc.*, 105 F.4th 1110, 1114 (8th Cir.

30

2024).  The MHRA, like Title VII, requires employers to make reasonable accommodations to the religious needs of their employees.  *See Sedalia No. 200 Sch. Dist. v. Mo. Comm'n on Hum. Rts.*, 843 S.W.2d 928, 930 (Mo. Ct. App. 1992) (noting that a plaintiff "carries the burden of establishing a prima facie case of religious discrimination" where he "demonstrates 1) a bona fide belief that compliance with an employer's requirement would be contrary to his or her religious belief, 2) the employer has been so notified, and, 3) the employee was discharged for failing to comply with the requirement").  Here, the three elements of the Court's jury instruction accurately make out a claim of religious discrimination under Title VII and the MHRA; the instruction does not "improperly combine" the two statutes.  The Board does not point to any part of the Court's instruction that misstates the law unfairly or inaccurately.  *See Lincoln*, 825 F.3d at 461.

The Board's second argument tries to differentiate between religious-discrimination claims and claims involving a failure to accommodate a religious belief.  Doc. 369 at 9.  This distinction is not based in law; a failure to accommodate an individual's sincerely held religious beliefs *is* religious discrimination.  *See Cole*, 105 F.4th at 1114.  Here, the Board's failure to accommodate Plaintiffs' religious exercise by imposing its vaccine mandate was religious discrimination against them.

The Board's third argument is similarly unconvincing.  If, as the Board asks, the Court followed Missouri's Approved Instruction for the jury instruction on Plaintiffs' MHRA claims, the instruction would have said:

> Your verdict must be for plaintiff if you believe:
>
> First, defendant [suspended without pay or terminated] plaintiff, and
>
> Second, plaintiff's [religion] actually played a role in and had a determinative influence on such action, and

31

Third, such conduct directly caused damage to plaintiff.

\* [unless you believe plaintiff is not entitled to recover by reason of Instruction Number [13]].

Mo. Approved Jury Instr. (Civil) 38.06 (8th ed.).  If the Court followed the Eighth Circuit's Model Jury Instructions for the jury instruction on Plaintiffs' Title VII claims, the instruction would have said:

Your verdict must be for [the plaintiff] and against defendant [Board] on plaintiff's [Title VII failure to accommodate] claim if all the following elements have been proved:

*First*, the defendant [suspended without pay or terminated] the plaintiff; and

*Second*, the plaintiff's [religion] [was a motivating factor] in the defendant's decision.

If either of the above elements has not been proved, your verdict must be for the defendant and you need not proceed further in considering this claim. [You may find that the plaintiff's [religion] [was a motivating factor] in the defendant's [decision to suspend without pay or terminate] if it has been proved that the defendant's stated reason(s) for its (decision) [(is) (are)] a pretext to hide [religious] discrimination.]

Manual Model Civ. Jury Instr. for Dist. Cts. 8th Cir. (Civil) 5.40 (2023) (emphasis in original) (citation modified).  Based on this, the jury's findings on the Court's jury instructions would have also found for the Plaintiff under both Missouri's approved jury instructions and the Eighth Circuit's model jury instructions.  Here, the jury found that the Board suspended without pay or terminated each plaintiff.  *See* doc. 346 at 3, 8, 13, 18, 23, 28, 33, 38, 43, 48, 53, 58, 63.  This would have met element one in both Missouri's and the Eighth Circuit's jury instructions.  The jury additionally found that the Board, when it denied Plaintiffs' requests for religious exemption, did so "because of intentional or purposeful religious discrimination."  *See id.* at 2, 7, 12, 17, 22, 27, 32, 37, 42, 47, 52, 57, 62.  This would be sufficient to find for Plaintiffs on element two in both Missouri's and the Eighth Circuit's jury instructions.  And the jury's finding

32

of damages for each plaintiff would have been sufficient to find for Plaintiffs on element three in Missouri's jury instructions. *See id.* at 5, 10, 15, 20, 25, 30, 35, 40, 45, 50, 55, 60, 65. The Board thus suffered no prejudice from the Court's jury instruction. Therefore, the Board provides the Court with no basis to grant a new trial.

### vi. Jury Instruction No. 13

Jury Instruction No. 13 reads:

> You must find for Defendant for Title VII failure to accommodate an MHRA failure to accommodate if Defendant has shown, by the greater weight of the evidence, that accommodating Plaintiff X's sincerely held religious beliefs would have imposed an undue hardship on Defendant's business. An undue hardship exists when the burden of granting an accommodation would have resulted in substantial increased costs in relation to the conduct of Defendant's particular business.

> In determining whether an undue hardship exists, you should take into account all relevant factors, including the particular accommodations at issue, and their practical impact in light of the nature, size, and operating cost of Defendant's business.

Doc 340 at 29; doc. 366 at 110:13–111:1. The Board argues that this instruction "should have specified that the jury could find an undue hardship based on intangible risks, such as the health and safety risk imposed by unvaccinated individuals during the relevant timeframe." Doc. 369 at 9. This argument does not warrant a new trial.

First, the Court's instructions asked the jury to "take into account all relevant factors," which already enabled the jury to examine the intangible risks that the Board describes. Second, the language of the Court's instruction came straight from *Groff v. DeJoy*, 600 U.S. 447 (2023), which is the most up-to-date binding precedent on Title VII's undue-hardship standard. Therefore, the Court's instructions "fairly and accurately submitted the issues to the jury." *Lincoln*, 825 F.3d at 461. Furthermore, the Board does not claim that the Court's alleged error, even if true, "misled the jury or had a probable effect on the jury's verdict." *Id.* (citation modified). Therefore, the Board provides the Court with no basis to grant a new trial.

33

vii.        Jury Instruction Nos. 15–16

Jury Instruction No. 15 reads:

> If you find in favor of Plaintiff X for MHRA failure to accommodate under Instruction No. 12, and if you find, by clear and convincing evidence, that the conduct of Defendant as submitted in Instruction No. 12 was outrageous because of Defendant's evil motive or reckless indifference to the rights of others, then in addition to any damages to which you find Plaintiff X entitled under Instruction No. 14, you may award Plaintiff X an additional amount as punitive damages in such sum as you believe will serve to punish Defendant and to deter Defendant and others from like conduct.

Doc. 340 at 32; doc. 366 at 112:12–22.  Jury Instruction No. 16 reads:

> You must not award Plaintiff X an additional amount as punitive damages under Instruction No. 15 unless you believe the conduct of Defendant as submitted in Instruction No. 12 was outrageous because of Defendant's evil motive or reckless indifference to the rights of others.

Doc. 340 at 33; doc. 366 at 112:23–13:3.  The Board objects that these instructions on punitive damages were improper for the same reasons discussed above.  *See infra* Section II.B.1.e.  As explained above, the Court disagrees with the Board and will not grant a new trial based on the alleged impropriety of this instruction.  *See id.*

III.    **The Plaintiff's motion for attorneys' fees and costs, and Adams and Burton's motion for costs**

The Court now considers Plaintiff's motion for attorneys' fees and costs, docs. 353, 355, and Adams and Burton's motion for costs, doc. 350, 351.  Plaintiffs, as prevailing parties, ask the Court for attorneys' fees pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 2000e-5(k), and the Missouri Human Rights Act: Mo. Rev. Stat. § 213.111.2, as well as costs pursuant to Federal Rule of Civil Procedure Rule 54(d)(1).  Adams and Burton—who the Court entered judgment in favor of and dismissed the claims against at summary judgment, *see* doc. 229 at 76; doc. 230—now ask the Court for costs, as prevailing parties, *see* docs. 350, 351.

A.    **Legal Standard**

34

1.    **Attorneys' fees**

"In the United States, parties are ordinarily required to bear their own attorney's fees—the prevailing party is not entitled to collect from the loser." *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res.*, 532 U.S. 598, 602 (2001) (citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975)).  "Under this 'American Rule,' [courts] follow 'a general practice of not awarding fees to a prevailing party absent explicit statutory authority.'"  *Id.* (quoting *Key Tronic Corp. v. United States*, 511 U.S. 809, 819 (1994)).  Here, Sections 1988, 2000e-5(k), and the Missouri Human Rights Act authorize an attorneys' fee award to prevailing parties.

In *Hensley v. Eckerhart*, the United States Supreme Court held that courts awarding attorney's fees must consider:  (1) whether an award is appropriate; and (2) the value of the services rendered as determined by the "lodestar" method.  *See* 461 U.S. 424, 433 (1983).  The lodestar is calculated by determining the number of hours reasonably expended on the case and multiplying them by the applicable hourly market rate for the relevant legal services.  *See id.*

The lodestar method "is meant to produce 'an award that roughly approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case.'"  *League of Women Voters of Mo. v. Ashcroft*, 5 F.4th 937, 939 (8th Cir. 2021) (emphasis omitted) (quoting *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551 (2010)).  The lodestar method enjoys a "strong presumption" of reasonableness, although "that presumption may be overcome in those rare circumstances in which the lodestar does not adequately take into account a factor that may properly be considered in determining a reasonable fee."  *Perdue*, 559 U.S. at 553–54.  The Court will apply the lodestar method in its attorneys' fee calculations below.

2.    **Costs**

Federal Rule of Civil Procedure 54(d)(1) provides that "costs . . . should be allowed to the prevailing party."  Prevailing parties can recover costs including (1) fees of the clerk and marshal, (2) fees for transcripts necessarily obtained for use in the case, (3) fees for printing and witnesses, (4) fees for copies of papers necessarily obtained for use in the case, (5) docket fees, and (6) compensation of court-appointed experts and interpreters.  *See* 28 U.S.C. § 1920.  "The party seeking to recover costs must fully establish the amount of compensable costs and expenses to which it is entitled."  *Abt Sys., LLC v. Emerson Elec. Co.*, No. 4:11-cv-00374-AGF, 2016 WL 5470198, at *2 (E.D. Mo. Sept. 29, 2016) (citing *In re Williams Sec. Litig. WCG Subclass*, 558 F.3d 1144, 1148 (10th Cir. 2009)).  Upon establishing such entitlement to costs, the "prevailing party is presumptively entitled to recover all of [these] costs."  *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 579 F.3d 894, 897 (8th Cir. 2009) (quoting *Thompson v. Wal-Mart Stores, Inc.*, 472 F.3d 515, 517 (8th Cir. 2006)).  "Despite this presumption, however, the district court has substantial discretion in awarding costs to a prevailing party."  *Greaser v. State, Dep't of Corr.*, 145 F.3d 979, 985 (8th Cir. 1998); *see also Cross v. Gen. Motors Corp.*, 721 F.2d 1152, 1157 (8th Cir. 1983) (permitting a district court to examine a party's financial resources when awarding costs).  While the Court has discretion in determining the amount of costs, only the categories of costs set forth in section 1920 may be taxed.  *See Crawford Fitting Co. v. J. T. Gibbons, Inc.*, 482 US. 437, 445 (1987).

### B.    Discussion

#### 1.    Plaintiffs' attorneys' fees and costs

Plaintiffs' counsel includes four individuals:  attorneys Kevin Kasper and Ryan Schellert, and paralegals Amanda Miller and Pamela Goyins.  *See* doc. 354 at 6.  The Court first examines their request for attorneys' fees by analyzing the reasonableness of their fees and hours and then examines their request for costs based on the standards outlined in section 1920.

a.       **Reasonable fees**

Attorney Kevin Kasper graduated from the University of Missouri School of Law in May

of 2002 and has been practicing law in Missouri since September 2002.  *Id.*  He has appeared

before the Eighth Circuit Court of Appeals and the Missouri Court of Appeals and has first-

chaired 20 jury trials to verdict.  *See id.*  He is currently the managing member of the Kasper

Law Firm, LLC.  *Id.*  Attorney Ryan Schellert is a 2004 graduate from the University of Missouri

School of Law and has been licensed to practice law since 2004.  *Id.*  He has worked for the

Kasper Law Firm from 2013 onwards.  *Id.*  Paralegal Amanda Miller graduated from Sanford

Brown College in 2010 with an associate degree in paralegal studies.  *Id.*  She has worked in the

legal field since 2010 and worked at the Kasper Law Firm since 2013.  *See id.*  Paralegal Pamela

Goyins is a 2010 Graduate from Sanford Brown College with an associate degree in paralegal

studies.  *Id.*  She has worked for the Kasper Law Firm as a paralegal since 2015.  *Id.*

Plaintiffs ask for a fee of $600 per hour for each attorney and $250 per hour for each

paralegal.  *Id.* at 8.  They support the reasonableness of their hourly rates by providing the Court

with two declarations, *see* docs. 354-6 and 354-7, and by detailing the past fee awards they

received, fee awards from other employment cases, the applicable portion of the USAO

Attorneys' Fees Matrix, and adjustments for inflation.  Doc. 354 at 9–11.

The Board disputes Plaintiffs' proposed fee amounts, and argues that Plaintiffs' counsel's

reasonable fee rates are "$400 per hour for Kevin Kasper, $300 per hour for Ryan Schellert, and

$100 for each paralegal."  Doc. 370 at 10.  To support the reasonableness of their hourly rates,

the Board cites fee awards in other employment cases and the *Missouri Lawyers Weekly*

magazine's billing rates survey.  *Id.* at 9–10.

Based on its review of the parties' filings and "its own experience and knowledge of

prevailing market rates," *Woodward v. Credit Serv. Int'l Corp.*, 132 F.4th 1047, 1056 (8th Cir.

2025) (citation omitted), the Court concludes that a fee of $600 per hour for each attorney and $200 per hour for each paralegal is reasonable. Accordingly, the Court uses these rates when calculating the lodestar.

### b. Reasonably expended hours

The Court next determines the number of hours that Plaintiffs' counsel reasonably expended on this case. "[A]ny fees must be 'reasonably expended,' so that services that were redundant, inefficient, or simply unnecessary are not compensable." *See Jenkins ex rel. Jenkins v. Missouri*, 127 F.3d 709, 716 (8th Cir. 1997) (quoting *Hensley*, 461 U.S. at 434). The prevailing party must be mindful that "[h]ours that are not properly billed to one's client also are not properly billed to one's adversary." *Hensley*, 461 U.S. at 434 (citation omitted) (emphasis omitted). The Board correctly notes that the Court may reduce attorneys' fees "when recordkeeping is poor or block billing is submitted" and when "purely clerical tasks" are "billed at paralegal or attorney rates." *Gruttemeyer v. Transit Auth.*, 31 F.4th 638, 651 (8th Cir. 2022) (citing *Missouri v. Agyei ex rel. Jenkins*, 491 U.S. 274, 288 n.10 (1989)).

Plaintiffs' counsel claims that they reasonably expended 2,599 hours on this case, which includes 1,805 hours spent on tasks related to the case in general and an additional 794 hours spent on tasks specific to the plaintiffs. Doc. 354 at 6–8. They state that they have removed 791.5 hours spent on tasks specific to many plaintiffs who had settled or accepted offers of judgment inclusive of attorneys' fees. *See id.* at 7; *see also* doc. 354-1 at 3.

The Board responds that many of the hours that Plaintiffs' counsel worked are for clerical tasks, and other time entries are vague, block-billed, or excessive. *See* doc. 370 at 5–6. The Board also argues for a pro rata reduction of the 1,805 hours that Plaintiffs' counsel spent on tasks related to the case in general, based on the number of plaintiffs that remained at any given stage of the case. *Id.* at 8–9. For example, because 13 out of the original 43 plaintiffs went to

trial, the Board argues that the Court should reduce Plaintiffs' counsel's fees by 70% (because 30% of the original plaintiffs remained at this point) for all worked performed during the period in which those 13 plaintiffs were the only plaintiffs in the case. *Id.* The Court takes each of these arguments in turn.

Upon review of Plaintiffs' counsel's billing records, the Court finds that entries totaling $12,540 contain infirmities. The attached document, doc. 377-1, highlights all of Plaintiffs' fee entries containing infirmities, according to this color scheme:

1.  Entries for clerical work,

2.  Entries that are vague or contain insufficient description,

3.  Block-billed entries, and

4.  Entries for tasks unnecessary to (or unsubstantiated as necessary to) this case.

The total value of such entries is $12,540, and the Court reduces Plaintiffs' counsel's attorneys' fees accordingly.

The Court finds the Board's argument for pro rata reduction unconvincing, however. This argument rests on the flawed premise that the settlement or dismissal of a plaintiff reduces the amount of the work in the case pro rata. The Board cites no sound basis for this, and on these facts, the Court rejects this argument. And Plaintiffs' counsel already removed from its reasonable hours the hours it spent working for specific plaintiffs who resolved their claims, doc. 354 at 7; *see also* doc. 354-1 at 3, the Court will not diminish counsel's hours further on account of those plaintiffs.

### c.    Plaintiffs' costs

Plaintiffs additionally ask for costs totaling $42,706.83. Doc. 354 at 11. The Board does not dispute Plaintiffs' entitlement to these costs. The Court also finds that all of Plaintiffs' costs

properly fall within section 1920's categories.  Therefore, the Court orders the Board to pay

Plaintiffs their costs in the amount of $42,706.83.

### d.    Total amount

Using the rates discussed above, the Court calculates Plaintiff's counsel attorneys' fees as

$1,270,920, prior to any reduction:

| Employee | Hours | Rate | Amount |
|---|---|---|---|
| Attorney Kasper | 1176.1 | $600.00 | $705,660.00 |
| Attorney Schellert | 701.7 | $600.00 | $421,020.00 |
| Paralegal Miller | 615.9 | $200.00 | $123,180.00 |
| Paralegal Goyins | 105.3 | $200.00 | $21,060.00 |
| | | | $1,270,920.00 |

*See* doc. 354 at 8.  As discussed above, the Court reduces this fee award by $12,540.

This results in a total fee award of $1,258,380.  Plaintiffs also seek interest on the judgment, as

provided by 28 U.S.C. § 1961, which the Board does not dispute.  *See* doc. 354 at 14; doc. 370.

Accordingly, the Court awards Plaintiffs attorneys' fees of $1,258,380, costs of $42,706.83.

Interest on these amounts begins to accrue, at the highest allowable rate, from the entry of

judgment.  28 U.S.C. § 1961.

### 2.    Adams's and Burton's costs

Former defendants Adams and Burton ask for costs totaling $60,721.37.  Doc. 351 at 1.

They claim that they became prevailing parties when the Court granted judgment in their favor

and dismissed the claims against them.  *See* doc. 229 at 76; doc. 230.  They seek "the costs of

transcript and video depositions services associated with Plaintiffs' depositions," which they

argue "were reasonably necessary to the defense of this matter."  Doc. 352 at 2–3 (citation

modified).  Because the total costs associated with these services was $91,082.05, and Adams

and Burton were two of the three defendants in this case up until they were dismissed (leaving

the Board the sole defendant), they ask for two-thirds of the costs, totaling $60,721.37.  *Id.* at 7.

Plaintiffs object on many grounds:  First, because the number of plaintiffs changed throughout the case, they claim it is unclear "who exactly is being described when [Adams and Burton] ask the Court to . . . tax costs."  Doc. 371 at 4.  Second, because there were 16 plaintiffs in the case when the Court entered judgment for Adams and Burton, Plaintiffs argue that Adams and Burton are only "prevailing parties as to those sixteen plaintiffs the Court referenced in its summary judgment memorandum and order."  *Id.*  Third, Plaintiffs argue that Adams's and Burton's expenses for 42 of the original plaintiffs were not reasonably necessary for them to prevail on summary judgment against 16 plaintiffs.  *Id.* at 5.  Fourth, because Adams and Burton were employees of the Board (which Plaintiffs claim presumably paid for Adams's and Burton's defense fees), and the Board was a non-prevailing party, an award in favor of Adams and Burton—in effect—allows the Board to inequitably recover costs as a non-prevailing party.  *Id.* at 6–7.  Fifth, it would be inequitable to assess costs against Plaintiffs, who are "individuals . . . with limited resources and are a prevailing party against the employers of the Defendants Adams and Burton."  *Id.* at 7.  And sixth, Adams and Burton have not proven that they "are financially responsible" for the costs that they submitted to the Court.  *Id.*  Plaintiffs then argue that many of the costs that Adams and Burton list on their Bill of Costs, doc. 350, are not costs that they can recover under section 1920.  *Id.* at 7–11.

The Court agrees with Plaintiffs.  All of Adams's and Burton's costs are "fees for printed or electronically recorded [deposition] transcripts."  Doc. 350 at 1; *see* 28 U.S.C. § 1920(2).  But to convince the Court to tax these costs against Plaintiffs, Adams and Burton "must fully establish" that they are "entitled" to "the amount of compensable costs and expenses."  *Abt Sys., LLC*, 2016 WL 5470198, at *2 (citing *In re Williams Sec. Litig. WCG Subclass*, 558 F.3d at 1148).  None of their arguments establish *their* entitlement to these costs.

Because "[t]here were three defendants at the time" of the depositions Adams and Burton seek costs for, and Adams and Burton both make up two out of three defendants, they ask for two-thirds of the total costs of taking those depositions.  Doc. 352 at 7.  But they do not prove that they personally incurred *any* of these costs, much less that they incurred two-thirds of them. Adams and Burton are correct that there were three defendants at the time of the relevant depositions.  But the third defendant was the Board, for which Adams and Burton worked and with whom they shared counsel.  *See* doc. 126.  After the Court dismissed Adams and Burton from this case, doc. 229 at 76, the Board litigated the case to trial, presumably incurring all of its costs.  Adams and Burton fail to offer any evidence that they personally, rather than the Board, shouldered the litigation costs before their dismissal as well.

As Plaintiffs claim, "[i]ndemnification clauses in superintendent/administrative contracts . . . is a standard practice in school districts like the . . . [Saint Louis Public School District]." Doc. 371 at 7.  Absent any evidence, the Court is not convinced Adams and Burton incurred two-thirds of the defendants' deposition expenses.

Additionally, the Court finds that it would be inequitable to tax these costs against Plaintiffs.  When the case began, there were 43 plaintiffs.  *See* doc. 24 at 10.  Only 16 were part of the case when Adams and Burton were dismissed, and only 13 went to trial.  Doc. 371 at 5. To tax 13 plaintiffs for the deposition costs incurred by litigation stemming from 43 would be inequitable.  Further, Plaintiffs are public-school educators, doc. 24 at 4–10, and possess "limited resources," doc. 371 at 6–7.  Making them incur costs totaling $60,721.37 would be inequitable, particularly given the evidence at trial that the Board possesses substantial resources, *see* doc. 365 at 58:8–60:18; *see also* doc. 373 at 15.  *See Cross*, 721 F.2d at 1157 (permitting a district court to examine a party's financial resources when awarding costs).

## IV.    Conclusion

Accordingly, the Court denies with prejudice the Board's [368] motion for judgment as a matter of law or, in the alternative, for a new trial.  The Court also grants Plaintiffs' [353] [355] motion for attorneys' fees and costs and denies Adams and Burton's [350] [351] motion for costs.  The Court awards Plaintiffs attorneys' fees of $1,258,380 and costs of $42,706.83, with interest accruing pursuant to 28 U.S.C. § 1961.

So ordered this 23rd day of December 2025.

_____
STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE